UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| FIRST CONNECTICUT CONSULTING GROUP, INC., | : | Bankruptcy Case No. 02-50852 |
| | : | |
| Debtor. | : | |
| _____ | : | |
| | : | |
| In re: | : | Chapter 7 |
| | : | |
| JAMES J. LICATA, | : | Bankruptcy Case No. 02-51167 |
| | : | |
| Debtor. | : | |
| _____ | : | |
| | : | |
| RICHARD M. COAN, as Chapter 7 Trustee | : | **Adv. Pro. 09-05010** |
| of FIRST CONNECTICUT | : | |
| CONSULTING GROUP, INC., | : | |
| and RONALD I. CHORCHES, as Chapter | : | |
| 7 Trustee of JAMES J. LICATA, | : | |
| | : | |
| Plaintiffs, | : | |
| V. | : | |
| | : | |
| CYNTHIA LICATA, JAMES LICATA, | : | |
| EAST COAST INVESTMENTS, LLC | : | |
| AND FIRST CONNECTICUT HOLDING | : | |
| GROUP LLC, IV, MICHAEL LANDER, | : | |
| TUCKER LICATA, NATASHA YEOH, | : | |
| JESSICA LICATA, CHARTER | : | |
| HOLDINGS, LLC, KNOX TRUCKING | : | |
| LLC AND MIGHTY SEVEN ANGELS, | : | |
| LLC              :: | : | |
| | : | |
| Defendants. | : | JULY 2, 2021 |

## AMENDED AND SUPPLEMENTAL COMPLAINT

Plaintiffs, **RICHARD M. COAN**, Chapter 7 Trustee of **First Connecticut Consulting**

**Group, Inc.**, Debtor in the United States Bankruptcy Court, District of Connecticut, Case No. 02-

1

50852, and **RONALD I. CHORCHES**, Chapter 7 Trustee of **James J. Licata**, Debtor, Case No. 02-51167 in the United States Bankruptcy Court, District of Connecticut, by and through their undersigned counsel, as and for their amended and supplemental complaint against Defendants Cynthia Licata, James, East Coast Investment, LLC, First Connecticut Holding Group, LLC IV, Santa Fe Development, LLC, Santa Fe Holdings, LLC, Charter Holdings, LLC, Knox Trucking, LLC, Mighty Seven Angels, LLC, Tucker Licata, Michael Lander, Natasha Yeoh, and Jessica Licata allege and show to the Court as follows:

## NATURE OF THE ACTION

1.      This is an action for fraudulent transfer, breach of fiduciary duty, unjust enrichment and related claims.

## SUBJECT MATTER JURISDICTION

2.      The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1334.

3.      This action is based upon and arises from and under the rules of the United States Bankruptcy Code, 11 U.S.C. §101 *et seq.*

4.      Venue is proper in this Court under 28 U.S.C. § 1409.

5.      Defendant Cynthia Licata is a resident of the State of Connecticut and the State of Florida and the wife of debtor James Licata.

6.      Defendant East Coast Investments, LLC is a limited liability company formed under the laws of the State of Florida. Its principals include members of the firm that represented the debtor James Licata in his criminal prosecution in *United States v. Licata*, Case No. 3:06-cr-0075.

7.      Defendant James Licata is the Debtor in this bankruptcy case in chief, which case is pending in this district.

8.      Defendant First Connecticut Holding Group, LLC IV ("FCHG IV") is a New

2

Jersey limited liability company having a principal place of business in the State of Connecticut.

## GENERAL ALLEGATIONS

9.      On September 30, 2002, FCCG filed a petition for relief under Chapter 11 of the United States Bankruptcy Code  (the "FCCG Bankruptcy").

10.     On June 21, 2002, Licata filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Licata Bankruptcy").   (The Licata Bankruptcy and the FCCG Bankruptcy are sometimes referred to herein as the "Bankruprtcy Cases." Licata and FCCG are sometimes referred to herein as the "Debtors.")

11.     In the Bankruptcy Cases, the Debtors' estates consisted of, *inter alia,* a group of assets (the "Assets") which eventually became subject to sale by auction, as more fully described herein.

12.     On March 11, 2005, the Debtors filed a motion for permission to sell substantially all of their assets (the "March Sale Motion") based upon a non-binding term sheet ("term sheet") executed by SWJ, a purported purchaser  pursuant to an as yet undrafted Asset Purchase Agreement ("APA").  Pursuant to the March Sale Motion, the Debtors were to sell certain assets to SWJ for $5.5 million.

13.     Upon information and belief, counsel for the Debtors believed (i) that Licata was funding the purchase of the Assets by SWJ, and (ii) that Licata had secreted substantial funds, including, but not limited to, funds with his wife, Cynthia Licata.  The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

14.     On April 25, 2005, the parties entered into the APA, subject to approval of the United States Bankruptcy Court.

15.     On May 19, 2005, the Debtor filed a First Amended Asset Purchase Agreement ("FAAPA").  Pursuant to the FAAPA, the Debtors agreed to transfer claims to ownership interests in limited liability companies, claims of ownership in and to certain mortgages, certain claims of ownership in joint venture agreements, certain causes of action against third parties, and other enumerated assets (the "Assets").

16.     On or about May 26, 2005, the Bankruptcy Court entered an Order (A) Approving Break-up Fee and Overbid Protections in Connection with the Sale of Assets (B) Approving Bid Procedures, (C) Scheduling Hearing to Consider Approval of the Sale of Assets Free and Clear of Liens, Claims, Interests, and Encumbrances (the "Sale Order").

17.     As a result of, *inter alia*, the FAAPA and the Sale Order, SWJ was to provide the Debtors' estates with a deposit of $400,000 for its prospective purchase of the Assets.  Upon information and belief, the deposit was not provided until after the auction, which is described below.

18.     On June 21, 2005, the Debtors auctioned (the "Auction") the Assets.  SWJ and  a second bid group that included Joe Chetrit, The Chetrit Group, Wennington Realty and Robert Wolf, Read Property Group (the "Alternate Bid Group") appeared to bid at the Auction.

19.     SWJ was the successful bidder at the Auction.  SWJ's winning bid was $8,950,000 (the "Purchase Price.")  Upon information and belief, the Alternate Bid Group made a bid of substantially more than $5.5 million for the Assets.

20.     On June 21, 2005, the Bankruptcy Court held a hearing to consider the Debtors' motion to have the Auction sale to SWJ approved by the Court.

21.     On June 21, 2005, the Bankruptcy Court signed an Order Authorizing and Approving (1) Asset Purchase Agreement, (2) Sale of Acquired Assets of the Debtors Free and

Clear of Liens, Claims, and Encumbrances to SWJ Holdings, LLC, (3) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (4) Certain Related Relief (the "Sale Approval Order").

22.     The Sale Approval Order recites that SWJ is not an insider of any of the Debtors and is completely unrelated to the Debtors.  However, no party advised the Bankruptcy Court that Licata had previously claimed an interest in SWJ.  The Sale Approval Order recites that Exhibit H to the FAAPA was a "Transfer, Settlement and Release Agreement" (the "TSRA") between Cynthia Licata (Licata's wife) and SWJ.

23.     Nevertheless, neither the Sale Approval Order, nor any statement made to the Bankruptcy Court at the sale approval hearing (or otherwise in connection with the sale process), advised the Bankruptcy Court that pursuant to the combined working of the TSRA and the FAAPA, SWJ would be nothing more than a mere pass-through entity for the transfer to Licata's wife of a substantial portion (based on value) of the Assets of the estate that were the subject matter of the FAAPA (the "Pass-Through Assets") and that, consequently, no value would be attributed to, or paid by SWJ for, the Pass-Through Assets in deriving a sales price for the Assets under the FAAPA.  The Pass-Through Assets were transferred to defendant Cynthia Licata contemporaneously with the closing on the FAAPA.  The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.


24.     Pursuant to the FAAPA, SWJ was required to close the transaction in which it purchased the Assets by June 27, 2005.

25.     SWJ failed to close the transaction contemplated in the FAAPA on June 17**,** 2005.

26.     On September 16, 2005, with SWJ still having failed to close on the transaction

contemplated by the FAAPA, the Committee sent a default notice to SWJ under the FAAPA.

27.     By way of a letter dated September 26, 2005, in anticipation of a Bankruptcy Court scheduled status conference on September 27, 2005, counsel for SWJ advised the Bankruptcy Court that SWJ had not paid the Purchase Price and that SWJ's funder, Cobra, had failed to close on a transaction with its funder, Arsad A. Kahn.  Despite its lack of funds, or a funder with funds, SWJ's letter to the Bankruptcy Court offered to increase the Purchase Price to $11,000,000.

28.     Upon information and belief, SWJ has hypothecated, alienated, transferred and encumbered some of the Assets prior to the closing of the FAAPA.  The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

29.     In response to, *inter alia,* the default notice, SWJ, the Debtors, the Committee and Cobra agreed upon a Consent Order which was entered by the Court on October 12, 2005 (the "October Consent Order").  Pursuant to the October Consent Order,  the Debtors agreed to modify the Sale Approval Order and FAAPA, by increasing the sale price and accepting as security a certain bank guarantee ("Bank Guarantee") issued by the Bangkok Bank PLC in the face amount of $50 million dollars.

30.     Cobra is the named beneficiary of the Bank Guarantee.  It was agreed that the Bank Guarantee would be held by Debtors' counsel in a bank vault.  The Conditions pursuant to which the Bank Guarantee could be presented for payment, released, or returned to Cobra were all set forth in the October Consent Order.

31.     Under the October Consent Order, deadlines were created for SWJ to close the transaction.  The Purchase Price was increased to $11 million (or a lesser sum if the Purchase Price was paid by October 7, 2005 – five days before the execution of the October Consent Order).   If

there was no closing by November 25, 2005, an alternate closing could take place.

32.   On November 16, 2005, at the hearing in the Bankruptcy Court on the potential sale to Enterprise, it was revealed that Debtors' counsel had released its possession of the Bank Guarantee and delivered it to the Societe Banque Privee, S.A. of Geneva, Switzerland ("SBP"). Upon information and belief, the release of possession occurred because Proskauer Rose had advised Debtors' counsel that the Bank Guaranty needed to be physically presented in Switzerland by a date certain.  The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

33.   Also at the November 16, 2005 hearing, it was revealed that SWJ had not closed and remained unable to close on the purchase of the Assets as set forth in the FAAPA and the October Consent Order.

34.   At the hearing on November 16, 2005, Judge Shiff determined that the Court Order "was violated" by the transfer, and stated "whether or not sanctions will be imposed because of that is something I'll take up on a later date."

35.   On February 2, 2006, with SWJ still having failed to tender any money towards the Purchase Price other than its initial $400,000 deposit, at a hearing on a motion of certain unsecured creditors to convert the Debtors' cases to cases under Chapter 7 of the United States Bankruptcy Code, the Bankruptcy Court entered an order (i) increasing the Purchase Price to $11,250,000 and requiring a closing of the purchase of the Assets by February 15, 2006, (ii) requiring Cobra to return the Bank Guarantee on or before February 16, 2006.

36.   SWJ did not close the transaction to purchase the Assets by February 15, 2006. Cobra did not return the Bank Guarantee to Arent Fox by February 16, 2006.

37.   On February 21, 2006, the Debtors and the Committee moved to amend the prior

orders of the Bankruptcy Court approving the sale of the Assets to SWJ and represented that SWJ had obtained $5 million in financing from Dare Investments, LLC and that said sum was being held in escrow.  The Committee indicated that a new proposal, set forth in a letter agreement attached to its moving papers, provided a means for the estates to be paid the Purchase Price – which was now $11.25 million.

38      On March 13, 2006, a closing of the sale of the Assets set forth in the FAAPA was held.  SWJ was the purchaser.

39.      At the closing, Sellers conveyed the assets to Purchaser by assignment, for consideration.

40.      The consideration was (i) the sum of $400,000 that had previously been deposited with Debtors' counsel on July 5, 2005, (ii) the sum of $ 5,000,000 deposited with Debtors' counsel on February 15, 2006 by Dare, and (iii) a Promissory Note in the amount of $ 5.85 million with an interest rate of 9% per annum with all interest and principal payable on December 15, 2006.

41.      The principal, if not the only one of, the Pass-Through Assets that then had substantial value, was any claim or interest in defendant FCHG IV.

42.      Licata, at the time of the filing of his voluntary petition, was either the actual or equitable owner of the entirety of FCHG IV (or, if not so with respect to the entirety of the membership interests in FCHG IV, at the very least was the actual or equitable owner of 50% of said interest).  James Licata was the grantor of a revocable trust concerning all or substantially all of the membership interests in FCHG IV, which trust was either revoked by him or otherwise used by him as a conduit to hold the investment in FCHGC IV for his use and disposition.  The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity

8

for further investigation or discovery.

43.     Many properties were transferred out of other First Connecticut Holding Group-related limited liability companies and congregated into First Connecticut Holding Group, LLC XXIII and FCHG IV, with FCHG IV having transferred into it a number of valuable properties from such other limited liability companies, all in connection with one or more pre-petition financing transactions.  The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

44.     One year prior to the filing of the bankruptcy petition by Licata, Cynthia Licata transferred (or irrevocably bound herself to transfer) any and all interests that she may have had in various limited liability companies related to First Connecticut (which would have included within the broad scope of the agreement and undertaking, any interest that Cynthia Licata might have had in FCHG IV).

45.     Cynthia Licata did not have, as of the commencement of James Licata's bankruptcy case, an ownership interest in FCHG IV (or at the most, any claim to an ownership interest could not have been greater than a 50% interest).  The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

46.     The claim, disclosed in a footnote in a schedule to a document pertaining to the complex Section 363 described hereinabove, that Cynthia Licata owned, as of the petition date, all of FCHG IV pursuant to a purported 1998 transaction (the "Ownership Claim"), was not a valid claim.  The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

47.     The Ownership Claim was an artifice devised as a means conceal Jim Licata's

ownership interests in FCHG IV, in order to transfer to Cynthia Licata and/or insiders of Cynthia Licata and debtor Licata, this valuable property of the estate without just compensation or provision of reasonably equivalent value to the estate, using SWJ as a conduit to do so, as one of the Pass-Through Assets in connection with the closing on the Section 363 Sale and the TSRA (the "Asset Transfer"). The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

48.     By way of a deed dated May 26, 2006, recorded on June 2, 2006, FCHG IV sold real estate owned by FCHG IV to SWJ for the total purchase price of $31,300,000.

49.     At the closing of the sale of the real estate by FCHG IV to SWJ, FCHG IV received a mortgage (the "Second Mortgage") on the real estate sold in the original principal amount of $22,950,833.50, and approximately $1,678,566.50 in cash (the "Cash Proceeds"). The Second Mortgage is a product or proceed of the said Pass-Through Asset. The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

50.     At the closing, certain loan proceeds were placed in escrow. Upon information and belief, Cynthia Licata received $380,000 from this escrow account. The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

51.     Upon information and belief, FCHG IV transferred the Second Mortgage to East Coast Investment, LLC ("East Coast"). The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

52.     The principals of East Coast are also principals of the law firm that represents

Licata, and represented Licata in the defense of his criminal prosecution.  The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

53.    Licata has orchestrated the transaction by which the Second Mortgage was transferred to East Coast and he and/or his insider spouse, Cynthia Licata, stand to benefit substantially from the transaction with East Coast and the undertakings of its principals in the pursuit of litigation in the State of New Jersey.  The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

## FIRST CAUSE OF ACTION

54.    The allegations of paragraphs 1 through 53 are included in this First Cause of Action as if fully set forth herein.

55.    Licata, as a debtor-in-possession of his bankruptcy estate, owed a duty to the creditors of his estate in accounting for, disclosing, and dealing with, the assets of the estate, including those of the Assets that comprise assets of his estate.

56.    Licata breached his duty to the estate by, *inter alia*, (a) devising, or participating in the devising of, the artifice of the Ownership Claim; (b) devising or structuring, and/or participating in the devising or structuring of, the FAAPA and the TSRA transactions to work in such a way as to effectuate a transfer of his interest in FCHG IV to Cynthia Licata using SWJ as a conduit through which to accomplish the same (the aforesaid Asset Transfer) without the estate receiving the value thereof, all to the detriment of the creditors of his estate.

57.    The creditors of the estates, who relied on Licata as the debtor-in-possession to fulfill his duty, have been harmed and have suffered damages by reason of said breach.

## SECOND CAUSE OF ACTION

58.     The allegations of paragraphs 1 through 53 are included in this Second Cause of Action as if fully set forth herein.

59.     Licata devised, or participating in the devising of, the artifice of the Ownership Claim; (b) devised or structured, and/or participated in the devising or structuring of, the FAAPA and the TSRA transactions to work in such a way as to effectuate a transfer of his interest in FCHG IV to Cynthia Licata using SWJ as a conduit through which to accomplish the same (the aforesaid Asset Transfer) without the estate receiving the value thereof, all to the detriment of the creditors of his estate.

60.     The Asset Transfer constitutes a transfer within the meaning of the term "transfer" as defined in Connecticut General Statutes Section 52-552b, by Licata to or for the benefit of defendant Cynthia Licata, as the term "assets" is defined under the Uniform Fraudulent Transfer Act.

61.     Licata made the Asset Transfer with the actual intent to hinder, delay and defraud his creditors, including, without limitation, the FCCG and Licata bankruptcy estates.

62.      The Asset Transfer was a fraudulent transfer by Licata to Cynthia Licata pursuant to Conn. Gen. Stat., § 52-552a *et seq.*.

63.     The Asset Transfers are fraudulent as to the Plaintiffs, and their respective successors and assigns, within the meaning of Connecticut General Statutes Section 52-552e(a).

64.     By reason of the foregoing, the Asset Transfer is voidable and should be set aside by the Bankruptcy Court.

65.     By reason of the foregoing, Cynthia Licata is personally liable to Plaintiffs, and their successors and assigns, to the extent of the aggregate of the dollar amount of the Asset

Transfer, said valuation being as of the date of such transfer, subject to such adjustment as the equities of the case may require, all within the meaning of, and as contemplated by, Connecticut General Statutes Section 52-552a through 52-552l, inclusive, and by 11 U.S.C. Sections 544 and 550.

66.    East Coast, as an assignee of Cynthia Licata of the products and proceeds of the Asset Transfer, and/or as a transferee of Licata of such proceeds by use of Cynthia Licata as a further conduit, is liable to the Plaintiffs therefor.

### THIRD CAUSE OF ACTION

67.    The allegations of paragraphs 1 through 66 (exclusive of paragraph 61) are included in this Third Cause of Action as if fully set forth herein.

68.    The Asset Transfer was made by Licata without receiving a reasonably equivalent value in exchange for said transfer, and Licata (1) was engaged or was about to engage in a business or transaction for which his remaining assets were unreasonably small in relation to the business or transaction, or (2) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

69.    By reason of the foregoing, the Asset Transfer is voidable and should be set aside by the Bankruptcy Court.

70.    By reason of the foregoing, Cynthia Licata is personally liable to Plaintiffs, and their successors and assigns, to the extent of the aggregate of the dollar amount of the Asset Transfer, said valuation being as of the date of such transfer, subject to such adjustment as the equities of the case may require, all within the meaning of, and as contemplated by, Connecticut General Statutes Section 52-552a through 52-552l, inclusive, and by 11 U.S.C. Sections 544 and 550.

71.     East Coast, as an assignee of Cynthia Licata of the products and proceeds of the Asset Transfer, and/or as a transferee of Licata of such proceeds by use of Cynthia Licata as a further conduit, is liable to the Plaintiffs therefor.

## FOURTH CAUSE OF ACTION

72.     The allegations of paragraphs 1 through 66 (exclusive of paragraph 61) are included in this Fourth Cause of Action as if fully set forth herein.

73.     The Asset Transfer was made by Licata to the defendants, without receiving a reasonably equivalent value in exchange for said transfer, and the Licata was insolvent at the time of such transfers or, alternatively, the Debtor became insolvent as a result of such transfers.

74.     By reason of the foregoing, the Asset Transfer is voidable and should be set aside by the Court.

75.     By reason of the foregoing, Cynthia Licata is personally liable to Plaintiffs, and their successors and assigns, to the extent of the aggregate of the dollar amount of the Asset Transfer, said valuation being as of the date of such transfer, subject to such adjustment as the equities of the case may require, all within the meaning of, and as contemplated by, Connecticut General Statutes Section 52-552a through 52-552l, inclusive, and by 11 U.S.C. Sections 544 and 550.

76.     East Coast, as an assignee of Cynthia Licata of the products and proceeds of the Asset Transfer, and/or as a transferee of Licata of such proceeds by use of Cynthia Licata as a further conduit, is liable to the Plaintiffs therefor.

## FIFTH CAUSE OF ACTION

77.     The allegations of paragraphs 1 through 66 (exclusive of paragraph 61) are included in this Fifth Cause of Action as if fully set forth herein.

14

78.     Based on the foregoing, it offends equity and good conscience for Cynthia Licata and East Cost to enjoy and retain ownership of Asset Transfer and/or the products and proceeds thereof, including, but not limited to, the Second Mortgage and the Cash Proceeds.

79.     By reason of the foregoing, the Plaintiff may, by this proceeding in equity, hold the defendants, and their successors and assigns, liable for the economic benefits they have improperly received.

80.     By reason of the foregoing, the defendants have engaged in conduct that has wrongfully harmed the Plaintiffs (and the creditors' of their estates).

81.     By reason of the foregoing, the defendants have  been unjustly enriched to the detriment of the Plaintiffs (and the creditors' of their estates).

82.     By reason of the foregoing, a constructive trust should be imposed upon the Asset Transfer and the products and proceeds thereof, and/or other property of the defendants, and a money judgment should enter against them, as they otherwise would be unjustly enriched by their actions and conduct.

## SIXTH CAUSE OF ACTION

83.     The allegations of paragraphs 1 through 82 (exclusive of paragraph 61) are included in this Sixth Cause of Action as if fully set forth herein.

84.     Based on the foregoing, a fraud has been worked upon this Bankruptcy Court, such that the Plaintiffs should obtain relief from the sale order to the extent of, inter alia, permitting it relief from the order for the purpose of obtaining redress for the Asset Transfer and the subsequent machinations with respect to the products and proceeds thereof.

## SEVENTH CAUSE OF ACTION

85.     The allegations of paragraphs 1 through 84 are included in this Seventh Cause of

Action as if fully set forth herein.

86.     Defendant Cynthia Licata was aware of the wrongfulness of her conduct and she, accordingly, aided and abetted Licata in perpetrating the fraud and wrong upon the estates and the Court.

### EIGHTH CAUSE OF ACTION

87.     The allegations of paragraphs 1 through 82 (exclusive of paragraph 61) are included in this Eighth Cause of Action as if fully set forth herein.

88.     A dispute arose over the validity and/or the enforceability of the Second Mortgage, which dispute, in turn, gave rise to a claim against a title insurance company (the "Title Claim").

89.     The Title Claim was marketed and used by Defendant James Licata to obtain substantial monies for the use, control by and benefit of Defendant Cynthia Licata and James Licata, which monies (the "Portland Funds") were obtained through a certain Assignment and Buyback Agreement between Defendant James Licata and Larry D. Kelley of Portland, Oregon (the "Buyback Agreement").

90.     The Portland Funds were, at all times, subject to the control and disposition of Defendant Cynthia Licata, and to some significant degree, also Defendant James Licata. Such control and disposition over the Portland Funds was initially by means of using Defendant Jessica Licata as a person who held legal title to certain bank accounts with JP Morgan Chase Bank (the "Jessica Licata  Accounts"), with the agreement and understanding of Jessica Licata that the monies in the Jessica Licata Accounts were not Jessica's monies and instead were held for, and at the disposition and control of, Defendant Cynthia Licata (and also, to some significant degree, Defendant James Licata, but not to the exclusion of Cynthia Licata).  At all relevant

16

times, Defendant Cynthia Licata had a debit card for one or more of these accounts, checks for one or more of these accounts, and the authority (which she regularly exercised) to instruct Jessica Licata to effectuate any transaction (including inter-account transactions) concerning any of the Jessica Licata Accounts.  The movement of monies into and out of the Jessica Licata Accounts was overseen and/or scrutinized by Defendant Cynthia Licata.

91.     The Jessica Licata Accounts were utilized by Cynthia Licata (and also by James Licata) to shield the monies in the Jessica Licata Accounts from creditors of Cynthia Licata and/or James Licata, and to enable James Licata and/or Cynthia Licata to engage in business and other transactions without having any monies pass through any account in the name of Cynthia Licata and/or James Licata.

92.     The monies in the Jessica Licata Accounts were used to fund the lavish lifestyle of Defendants Cynthia Licata and James Licata, as well as to support their adult children, and such was the case for a period of years.

93.     There came a point in time when Defendant Cynthia Licata decided that the Jessica Licata Accounts should no longer be utilized to hold the monies over which she exercised all of the indicia of ownership other than legal title (albeit apparently not to the exclusion of Defendant James Licata, at least to some significant extent), and it was decided that a new company would be created as a front to establish and hold bank accounts in its name, and which would serve the same function as the Jessica Licata Accounts theretofore had served.  This entity is defendant Santa Fe Development LLC, a New Jersey limited liability company ("Santa Fe Development").

94.     One or more bank accounts were established in the name of Santa Fe Development, and substantially all remaining funds in the Jessica Licata Accounts were

transferred into Santa Fe Development accounts, including the Santa Fe Development account at JP Morgan Chase Bank, N.A.

95.     Defendants Cynthia Licata and James Licata obtained debit cards that were tied to one or more of the Santa Fe Development accounts, as well as checks that could be written on the Santa Fe Development accounts that had check writing privileges.  Just as with the Jessica Licata Accounts, the Santa Fe Development accounts were accounts over which Defendant Cynthia Licata exercised control, and were utilized by Cynthia Licata for her use and benefit, as well as for the benefit of Defendant James Licata (who also exercised a degree of control over the account, but not to the exclusion of Defendant Cynthia Licata).  Together, Cynthia Licata and James Licata held and exercised all indicia of ownership over the funds in the Santa Fe Development accounts other than legal title to such accounts, all in order to house their assets and keep them out of the conventional reach of the creditors of Defendant Cynthia Licata and/or Defendant James Licata.

96.     After having the Jessica Licata Accounts go dormant and transferring their essence to one or more of the Santa Fe Development accounts, Defendant Cynthia Licata and Defendant James Licata used the monies in the Santa Fe Development accounts to run their financial lives – the means by which they held monetary assets and conducted financial transactions – funding a lavish lifestyle and engaging in business transactions.

97.     Santa Fe Development itself was structured in such a way that it would have nominal individual members (Defendant Jessica Licata, now or formerly of 351 Delavan Ave., Greenwich, CT 06830, Defendant Michael Lander, now or formerly of 2 Hobart Street, Bronxville, NY, and Defendant NatashaYeoh, now or formerly of 8 Hobart Street, Bronxville, NY) and a trust to be the beneficial "holder" of the substantial majority – almost the entirety – of

the membership interest, the beneficiaries of which trust are (or were to be) Defendants Cynthia
Licata and James Licata.

98.     The trust itself is an artifice – another and further attempt to have legal title to the
company (Santa Fe Development) not rest directly in the name of Defendant Cynthia Licata or
Defendant James Licata, in order to hold their creditors at bay and attempt to shield the assets
held in the name of Santa Fe Development from the reach of the creditors of Defendant Cynthia
Licata and/or Defendant James Licata. Santa Fe was established very shortly after the Plaintiffs
herein, through counsel, issued six notices of intent to serve subpoenas, post-judgment, in that
certain adversary proceeding bearing Adversary Proceeding No. 03-05045 in the United States
Bankruptcy Court in the District of Connecticut, in an effort to discover assets of Defendant
Cynthia Licata with which to attempt to satisfy the $1.6 Million judgment rendered in that
proceeding.  As a further manifestation of the artifice, the Operating Agreement for Santa Fe
Development provides that Defendants James and Cynthia Licata agree to defend Jessica Licata
against any and all claims and to pay her legal fees, and that Santa Fe is to hold Jessica Licata
harmless and fully indemnify Jessica Licata against any and all claims and suits from any outside
party.

99.     Given the control exercised by Defendant Cynthia Licata (for her benefit and/or
the benefit of Defendant James Licata), over the funds in the Jessica Licata Accounts , and other
indicia of ownership, including, but not limited to, the uses to which the monies were put (that
were mostly at Cynthia Licata's direction) and the oversight of Defendant Cynthia Licata over
the sources and uses of funds in the Jessica Licata Accounts, Defendant Cynthia Licata is (and
has been) the equitable owner of the Jessica Licata Accounts, although not to the exclusion of
Defendant James Licata, who also exercised control over the Jessica Licata Accounts (although

often indirectly through Defendant Cynthia Licata).  Thus, the monetary assets that were

amassed in and ran through the Jessica Licata Accounts constituted property of Defendant

Cynthia Licata (and, at least to some degree, also property that may be construed to be joint

property holdings of Defendants Cynthia Licata and James Licata).

100.    Given the control exercised by Defendant Cynthia Licata (for her benefit and/or

the benefit of Defendant James Licata), over the funds in the Santa Fe Development accounts,

and other indicia of ownership, including, but not limited to, the uses to which the monies were

put (that were mostly at Cynthia Licata's direction) and the oversight of Defendant Cynthia

Licata over the sources and uses of funds in the Santa Fe Development accounts, Defendant

Cynthia Licata is (and has been) the equitable owner of the Santa Fe Development accounts,

although not to the exclusion of Defendant James Licata, who also exercised control over the

Santa Fe Development accounts (although often indirectly through Defendant Cynthia Licata).

Thus, the monetary assets that are, and have been, amassed in and ran through the Santa Fe

Development accounts constitute (and/or constituted) property of Defendant Cynthia Licata (and,

at least to some degree, also property that may be construed to be joint property holdings of

Defendants Cynthia Licata and James Licata).

101.    Given the control exercised by Defendant Cynthia Licata over assets of Santa Fe

Development, and the evident intent for which Santa Fe Development was formed and

structured, Defendant Cynthia Licata is the (or an) equitable owner of Defendant Santa Fe

Development itself (and, at least to some degree, Santa Fe Development may be construed to be

joint property holdings of Defendants Cynthia Licata and James Licata).

102.    Upon information and belief (after a further opportunity for further investigation

or discovery), the following factual allegations will likely have evidentiary support: One or more

other companies were organized and structured in a way that they would be nominally owned by

an individual, with a trust to be the beneficial "holder" of the substantial majority – almost the

entirety – of the membership interest, the beneficiaries of which trust are (or were to be)

Defendants Cynthia Licata and James Licata (or, in the absence of such a trust, an agreement

with the nominal owner that the entity would be and constitute the property of Defendants

Cynthia Licata and James Licata for their economic benefit, although they would not hold legal

title to the bulk of the economic stake in the company).  Such other and further companies

include, but are not necessarily limited to, Charter Holdings, LLC (the nominal member of which

is Defendant Michael Lander, either by himself or together with Defendant Natasha Yeoh),

Defendant Knox Trucking, LLC f/k/a Jtw3 Development, LLC – a New York limited liability

company (the nominal member of which is Defendant Jessica Licata), Santa Fe Holdings, LLC –

a Delaware or Florida limited liability company, and Mighty Seven Angels, LLC, a Florida

limited liability company.

      103.    The trust itself is an artifice – another and further attempt to have legal title to

these companies not rest directly in the name of Defendants Cynthia Licata and James Licata, in

order to hold their creditors at bay and attempt to shield the assets held in the names of these

companies from the reach of the creditors of Defendant Cynthia Licata and/or Defendant James

Licata.  The allegations of this paragraph are likely to have evidentiary support after a reasonable

opportunity for further investigation and discovery.

      104.    In or about December of 2016, the property commonly known as 120 Candyce

Drive, Osprey, Florida (the "Candyce Drive Property") was purchased in the name of Charter

Holdings, LLC for an approximate purchase price of $647,000.00.  The purchase price for the

Candyce Drive Property was paid by means of a wire transfer from one of the Jessica Licata

Accounts.  The Candyce Drive Property is the home of Defendants Cynthia Licata and James

Licata's son, Defendant Tucker Licata.

105.    The Candyce Drive Property is listed as an asset on the Licata Group balance

sheet.  The Jessica Licata Accounts are identified on one or more balance sheets of the Licata

Group.  Defendant Cynthia Licata oversaw the finances of the Licata Group, and, in the exercise

of that function, reviewed reports and financial statements of the Licata Group, and exercised

control over, and made beneficial use of, bank accounts identified as Licata Group accounts,

such as the Jessica Licata Accounts and/or the Santa Fe Development accounts.

106.    In 2020, the Candyce Drive Property was transferred to Defendant Mighty Seven

Angels, LLC, an entity nominally owned by an individual, and which holds title to the property

for the benefit of Defendants Cynthia Licata and James Licata in the manner aforesaid.

107.    Defendant Tucker Licata is referenced in one or more financial statements of the

Licata Group as having received in excess of $800,000 from these bank accounts.

108.    In or about 2018, a yacht was purchased from Galati Yacht Sales – a 58 foot

Monterey Sport Fisherman (used) (the "Yacht") for the approximate sum of $485,000, all with

monies from one of the Jessica Licata Accounts.  Title to the Yacht was purported taken in the

name of Defendant Tucker Licata.

109.    Based on all of the foregoing, Defendants Cynthia Licata and James Licata are, in

equity, the joint owners of the companies that collectively compose the Licata Group (and/or of

the assets of such companies, which companies include, but are not necessarily limited to,

Defendant Charter Holdings, LLC, Defendant Knox Trucking, LLC f/k/a Jtw3 Development,

LLC, Defendant Santa Fe Holdings, LLC, Defendant Santa Fe Development, and Defendant

Mighty Seven Angels, LLC (collectively, the "Company Defendants").

110.    Based on the foregoing, it offends equity and good conscience for the Company
Defendants and defendant Tucker Licata to enjoy and retain ownership of any and all assets held
in their respective names, and/or the products and proceeds thereof.

111.    By reason of the foregoing, the Plaintiff may, by this proceeding in equity, hold
the Company defendants and defendant Tucker Licata, and their successors and assigns, liable
for the economic benefits they have improperly received.

112.    By reason of the foregoing, the defendants have engaged in conduct that has
wrongfully harmed the Plaintiffs (and the creditors' of their estates).

113.    By reason of the foregoing, the defendants have  been unjustly enriched to the
detriment of the Plaintiffs (and the creditors of their estates).

114.    By reason of the foregoing, as remedies therefor, a constructive trust should be
imposed upon any and all assets held in the names of the Company Defendants and/or defendant
Tucker Licata, and a money judgment should enter against them for the value of the property so
received by them, as they otherwise would be unjustly enriched by their actions and conduct.  A
money judgment should likewise enter against Defendants Cynthia Licata and James Licata.

### NINTH CAUSE OF ACTION

115.    The allegations of paragraphs 87 through 114 are included in this Ninth Cause of
Action as if fully set forth herein.

116.    All of the property purchased in the names of the Company Defendants (or
transferred by one Company Defendant to another Company Defendant) and/or defendant Tucker
Licata with funds from either the Jessica Licata Accounts or the Santa Fe Development accounts, as
well as all monetary assets transferred to any of the Company Defendants or Tucker Licata from
any such accounts (or purchases made by Tucker Licata that were made by a debit card (or cards)

tied to one or more of the accounts), together with inter-company transfers between the Company Defendants of monies or property that have, as their root source, the Jessica Licata Accounts or the Santa Fe Development accounts, constitute a transfer within the meaning of the term "transfer" as defined in Connecticut General Statutes Section 52-552b, by Defendants Cynthia and James Licata to the Company Defendants and/or defendant Tucker Licata, as the term "assets" is defined under the Uniform Fraudulent Transfer Act.

117.    Defendants Cynthia Licata and James Licata made those asset transfers with the actual intent to hinder, delay and defraud their respective creditors, including, without limitation, the FCCG and Licata bankruptcy estates.

118.     Those asset transfers were fraudulent transfer by defendants Cynthia and James Licata to the Company Defendants and defendant Tucker Licata, pursuant to Conn. Gen. Stat., § 52-552a *et seq.*.

119.    Those asset transfers are fraudulent as to the Plaintiffs, and their respective successors and assigns, within the meaning of Connecticut General Statutes Section 52-552e(a).

120.    By reason of the foregoing, those asset transfers are voidable and should be set aside by the Bankruptcy Court.

121.    By reason of the foregoing, the company defendants, defendant Tucker Licata, and Defendants Cynthia and James Licata are each and all personally liable to Plaintiffs, and their successors and assigns, to the extent of the aggregate of the dollar amount of the  assets so transferred, said valuation being as of the date of such transfer, subject to such adjustment as the equities of the case may require, all within the meaning of, and as contemplated by, Connecticut General Statutes Section 52-552a through 52-552l, inclusive, and by 11 U.S.C. Sections 544 and 550.

122.    As the holder of legal title to the Jessica Licata Accounts, defendant Jessica Licata also has personal liability for all monies that so flowed into and out of the Jessica Licata Accounts.

## TENTH CAUSE OF ACTION

123.    The allegations of paragraphs 87 through 114 are included in this Tenth Cause of Action as if fully set forth herein.

124.    All of the property purchased in the names of the Company Defendants (or transferred by one Company Defendant to another Company Defendant) and/or defendant Tucker Licata with funds from either the Jessica Licata Accounts or the Santa Fe Development accounts, as well as all monetary assets transferred to any of the Company Defendants or Tucker Licata from any such accounts (or purchases made by Tucker Licata that were made by a debit card (or cards) tied to one or more of the accounts), together with inter-company transfers between the Company Defendants of monies or property that have, as their root source, the Jessica Licata Accounts or the Santa Fe Development accounts, constitute a transfer within the meaning of the term "transfer" as defined in Connecticut General Statutes Section 52-552b, by Defendants Cynthia and James Licata to the Company Defendants and/or defendant Tucker Licata, as the term "assets" is defined under the Uniform Fraudulent Transfer Act.

125.    The assets so transferred by Defendants Cynthia Licata and James Licata were made by them without receiving a reasonably equivalent value in exchange for said transfer, and they (1) were engaged or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction, or (2) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond his ability to pay as they became due.

25

126.     By reason of the foregoing, the assets so transferred are voidable and should be set aside by the Bankruptcy Court.

127.     By reason of the foregoing, the Company Defendants, defendant Tucker Licata, and Defendants Cynthia and James Licata are each and all personally liable to Plaintiffs, and their successors and assigns, to the extent of the aggregate of the dollar amount of the assets so transferred, said valuation being as of the date of such transfer, subject to such adjustment as the equities of the case may require, all within the meaning of, and as contemplated by, Connecticut General Statutes Section 52-552a through 52-552l, inclusive, and by 11 U.S.C. Sections 544 and 550.

128.     As the holder of legal title to the Jessica Licata Accounts, defendant Jessica Licata also has personal liability for all monies that so flowed into and out of the Jessica Licata Accounts.

**ELEVENTH CAUSE OF ACTION**

129.     The allegations of paragraphs 87 through 114 are included in this Eleventh Cause of Action as if fully set forth herein.

130.     All of the property purchased in the names of the Company Defendants (or transferred by one Company Defendant to another Company Defendant) and/or defendant Tucker Licata with funds from either the Jessica Licata Accounts or the Santa Fe Development accounts, as well as all monetary assets transferred to any of the Company Defendants or Tucker Licata from any such accounts (or purchases made by Tucker Licata that were made by a debit card (or cards) tied to one or more of the accounts), together with inter-company transfers between the Company Defendants of monies or property that have, as their root source, the Jessica Licata Accounts or the Santa Fe Development accounts, constitute a transfer within the meaning of the term "transfer" as

defined in Connecticut General Statutes Section 52-552b, by Defendants Cynthia and James Licata to the Company Defendants and/or defendant Tucker Licata, as the term "assets" is defined under the Uniform Fraudulent Transfer Act.

131.    The assets so transferred by Defendants Cynthia Licata and James Licata were made by them without receiving a reasonably equivalent value in exchange for said transfer, and they were insolvent at the time of such transfers or, alternatively, they became insolvent as a result of such transfers.

132.    By reason of the foregoing, the assets so transferred are voidable and should be set aside by the Court.

133.    By reason of the foregoing, the Company Defendants, defendant Tucker Licata, and Defendants Cynthia and James Licata are each and all personally liable to Plaintiffs, and their successors and assigns, to the extent of the aggregate of the dollar amount of the  assets so transferred, said valuation being as of the date of such transfer, subject to such adjustment as the equities of the case may require, all within the meaning of, and as contemplated by, Connecticut General Statutes Section 52-552a through 52-552l, inclusive, and by 11 U.S.C. Sections 544 and 550.

134.    As the holder of legal title to the Jessica Licata Accounts, defendant Jessica Licata also has personal liability for all monies that so flowed into and out of the Jessica Licata Accounts.

**WHEREFORE,** the Plaintiffs respectfully request entry of a judgment against defendants, inter alia, (i) declaring that the asset transfers and the transactions with respect to the products and proceeds each constitute fraudulent transfers and are avoided (ii) for judgment in an amount equal to the value of the transferred property and/or the products and proceeds thereof, together with full legal interest and costs of suit; (iii) entering an injunction restraining the defendants and their respective agents, servants, employees, attorneys and all persons in active concert or participation with them from (a) taking any action to cause any ownership interests or rights in the transferred assets and their products and proceeds, and (b) taking any action to cause the transferred asset and the products and proceeds to be further encumbered; (iv) imposing a constructive trust on all assets of the defendants, in favor of the Plaintiffs, to the extent of their unjust enrichment; (v) awarding money damages in favor of the Plaintiffs and against the defendants by reason of their unjust enrichment; and (vi) such other and further relief as at law and/or in equity may pertain, or as the Court deems just and proper.

Dated: July 2, 2021.

> PLAINTIFFS,
> RONALD I. CHORCHES, TRUSTEE
> RICHARD COAN, TRUSTEE
>
> By:____/s/ Paul N. Gilmore_____
> PAUL N. GILMORE, ESQ.
> **UPDIKE, KELLY & SPELLACY, P.C.**
> Federal Bar No. ct03347
> P.O. Box 231277
> 100 Pearl Street
> Hartford, CT  06123-1277
> Tel. (860) 548-2641
> Fax (860) 548-2680
> Email:  pgilmore@uks.com