**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| In Re: | ) | Case No.　02-50852 (JJT) |
| | ) | Case No.　02-51167 (JJT) |
| FIRST CONNECTICUT CONSULTING | ) | (Jointly Administered) |
| GROUP, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Chapter　7 |
| | ) | |
| RICHARD M. COAN, TRUSTEE, and | ) | |
| RONALD I. CHORCHES, TRUSTEE, | ) | |
| | ) | Adv. Pro. Case No. 09-05010 (JJT) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Re: ECF Nos. 81, 282 |
| | ) | |
| JAMES J. LICATA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF DECISION AND ORDER DENYING**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

In 2002, James J. Licata ("Licata") and his consulting entity known as First Connecticut

Holding Group, Inc. ("FCCG," and together with Licata, the "Debtors") filed Chapter 11

bankruptcy after experiencing financial distress related to real estate business dealings with Peter

Mocco ("Mocco"). In June 2005, the Honorable Alan H. W. Shiff, the undersigned's immediate

predecessor, approved a sale under 11 U.S.C. § 363(b) of substantially all of the Debtors' assets

(the "Sale" or "Sale Order").[1] Approximately one year later, the Debtors' bankruptcy case was

---

[1] All citations to Title 11 of the United States Code refer to the Bankruptcy Code, and any references herein to a
section under the "Code" also refers to the Bankruptcy Code.

converted to Chapter 7. In 2009, Richard M. Coan and Ronald I. Chorches, the Chapter 7

Trustees, commenced this adversary proceeding against Licata and others after discovering

evidence indicating that Licata had orchestrated a fraudulent sale and made material

misstatements and omissions to Judge Shiff to disguise his intent to use the sale as a vehicle to

transfer bankruptcy estate property to himself and his wife, Cynthia Licata, and use the

bankruptcy system as a mechanism for furthering his fraudulent enterprise.

This case has a long, storied history that stretches back in time far beyond the inception

of the Debtors' bankruptcy cases. The tangled web of business transactions giving rise to this

case began over 25 years ago and has resulted in bitter disputes crossing multiple jurisdictions in

various court systems, many of which have outlasted several judges and jurists. The Court will

not endeavor to recite every detail of the history of this case, but it will provide the background

relevant to the dispute presently before it. Many judges have already contributed substantial

efforts in this regard and the Court will cite to those prior opinions where applicable. In 2004, the

Honorable Colleen A. Brown of the United States Bankruptcy Court for the District of Vermont

rendered a decision after trial concerning the ownership of certain properties as between Licata

and Mocco. *In re First Connecticut Consulting Grp., Inc.* ("*In re FCCG*"), 2004 WL 1676211, at

*10 (Bankr. D. Vt. July 27, 2004), *aff'd*, 340 B.R. 210 (D. Vt. 2006), *aff'd*, 254 F. App'x 64 (2d

Cir. 2007). Most notably, after a 39-day bench trial that occurred in 2015, the Honorable James

S. Rothschild of the Superior Court of New Jersey rendered a 223-page decision that sets forth

an extremely detailed account of the business dealings between Licata and Mocco as well as the

Debtors' bankruptcy Sale and Judge Shiff's Sale Order (the "NJ Ownership Dispute"). *Mocco v.

Licata*, No. L-7709-13, Superior Court of New Jersey, Law Division, Essex County (Rothschild,

J., June 2, 2015); *aff'd, Mocco v. Licata*, No. A-5041-14T2, 2018 WL 2923483 (N.J. Super. Ct.

App. Div. June 5, 2018). Judge Brown and Judge Rothchild's decisions are not relevant to the Court's resolution of the matter before it today, but it is a vital piece of the background of this case.[2]

Before the Court is a Motion for Summary Judgment (AP-ECF Nos. 81, 282) (the "Motion") filed by Defendants James and Cynthia Licata (the "Licatas").[3] In essence, the Motion characterizes the Trustees' case as an impermissible collateral attack on Judge Shiff's Sale Order. The issues before the Court today present difficult, troubling questions, particularly in circumstances such as these where the Trustees have attacked the finality of the Sale Order based on sweeping allegations of a family-wide, fraudulent asset-shielding enterprise designed, in part, to deprive the bankruptcy estate of its valuable assets.

As explained further below, the Licatas make arguments in their Motion that implicate both Rule 12(b)(6) and Rule 56 of the Federal Rules of Civil Procedure. The Court will therefore construe the Motion as a hybrid motion for dismissal and for summary judgment. The Court will address these respective arguments separately under the appropriate standard of review.

For the reasons that follow, the Licatas' Motion for Summary Judgment is denied.

## II.    JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceedings under 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to

---

[2] The Court does not adopt the decisions by Judge Brown and Judge Rothschild for purposes of this Motion today, but will offer parts of those opinions to provide the relevant background of this case. In its discretion, the Court will take judicial notice of Judge Brown and Judge Rothchild's decisions, as well as any relevant appellate decisions. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in other litigation but rather to establish the fact of such litigation and related filings.").

[3] All citations to the docket of this adversary proceeding are designated as "AP-ECF No. ___." All citations to the Debtors' main bankruptcy cases are designated as "BR-ECF No. __" with the appropriate Debtor's name and case number indicated in the citation. For all citations to bankruptcy cases of debtors other than Licata and FCCG, the Court will also include the appropriate debtor's name and case number in the citation.

hear and determine this matter on reference from the District Court under 28 U.S.C. § 157(a) and (b)(1) and the General Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (H).

## III.    BACKGROUND[4]

Before addressing the merits of the Motion, the Court must discuss the relevant portions of the background of this epic case.

### A.  Licata's Bankruptcy and Sale of Assets

In 1994, Mocco filed a voluntary Chapter 11 bankruptcy petition in the State of New Jersey after experiencing significant losses during the collapse of the New Jersey real estate market in 1989. Faced with the possibility that he would not be able to confirm a plan of reorganization, Mocco sought financing from Licata and FCCG to buy out a secured claim held by one of his lenders. All of the disputes between Licata and Mocco emanate from the financing deal they made at this time.[5] The elements of this financing deal were examined by Judge Brown in her 2004 decision.[6] *In re FCCG,* 2004 WL 1676211, at *10.

As Judge Brown's decision explains, Licata did not have cash to lend to Mocco; rather, he had access to a line of credit through another entity known as EMP Whole Loan I ("EMP"). EMP would not advance the funds to FCCG if FCCG was going to lend those funds to a

---

[4] In the interest of economy, the Court assumes the parties' familiarity with the voluminous record of the Debtors' bankruptcy cases and provides only the background necessary to give context to this decision.

[5] The real estate dealings between Licata and Mocco triggered numerous lawsuits in the New Jersey Superior Court dating as far back as 1998. The 2015 trial opinion by Judge Rothschild meticulously sets forth the origination of those lawsuits and the full history of the Licata/Mocco disputes that endured up to 2015, which includes an in-depth discussion of the various hearings held by Judge Shiff directly before and after the Sale with extensive excerpts from those hearing transcripts. *Mocco v. Licata*, No. L-7709-13, Superior Court of New Jersey, Law Division, Essex County (Rothschild, J., June 2, 2015). The Court will not try to recite that history here, but will reference Judge Rothschild's opinion where appropriate. This decision will, however, cover the subsequent developments that occurred from 2015 to the present day.

[6] Judge Brown's opinion will be discussed later in this decision, as it pertains to bankruptcy cases filed by Licata for certain Holding Group LLCs that were pending before Judge Shiff.

bankruptcy debtor, but would advance the funds on a short-term basis to a bankruptcy-remote entity. This restriction resulted in the creation of what the Court will denominate as the "Holding Group LLCs." Licata set up a series of limited liability companies named First Connecticut Holding Group, LLC where each entity was denominated by a roman numeral at the end of its name (the "Holding Group LLCs"). Mocco then transferred his properties into the Holding Group LLCs to circumvent EMP's restriction. Licata and his wife, Cynthia, were named as the owners of the LLCs to ensure that the LLCs would be true "bankruptcy-remote entities." Licata and Mocco then entered a "3-page Agreement" (the "TPA"), which specified that Licata was taking title to the properties as a nominee only and that the properties would be reconveyed back to Mocco for $1 at Mocco's discretion once Mocco had obtained long-term financing to replace EMP's short-term financing.

At some point in time after this deal was consummated, Licata apparently transferred most of the valuable real estate into one Holding Group entity known as First Connecticut Holding Group, LLC IV ("FCHG IV"). The ownership of FCHG IV and the real estate it held would later become the subject of many of the disputes between Licata and Mocco that emanated from this financing deal, including the NJ Ownership Dispute before Judge Rothschild in New Jersey and the Sale proceedings before Judge Shiff in this Court.

On June 27, 2002, Mr. Licata filed a voluntary petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Middle District of Florida. On July 12, 2002, FCCG filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the District of Connecticut before this Court. Upon the motion of the United States Trustee for the Middle District of Florida to transfer venue, Licata's bankruptcy case was transferred to this Court on September 20, 2002. On December 30, 2002,

the Chapter 11 cases of Licata and FCCG were administratively consolidated.

### 1. The Vermont Decisions

Also in September of 2002, Licata filed voluntary petitions for bankruptcy relief under Chapter 11 of the Bankruptcy Code in this Court for certain Holding Group LLCs, which included FCHG II, III, X, XI, and XIII. *In re* FCCG, 2004 WL 1676211. FCHG IV was not included in the bankruptcy filing. Mocco filed a motion to dismiss the cases, claiming that Licata lacked authority to file the petitions because he did not own the Holding Group LLCs and the real estate they controlled. In January of 2004, these cases and the motion to dismiss were transferred to Judge Brown in District of Vermont. Following an eight-day trial on the motion to dismiss, Judge Brown held "that Licata had no ownership interest in the [Holding Group] LLCs as of the date he filed the LLC bankruptcy petitions." *Id.* at *16. Judge Brown noted that Licata and Mocco's complex series of transactions were like a tangled web with "many loops and knots woven by the parties' conduct." *Id.* at *1. Judge Brown further determined that Licata had filed the petitions in bad faith because "[t]here was no legitimate reorganization purpose to be served by filings" and "Licata's primary, if not sole, motivation in the filing of [these] cases was to attempt to retain possession and control over property in which he had no ownership rights . . . ." *Id.* at *16. Judge Brown also noted that Licata's testimony—that he believed the TPA was a "non-binding gentleman's agreement" with Mocco—was "both disturbing and disingenuous" based on the record, *id.* at *4, and that "Mocco was a more credible witness than Licata on all issues," *id.* at *2. Licata appealed Judge Brown's ruling without success. Both the United States District Court for the District of Vermont (Sessions, C.J.) and the United States Court of Appeals for the Second Circuit (the "Second Circuit") affirmed Judge Brown's decision. *See In re First Connecticut Consulting*

*Grp., Inc.*, 340 B.R. 210, 213 (D. Vt. 2006), *aff'd*, 254 F. App'x 64 (2d Cir. 2007). The decisions by Judge Brown, Judge Sessions, and the Second Circuit are collectively referred to as the "Vermont Decisions."

### 2.  The Bankruptcy Sale

In March 2005, the Debtors (Licata and FCCG) sought approval from Judge Shiff in this Court to sell substantially all of their assets to a third party known as SWJ Holdings, LLC ("SWJ Holdings"). The parties submitted two agreements: the First Amended Purchase Agreement ("FAAPA") between the Debtors and SWJ Holdings, and a Transfer, Settlement, and Release, Agreement ("TSRA") between SWJ Holdings and Cynthia Licata. The FAAPA defines the "Acquired Assets" to be sold, which included Licata's claimed interests in FCHG IV. The FAAPA allowed the Debtors to transfer the Acquired Assets to SWJ Holdings, and the TSRA allowed SWJ Holdings to transfer any Acquired Assets (including FCHG IV) to Cynthia Licata that were meant to pass through the transaction to her as non-debtor assets.

At the time of the Sale, the Acquired Assets consisted of, *inter alia*, a large collection of various membership interests in certain limited liability companies (some of which held valuable real estate) and numerous contingent, unliquidated claims against various third parties. Most of the membership interests pertained to the Holding Group LLCs. James and Cynthia Licata each claimed to own 50% of fifteen of these entities, except for FCHG IV, in which Cynthia claimed to hold a 100% interest.

The Sale was structured similar to a quitclaim transaction, where James Licata would transfer any and all rights he possessed in the Acquired Assets to SWJ Holdings, which at the time was believed to be a purported non-interested third party. Contemporaneous with the transfer from James Licata, SWJ Holdings transferred to Cynthia Licata any membership

interests she held in the Holding Group LLCs. In other words, one purpose of the Sale was to allow Cynthia's membership interests to pass through SWJ Holdings to her as non-debtor assets. Cynthia Licata did not pay consideration for these membership interests, as the disclosures made by James Licata at the time of the Sale indicated that she was the owner of those assets.

The Moccos objected to the Sale based on their belief that SWJ Holdings was an insider of FCCG and closely related to Licata himself and believed that the source of funds SWJ Holdings would use to purchase the assets were derived from offshore accounts related to Licata. (The Moccos' Objections, BR-ECF Nos. 606, 656, and 704, FCCG No. 02-50852). The Moccos also requested that the Sale Order clarify that it was not making a judicial determination that the Debtors had a legitimate ownership interest in the assets subject to the Sale.

Stephen Podell, the purported managing member of SWJ Holdings, filed an affidavit attesting that SWJ did not engage in any type of collusion, misrepresentation, or fraud when negotiating the FAAPA with James and Cynthia Licata (the "Podell Affidavit"). (BR-ECF No. 668, FCCG No. 02-50852). Podell also attested that Licata held no interest in SWJ Holdings, was not an officer, employee, manager or party to any contractual relationship with SWJ Holdings, and did not have any side deals with the Licatas.

On May 25, 2005, Judge Shiff held a hearing in this Court to consider the Debtors' proposed Sale and any related objections. The Mocco's Objections were resolved on the record during the Sale Hearing and no formal decision was issued on the merits. The next day, Judge Shiff entered an order approving bidding procedures for the Sale. (BR-ECF No. 676, FCCG No. 02-50852). On June 21, 2005, SWJ Holdings was the successful bidder at an auction to purchase the Licata assets. The successful bid was $8,950,000. That same day, Judge Shiff held a hearing

to consider approval of the Sale (the "Sale Hearing"). During that hearing, Judge Shiff approved the FAAPA with the consent of all parties and approved the Sale.

On June 23, 2005, Judge Shiff entered an order approving the Sale pursuant to 11 U.S.C. § 363(b) (the "Sale Order"). (BR-ECF No. 716, FCCG No. 02-50852). No party sought an appeal of the Sale Order. In July 2005, the Moccos filed a motion to clarify the intent of the bankruptcy court's order approving the Sale. (BR-ECF No. 720, FCCG No. 02-50852). The Moccos wanted certainty that their claims would survive the Sale Order and that their claims would survive the Sale Order, or in other words, that SWJ Holdings was not purchasing the Acquired Assets free and clear of all liens and encumbrances. During a hearing held on July 19, 2005, Judge Shiff denied the Mocco's motion but did not docket a decision on that issue.

Due in part to SWJ Holdings' difficulties with obtaining financing for the Sale, the closing was delayed for nearly one year after Judge Shiff's Sale Order. On March 9, 2006, Judge Shiff entered an order modifying the terms of payment for the purchase price. (BR-ECF No. 917, FCCG No. 02-50852). Pursuant to that Order, and upon closing of the FAAPA on March 16, 2006, SWJ Holdings was directed to deliver: (1) payment of the escrowed $5,000,000 to the Trustees' counsel; (2) an executed promissory note (the "Note") in the principal amount of $5,850,000 for the unpaid balance of the purchase price, with interest on such principal amount payable at the rate of nine percent (9%) per annum, payable in full with interest on December 15, 2006 to the Debtors' bankruptcy estate; (3) an executed Security and Intercreditor Agreement between SWJ Holdings, the Debtors' estates, SWJ Holdings' parent (Cobra/Ventura Equities LLC), and Dare Investments LLC, the entity that financed the Sale; and (4) an executed Guaranty by Cobra/Ventura of the obligations of SWJ Holdings under the Note. On March 13, 2006, the closing of the Sale finally occurred. The Debtors' estates transferred the Acquired

Assets to SWJ Holdings, and SWJ Holdings transferred 100% of the membership interests in FCHG IV to Cynthia Licata.

### 3.  The SWJ Bankruptcies

After the Sale closed, chaos ensued. The following background information does not present a complete picture of this chaos, but the Court provides some detail on the bankruptcies filed by two "SWJ" entities as it suggests that Licata is possibly the architect of this mayhem. He certainly appears to be the common denominator amongst a colorful cast of characters affiliated with SWJ Holdings and other entities that were either directly or peripherally involved in the Sale.

On September 10, 2007, SWJ Holdings was forced into involuntary Chapter 11 bankruptcy in the District of New Jersey by a group of creditors.[7] Upon motion by the Trustees, the case was transferred to Judge Shiff in this Court. (BR-ECF No. 8, SWJ Holdings No. 07-22951). In the briefing that occurred on that motion, the Trustees alleged that SWJ Holdings was created for the sole purpose of purchasing the Acquired Assets from the Debtors and had supplied a forged bank document to Judge Shiff misrepresenting their ability to meet their obligations under the Note.

Once the case was transferred to Judge Shiff in October 2007, the case was converted to a voluntary Chapter 11 case. Judge Shiff granted relief from stay to the Trustees to foreclose on any assets held by SWJ Holdings and that case was converted to Chapter 7 thereafter. (BR-ECF No. 206, SWJ Holdings No. 07-50658). Any remaining assets were abandoned by the Chapter 7 Trustee, and the case closed without a discharge on April 4, 2011.

---

[7] In its discretion, the Court will take judicial notice of all bankruptcy cases filed by SWJ Holdings and any related "SWJ" entities. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in other litigation but rather to establish the fact of such litigation and related filings.").

In the Debtors' bankruptcy cases before Judge Shiff, the Trustees asserted that SWJ Holdings was owned by the following members:

Stephen Podell – 30%

Cobra/Ventura Equities LLC (William Mournes) – 59.3%

Payne Investments LLC (Rich McCloskey) – 10%

G Triple S. LLC (Shandon Gubler) – 0.07%

*Mocco v. Licata*, No. L-7709-13 at 4–5. Stephen Podell has also been described as the 100% owner and "managing member" of SWJ Holdings. *Id.*

To make the matter even more confusing, in the NJ Ownership Dispute at the trial before Judge Rothschild, Mocco claimed that the name "SWJ" stands for its three members: Stephen Podell ("S"), William Mournes ("W"), and James Licata ("J"). *Mocco v. Licata*, No. L-7709-13 at 4. Mocco submitted an email at trial from a defendant attorney who had previously settled and was no longer in the case. The email stated that SWJ Holdings was to be owned by Licata, Mr. Podell and another defendant, and Mr. Mournes, with each member holding an equal 1/3 membership interest. *Id.* Licata denied any membership in SWJ Holdings. Another individual named Richard Annunziata told Judge Rothschild that he was a 30% owner of SWJ Holdings. *Id.* Mr. Annunziata was believed at the time to be a friend of Licata or may have bought an interest in SWJ Holdings from Licata. *Id.*

Mr. Annunziata also claimed to own 100% of an entity known as SWJ Management, LLC ("SWJ Management"). On June 28, 2013, SWJ Management filed a voluntary Chapter 11 bankruptcy petition in the Southern District of New York. (BR-ECF No. 1, SWJ Management No. 13-12123). On September 6, 2013, the case was transferred to the District of New Jersey. In SWJ Management's Statement of Financial Affairs, Mr. Annunziata claimed to own 80% of

SWJ Management as the managing member and that a woman by the name of Angelina Kates owned the other 20%. (BR-ECF No. 16, SWJ Management, No. 13-29621). On January 15, 2014, upon motion by SWJ Holdings, the Honorable Novalyn L. Winfield dismissed SWJ Management's bankruptcy petition after determining that the case was not filed in good faith due to Mr. Annunziata's use of the DIP checking account to pay his personal expenses, which included cash withdrawals made at several Atlantic City, New Jersey casinos. (BR-ECF Nos. 85, 99, SWJ Management, No. 13-29621).

Less than two months later, SWJ Management and another entity known as CB3 Acquisitions, LLC ("CB3") filed for Chapter 11 bankruptcy protection in the District of Delaware. Both entities claimed to own the Acquired Assets that were the subject of the Sale before Judge Shiff. The Trustees moved to have the case transferred to Judge Shiff in Connecticut, asserting that CB3 was attempting to perpetrate a fraud on the court after its failed attempt to purchase the Acquired Assets at the time of Sale and that the owner of CB3, Michael Staisil, was a friend of Licata's. (BR-ECF No. 3, SWJ Management No. 14-10416). The Trustees also asserted that Bruce Duke, the attorney representing CB3, had also signed various bankruptcy petitions for SWJ Holdings and SWJ Management but was not authorized to practice law before the Delaware Bankruptcy Court. The Trustees argued that Licata, Staisal, and Annunziata were all acting as co-conspirators to attempt to regain control over the Acquired Assets and prevent Mocco's efforts in New Jersey to prove his ownership over the Holding Group LLCs.

SWJ Management's Chapter 11 case was transferred to Judge Shiff in Connecticut. Once there, SWJ Management sought to dismiss its case on the basis that it had no assets to administer and the bankruptcy case served no purpose. Judge Shiff denied SWJ Management's motion for

failure to articulate any cause for dismissal and converted the case to Chapter 7. (BR-ECF No. 111, SWJ Management No. 14-50526). SWJ Management appealed the decision without success. The Honorable Michael P. Shea of the District Court for the District of Connecticut determined that Judge Shiff did not abuse his discretion in deciding to convert SWJ Management's case from Chapter 11 to Chapter 7 over dismissal. *SWJ Mgmt., LLC v. Coan*, 551 B.R. 93, 99 (D. Conn. 2015). SWJ Management attempted to appeal Judge Shea's decision, but the Second Circuit dismissed the appeal. (Second Circuit No. 15-3338, December 16, 2015). After the Chapter 7 Trustee filed a report of no distribution, Judge Shiff closed SWJ Management's case.

### B.  The Instant Adversary Proceeding

#### 1.  The Trustees' Complaint

On March 13, 2009, the Trustees commenced this adversary proceeding by way of Complaint against James and Cynthia Licata. Compl., AP-ECF No. 1. In their Complaint, the Trustees assert allegations of a widespread asset-shielding scheme perpetrated by James and Cynthia Licata and, to a lesser degree, their daughter Jessica Licata and their son Tucker Licata. Natasha Yeoh, an employee of James Licata, is also alleged to be a participant in the scheme. A collection of other defendants remain in default for failure to appear in this case. Those defendants include Michael Lander, an alleged associate of James Licata, and several limited liability companies alleged to comprise the network of business entities used by James and Cynthia Licata to further their asset-shielding scheme. Those entities include: East Coast Investments LLC ("East Coast"), Santa Fe Holdings LLC, Santa Fe Development LLC, Knox Trucking LLC f/k/a Jtw3 Development LLC, Mighty Seven Angels LLC, and Charter Holdings LLC (collectively, the "Company Defendants").

This fraudulent enterprise is alleged to encompass not only the Sale, but several transactions that occurred after, and perhaps because of, the Sale. The alleged fraudulent scheme consists of three main components. First, the Trustees allege that James Licata made material misstatements and omissions in his bankruptcy case to induce this Court to approve a fraudulent sale of assets. James Licata allegedly failed to disclose that he was an insider of SWJ Holdings. He also allegedly failed to disclose that he—not Cynthia Licata—was the owner of the 100% membership interest in FCHG IV. In other words, the Trustees claim that James Licata induced the Court into approving a sale that effectively allowed James Licata to transfer assets to himself and Cynthia Licata in an effort to shield their assets from creditors. Thus, the Trustees allege that not only were assets fraudulently transferred to SWJ Holdings, but also to Cynthia Licata.

The second component of the fraudulent scheme involves a real estate transaction that occurred after the Sale. Once Cynthia Licata obtained the membership interest in FCHG IV, she allegedly sold the real estate held by FCHG IV to SWJ Holdings for a total purchase price of $31.3 million. In the closing of this transaction, FCHG IV received or granted a mortgage for approximately $23 million and close to $1.7 million in cash (the "Second Mortgage"). Certain of these loan proceeds were placed in escrow. The Trustees allege that Cynthia Licata received $380,000 from this escrow account. FCHG IV then transferred the mortgage to East Coast, another entity the Trustees allege is controlled by James and Cynthia Licata

Finally, the Trustees allege that a dispute arose over the validity and enforceability of the Second Mortgage, which in turn gave rise to a claim against a title insurance company (the "Title Claim"). The Trustees do not fully explain the dispute or who triggered the Title Claim, but one possibility is that the Title Claim arose when Mocco was actively attempting to prove his ownership over FCHG IV. James Licata allegedly sold the Title Claim to Larry D. Kelley of

14

Portland, Oregon through an Assignment and Buyback Agreement, and he and his wife allegedly used the proceeds of that sale to fund a lavish lifestyle for them and their children (the proceeds are referred to as the "Portland Funds").

The Trustees' Complaint consists of eleven counts, many of which constitute fraudulent transfer claims. The first seven counts of the Complaint pertain to James Licata's transfer of FCHG IV to Cynthia Licata at the time of the Sale. Counts One through Seven assert the following claims:

a) Count One asserts a claim against James Licata for breach of fiduciary duty.

b) Counts Two through Four assert claims against James Licata for intentional and constructive fraudulent transfer of FCHG IV under Section 52-552e(a) of the Connecticut Uniform Fraudulent Transfer Act ("CUFTA"). Counts Two through Four also cite to 11 U.S.C. § 544, and seek recovery of the transferred property under 11 U.S.C. § 550 from Cynthia Licata and East Coast, as her assignee.

c) Count Five asserts a claim against Cynthia Licata and East Coast for unjust enrichment.

d) Count Six asserts a claim for fraud on the court and seeks relief from the Sale Order. Count Six does not reference any defendants by name, but incorporates all prior allegations against all defendants.

e) Count Seven purportedly asserts a claim against Cynthia Licata for aiding and abetting James Licata in perpetrating the fraud upon the court and the bankruptcy estates.

Counts Eight through Eleven were later added to the Complaint by the Trustees to address the Licatas' acquisition of the Portland Funds and the involvement of Jessica and Tucker

Licata, Natasha Yeoh, and the Company Defendants in that component of the scheme. The Trustees added substantial factual allegations describing the Licatas' acquisition of the Portland Funds and the subsequent transfers that occurred as they moved those funds through different bank accounts belonging to Jessica Licata and certain other Defendants. The Trustees also include allegations that Tucker Licata purchased certain property, including a house and a yacht, with the Portland Funds. Counts Eight through Eleven assert the following claims:

a) Count Eight contains all of the Trustee's new factual allegations related to the Portland Funds. It asserts that James and Cynthia Licata are the equitable owners of the Company Defendants. It also asserts a claim of unjust enrichment against Tucker Licata and the Company Defendants.

b) Count Nine asserts a claim against James and Cynthia Licata, Tucker Licata, and the Company Defendants for intentional fraudulent transfer under 11 U.S.C. § 544 and under Section 52-552e(a) of CUFTA of all transfers of funds that flowed through bank accounts owned by Jessica Licata and certain Company Defendants. Count Nine also seeks recovery of the transferred property under 11 U.S.C. § 550.

c) Count Ten asserts a claim against James and Cynthia Licata, Tucker Licata, and the Company Defendants for constructive fraudulent transfer under Section 52-552e(a)(2) of CUFTA related to the lack of reasonably equivalent value received in exchange for the transfer. Count Ten also cites to 11 U.S.C. § 544 and seeks recovery of the property transferred under 11 U.S.C. § 550.

d) Count Eleven asserts a claim against James and Cynthia Licata, Tucker Licata, and the Company Defendants for constructive fraudulent transfer under Section 52-552e(a)(2) of CUFTA related to James and Cynthia Licata's alleged

16

insolvency at the time of the transfer. Count Ten also cites to 11 U.S.C. § 544 and seeks recovery of the property transferred under 11 U.S.C. § 550.

Section 544(b)(1) of the Bankruptcy Code allows the Trustees to bring a claim against the Debtors as an actual creditor with an unsecured claim that could have avoided the transfer of the Debtors' property under CUFTA. 11 U.S.C. § 544(b)(1). It is not clear whether the Trustees also seek to avoid the relevant transfers under Section 544(a) as a hypothetical lien creditor. 11 U.S.C. § 544(a). No party has raised this issue before the Court.

In Counts Nine, Ten, and Eleven, Jessica Licata is named as the record holder of legal title to certain bank accounts. Michael Lander and Natasha Yeoh's facilitative involvement with the Company Defendants is described in the factual allegations set forth in Count Eight, but they are not specifically named with respect to any other counts.

The Trustees seek the following relief in their Complaint: (1) avoidance of the fraudulent transfers; (2) a judgment in an amount equal to the value of the transferred assets, and/or any products or proceeds of the transfers; (3) an injunction restraining all defendants, as well as their agents, employees, attorneys, and all persons acting in concert with them, (i) from transferring the assets, or any products or proceeds of those assets, and (ii) from taking any action to further encumber the transferred assets; (4) imposition of a constructive trust on all assets of the defendants to the extent of any unjust enrichment; and (5) money damages for unjust enrichment. Consistent with their cause of action in Count Six for "fraud on the court," the Trustees also seek relief from the Sale Order. Although the Trustees appear to be principally concerned with the transfer of FCHG IV and the Portland Funds, it is not clear whether they also intend to pursue the transfer of the first basket of assets to SWJ Holdings.

On February 3, 2010, the Licatas filed their Answer to the Complaint. Answer, AP-ECF No. 75. In their Answer, James and Cynthia Licata asserted the following affirmative defenses: (1) failure to state a claim upon which relief may be granted; (2) doctrine of unclean hands; (3) any damage suffered by the Trustees was caused, not by James and Cynthia Licata, but by other persons or entities for which the Licatas cannot be held liable; (4) expiration of the applicable statute of limitations; (5) failure to state a claim under 11 U.S.C. § 544 and expiration of the limitations period for that cause of action; (6) failure to state a claim under 11 U.S.C. § 548; (7) expiration of the limitations period under 11 U.S.C § 549; (8) impermissible collateral attack on the final Sale Order; (9) laches; (10) estoppel; and (11) lack of standing.

### 2.  The Licatas' Motion

On August 12, 2010, the Licatas filed their Motion seeking summary judgment on the entire Complaint. Mot., AP-ECF No. 81; Def.'s Mem. of Law, AP-ECF No. 82. The Licatas' Motion implicates only some of their affirmative defenses. The Licatas argue that they are entitled to summary judgment primarily because the Sale Order is a final order not subject to further litigation. They argue that the Complaint constitutes an impermissible collateral attack on the Sale Order and, further, that the law of the case doctrine does not warrant an unraveling of the Sale Order. They also make several arguments that the Trustees have failed to state a claim upon which relief may be granted and that certain claims are time-barred. First, they argue that the Trustees have failed to state a claim under 11 U.S.C. § 544 because the transfers at issue occurred postpetition. Even if the Trustees have asserted a claim under 11 U.S.C. § 544, they argue the claim is time-barred. Second, they argue that the Trustees' fraudulent transfer claims under the Bankruptcy Code should be construed as claims for avoidance of postpetition transfers under 11 U.S.C. § 549, but that any claim under that Code section is also time-barred. They

18

make one additional argument that the Trustees' claims for recovery under 11 U.S.C. § 550 are also time-barred. The Licatas' do not address any of the Trustees' fraudulent transfer claims asserted under CUFTA, nor do they argue that the Trustees have failed to state a claim under Section 544 or 548 of the Bankruptcy Code. The Licatas' affirmative defenses for the doctrine of unclean hands, laches, estoppel, lack of standing, and their defense that any damage suffered was done by others, are also not implicated in their Motion.

Perhaps as an attempt to circumvent the Trustee's response to their Motion, the Licatas additionally argue that they did not fraudulently conceal material information related to the Sale. They point to the language of the Sale Order as proof of this fact. The Licatas did not provide any factual evidence in support of their Motion other than documents that are already part of the record of this case, such as the FAAPA, the TSRA, and the Sale Order. They rely primarily on the Sale Order itself.

The Trustees do not address the Licatas' arguments related to the sufficiency or time-barred nature of specific fraudulent transfer claims under the Bankruptcy Code. Instead, in avoidance of those contentions, they raise several fraudulent concealment exceptions that they contend allow them to bring this case. First, as to the Complaint as a whole, the Trustees argue that the alleged finality of the Sale Order does not preclude this action. Even if the Sale Order operates as res judicata to preclude subsequent litigation concerning the Sale, they argue that an exception to res judicata exists when newly discovered evidence uncovers a party's fraudulent concealment of material information. In this case, they argue that the Licatas fraudulently concealed material information at the time of the Sale. They further argue that the related law of the case doctrine is a discretionary doctrine that does not require this Court to fully adhere to its prior Sale Order, and that Fed. R. Civ. P. 60 allows this Court to entertain an independent action

to set aside a judgment for fraud on the court. Second, as to the fraudulent transfer claims under the Bankruptcy Code, the Trustees argue that the doctrine of equitable tolling prevents the running of the applicable statute of limitations on any time-barred claims due to the Licatas' fraudulent concealment of material information from Judge Shiff in relation to the Sale.

In support of their arguments on these fraudulent concealment exceptions, the Trustees rely on the Affidavit of Special Counsel by Attorney Paul N. Gilmore (the "Gilmore Affidavit"),[8] which contains exhibits amounting to over 1,000 pages of documentary evidence. This evidence was produced by various parties in response to discovery subpoenas issued by the Unsecured Creditor's Committee (the "Committee") during the Debtors' bankruptcy cases as well as subpoenas issued by Attorney Gilmore during his investigation of the claims in this adversary proceeding.

The Licatas never filed a reply brief addressing the Trustees' arguments. They also failed to respond to the Trustees' Additional Statement of Material Facts setting forth the evidence supporting their fraudulent concealment exceptions. Moreover, the Licatas do not argue that a fraudulent transfer did not occur or that they did not commit some other variety of fraud. They specifically argue that they did not fraudulently conceal information from Judge Shiff, but say nothing more about the scope and extent of the Trustee's allegations that encompass fraudulent conduct beyond the Sale.

The arguments made by the Licatas in their Motion implicate both Fed. R. Civ. P. 12(b)(6) and 56, two generally incompatible standards of review. For this reason, the Court will segregate those arguments and address them separately.

---

[8] Attorney Paul Gilmore is counsel for the Trustees in this matter.

### 3.  The Stay of Proceedings

To fully capture the history of this case, it is necessary to take a momentary detour to explain why the Court is addressing the Licatas' Motion thirteen years after it was initially filed.

### i.  The Settlement Between the Trustees and the Moccos

In October 2014, in the Debtors' bankruptcy cases, the Court approved a settlement agreement between the Trustees and the Moccos under Fed. R. Bankr. P. 9019 (the "9019 Order"). (AP-ECF No. 2486). Under the settlement agreement, the Trustees sold the remaining assets of the Debtors' estates to Mocco for $1.5 million and withdrew as parties in the NJ Ownership Dispute. Licata objected, but the Court held that Licata lacked a pecuniary interest in the settlement and thus lacked standing to object after having failed to demonstrate a reasonable possibility that a surplus would remain in his estate after all creditors were paid. Licata appealed the 9019 Order to the United States District Court for the District of Connecticut. In September 2015, the District Court dismissed his appeal after affirming this Court's finding that Licata lacked standing; the Second Circuit upheld the District Court on appeal. *See Licata v. Coan*, No. 3:14-CV-1754 (MPS), 2015 WL 9699304 (D. Conn. Sept. 22, 2015), *aff'd sub nom. In re Licata*, 659 F. App'x 704 (2d Cir. 2016).

### ii.  The NJ Ownership Dispute

In June 2015, following a 39-day bench trial in the NJ Ownership Dispute, Judge Rothschild rendered a 223-page trial court opinion in which he determined that Licata only held title to FCHG IV and the other Holding Group LLCs as Mocco's nominee, not as the true equity owner, and that an escrow agreement provided for the re-conveyance of the Holding Group LLCs to Mocco. *Mocco v. Licata*, No. A-5041-14T2, 2018 WL 2923483, at *7–*8 (N.J.

21

Super. Ct. App. Div. June 5, 2018). After reviewing the transcripts from the Sale Hearing before Judge Shiff, Judge Rothschild determined that Judge Shiff never intended the Sale would terminate Mocco's rights to FCHG IV. In other words, the only asset related to FCHG IV that was transferred to SWJ Holdings (and, later, to Cynthia Licata) in the Sale was Licata's *claim* to FCHG IV—not the right, title and interest to FCHG IV or the real property it held. *Id.* at *13. Further, because Licata was only Mocco's nominee, he could not give SWJ Holdings or Cynthia Licata any greater rights or title than he possessed. Judge Rothschild noted that Cynthia Licata "never paid any money for the rights to FCHG IV, never listed herself as the owner of the FCHG IV properties, never paid any money toward the FCHG IV mortgage, never knew what properties FCHG IV possessed, and never claimed ownership of FCHG IV," while also noting that Licata—not Cynthia—kept all the rights to the FCHG IV properties pursuant to their divorce-related separation agreement.[9] *Id.*

Licata appealed the judgment to the Appellate Division of the New Jersey Superior Court. In February 2017, this adversary proceeding was stayed by order of this Court to await the outcome of the appeal of the NJ Ownership Dispute, as well the outcome of a second appeal pending before the United States Court of Appeals for the Second Circuit. AP-ECF No. 216. The Licata and FCCG bankruptcy cases essentially remained in administrative suspension during the stay as well.

In June 2018, a three-judge panel in the New Jersey Appellate Division affirmed Judge

---

[9] Notwithstanding Licata's charade, Judge Rothschild set forth a list of acts or omissions by Mocco—separate and apart from Licata's actions—that lead to confusion regarding the ownership of FCHG IV, including: choosing to use "unreliable James Licata" as his consultant or partner; drafting and keeping secret the TPA; drafting and keeping secret the escrow agreement; drafting "extraordinarily complex" corporate stock ownership documents; failing to renew the notice of lis pendens; failing to record the 2001 Order entered in the New Jersey Superior Court restraining the sale and transfer of FCHG IV's assets; failing to inform bankruptcy courts about the 2001 Order; failing to appeal the Sale Order; and, allegedly "failing to adequately warn and inform potential buyers and/or lenders that he owned the properties." *Mocco v. Licata*, No. A-5041-14T2, 2018 WL 2923483, at *6 (N.J. Super. Ct. App. Div. June 5, 2018).

Rothschild in a per curiam opinion, agreeing that Licata only held title to FCHG IV as Mocco's nominee and that he merely transferred his claim to FCHG IV—not the actual membership interest or the underlying assets themselves—to SWJ Holdings and Cynthia in the Sale, thus preserving Mocco's right, title, and interest to those assets. *Mocco*, 2018 WL 2923483 at *7– *8, *13.

In September 2021, upon motion by the Trustees, this Court entered an Order terminating the stay of proceedings and allowing the Trustees to amend their Complaint and add additional parties. (AP-ECF No. 256). It was at this juncture that the Trustees added Jessica and Tucker Licata, Natasha Yeoh, Michael Lander, and the Company Defendants to the Complaint and amended their claims to include Counts Eight through Eleven addressing the Portland Funds.

In October 2021, following the filing of the Amended Complaint, James and Cynthia Licata moved for summary judgment a second time (the "2021 Motion"). (AP-ECF No. 282, 283). The Licatas incorporated their original Motion by reference, relying on the same arguments they raised therein. The Trustees opposed the 2021 Motion, incorporating their prior Opposition by reference. (AP-ECF Nos. 292, 352). Notwithstanding that the NJ Ownership Dispute resulted in a finding on appeal that Licata never held an equitable interest in FCHG IV, the Trustees contend that the Sale, the FAAPA, and the TSRA effectuated a transfer of a contingent claim related to FCHG IV. The Trustees have not fully explained the nature of this contingent claim, except to emphasize that it was monetized by the Licatas.

On April 13, 2022, the Court held extensive oral argument on the Motions and took the matter under advisement.

The Court has not yet provided the parties with notice and a hearing on the issue of whether it will afford full faith and credit to Judge Rothchild's decision and adopt it in this case.

That issue, however, looms on the horizon. For now, the Court can resolve the present Motion without needing to determine that issue.

## IV.    THE LICATAS' MOTION TO DISMISS

### A. Discussion

#### 1.   Rule 12(b)(6) Standard of Review

Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012(b), allows a party to move to dismiss a cause of action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

 "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "As the Supreme Court has explained, this standard creates a 'two-pronged approach' based on '[t]wo working principles.'" *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) ("*Pension Benefit*") (alteration in original) (citations omitted) (quoting *Iqbal*, 556 U.S. at 678).

"First, although a complaint need not include detailed factual allegations, it must provide 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Id*. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 678). "Although for the purposes of a motion to dismiss we must take all of

the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

"Second, '[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Id.* quoting *Iqbal*, 556 U.S. at 679). "This 'facial plausibility' prong requires the plaintiff to plead facts 'allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 717–18 (alteration in original) (quoting *Iqbal*, 556 U.S. at 678). "Importantly, the complaint must demonstrate 'more than a sheer possibility that a defendant has acted unlawfully.'" *Id*. at 718 (quoting *Iqbal*, 556 U.S. at 678). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (alteration in original).

## 2.   Preliminary Procedural Issues

The Licatas have inserted two sentences into their Rule 56 Motion that purportedly attempt to assert an argument under Fed. R. Civ. P. 12(b)(6). While citing to Rule 8 and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Licatas' assert: "[w]ith its fourteen invocations of 'the allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery' . . . and repeated reliance upon allegations made solely on 'information and belief' . . . the plaintiffs' complaint fails the

*Twombly* standard." Defs.' Mem. at 13–14. In addition, at the hearing, the Licatas argued for the first time that the Trustee had failed to state a claim for fraud on the court, arguing that the Trustee's allegation—that discovery documents show Cynthia Licata was not the owner of FCHG IV at the time her husband transferred it to her through the Sale—is vague to such a degree that it fails to meet the strong burden for asserting fraud on the court.[10]

Although the defense of failure to state a claim upon which relief may be granted is generally made in a motion to dismiss under Rule 12(b)(6) before the pleadings have closed, the defendant does not waive the defense by failing to do so. *See Patel v. Contemp. Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) ("[T]he defense of failure to state a claim is not waivable."). Here, the Licatas asserted a defense under Rule 12(b)(6) in their Answer to the original Complaint, and thus they asserted the defense prior to the close of pleadings. *See id.* at 126 n.5.

However, it is the Court's conclusion that the Licatas' Rule 12(b)(6) argument in its Motion is insufficiently briefed and procedurally improper. Rule 11(b)(3) states that "[b]y presenting to the court a pleading, written motion, or other paper-whether by signing, filing, submitting, or later advocating it-an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3) (emphasis added). Thus, "allegations may be based on information and belief when facts are peculiarly within the opposing party's

---

[10] The Licatas never formally moved to dismiss the Trustee's Complaint under Rule 12(b)(6). They filed their Answer and Special Defenses and moved for early summary judgment not long after. Even though their original motion was filed over ten years ago, the Licatas, who are represented by counsel, never made an attempt in the years since to properly assert an argument under Rule 12(b)(6).

knowledge." *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008). When the bankruptcy trustee is the party asserting a claim, "courts take a more liberal view when examining allegations of actual fraud . . . in the context of a fraudulent conveyance, since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge." *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395 (Bankr.S.D.N.Y.2007) (internal quotation marks omitted) (quoting *Picard v. Taylor (In re Park S. Secs., LLC)*, 326 B.R. 505, 517–18 (S.D.N.Y. 2005)); *Secs. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999). Accordingly, courts have recognized that "allegations of circumstantial evidence are sufficient to establish fraudulent intent," *Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 643 (Bankr. S.D.N.Y. 2009), because "the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time," *Stratton Oakmont*, 234 B.R. at 310 (citation omitted). However, "relaxing the particularity requirement in bankruptcy cases should not be construed to eliminate that requirement altogether." *Id.* at 311 (citation omitted). Thus, the Trustee's inclusion of the phrase "the allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery" is appropriate in a case where the Complaint alleges that the Licatas fraudulently concealed material information to induce and mislead this Court into approving the sale of bankruptcy estate assets to an insider of the Debtors.

The Licatas' second argument, that the Trustees have failed to allege a claim for fraud on the court, references documents uncovered in discovery and therefore looks well beyond the pleadings.[11] The Trustees have responded to this argument by including documentary evidence

---

[11] Rule 12(b) affords a district court two options when presented with matters outside the pleadings: "exclude the extrinsic documents" or "convert the motion to one for summary judgement and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citing *Carter v. Stanton*, 405 U.S. 669, 671 (1972)).

with their Opposition to the Licatas' Motion. Because this issue is so closely intertwined with the Licatas' Rule 56 arguments and necessarily involves the evidence presented by the Trustees, the Court will address this argument in the second part of this decision under the Rule 56 standard of review.[12]

### 3.  The Trustees have stated a claim for avoidance of postpetition transfers under 11 U.S.C. § 549.

The Licatas seek to construe the Trustee's Complaint as stating a claim for avoidance of postpetition transfers under 11 U.S.C. § 549, but do not refer to any particular Count in the Complaint. The Licatas thus leave to the Court the task of identifying which Counts in the Complaint their argument applies to. Based on the Court's review, Counts Two, Three, Four, Nine, Ten, and Eleven address postpetition transfers allegedly made by the Licatas.

Section 549 of the Bankruptcy Code arms the trustee with the authority to avoid a postpetition transfer of property of the estate that is not authorized by the Bankruptcy Court or the Code. "The purpose of section 549 is to allow the trustee to avoid those postpetition transfers which deplete the estate while providing limited protection to transferees who deal with the debtor. Fraud by the debtor and, except with respect to purchasers of real property, good faith on the part of the transferee are irrelevant to the application of this section." *In re PSA, Inc.*, 335 B.R. 580, 584 (Bankr. D. Del. 2005) (quoting 5 Collier on Bankruptcy ¶ 549.02 (15th ed.

---

[12] The Court is not inclined to entertain an incomplete, inadequately briefed Rule 12(b)(6) argument raised over ten years ago when the Licatas, who are represented by counsel, have made no effort, despite having ample opportunities, to supplement their argument or otherwise demonstrate to the Court that it is procedurally proper. *See Adams v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the United States & Canada, AFL-CIO, Loc. 198*, 469 F. Supp. 3d 615, 647 (M.D. La.), *on reconsideration in part*, 495 F. Supp. 3d 392 (M.D. La. 2020), *and reconsideration denied sub nom. Adams v. United Ass'n of Journeyman & Apprentices of the Plumbing & Pipefitting Indus. of the United States & Canada, AFL-CIO, Loc. 198*, No. CV 98-400-JWD-RLB, 2022 WL 193022 (M.D. La. Jan. 20, 2022) (trial court would not convert motions for summary judgment to motions to dismiss for failure to state a claim where action had been pending for over 20 years with multiple discovery extensions and multiple amendments to the complaint).

rev.2005)). "Section 549 is geared to protecting the estate against unauthorized, post-petition transfers by the debtor or by creditors seizing property in order to perfect their liens." *Id.*

The Complaint does not cite to Section 549, but that alone does not mean the Trustees have not stated a claim under that section. *See Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012) ("[T]he failure in a complaint to cite a statute, or cite the correct one, in no way affects the merits of a claim, because factual allegations alone are what matters."); *Stratton Oakmont*, 234 B.R. at 317–18 (court can consider theories of recovery not articulated in complaint, so long as there are facts alleged to support them); *Reisch-Elvin v. Provident Life & Acc. Ins. Co.*, 372 F. Supp. 2d 827, 832 (E.D. Va. 2005) (plaintiff's failure to specifically identify the provision permitting recovery is not fatal on a motion to dismiss for failure to state a claim). The Trustees seek to avoid the Sale and the subsequent transfers involving FCHG IV and the Portland Funds. All of these transfers occurred postpetition. Therefore, the allegations in the Complaint contained in Counts Two, Three, Four, Nine, Ten, and Eleven are sufficient to state a claim for avoidance of postpetition transfers under 11 U.S.C. § 549.

This finding does not impact any claims the Trustees may have asserted under 11 U.S.C. § 544, as the Licatas do not challenge the sufficiency of those claims in their Motion.

## V.    THE LICATAS' MOTION FOR SUMMARY JUDGMENT

The Court will now turn to the Licatas' Rule 56 arguments and will begin by setting forth the undisputed facts.

### A.  Undisputed Material Facts

Local Rule 56(a)(1) of the Local Rules of Civil Procedure of the United States District Court for the District of Connecticut, applicable to this adversary proceeding under Federal Rule of Bankruptcy Procedure 7056, requires that the party moving for summary judgment file a

Local Rule 56(a)(1) Statement of Undisputed Material Facts. D. Conn. L. R. 56(a)(1). Local Rule 56(a)(2) requires that the party opposing summary judgment file a Local Rule 56(a)(2) Statement of Facts in Opposition to Summary Judgment. D. Conn. L. R. 56(a)(2). "The Local Rule 56(a)1 Statement should include only those facts that are material to the decision of the motion."

Each material fact set forth in a movant's statement and supported by the evidence "will be deemed to be admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with this Local Rule . . . ." D. Conn. L.R. 56(a)(1); *see also Paris v. Delaney (In re Delaney)*, 504 B.R. 738, 746–47 (Bankr. D. Conn. 2014).

The facts set forth by the Licatas in their Local Rule 56(a)(1) Statement focus solely on the Sale Order and related documents. *See* Defs.' Local Rule 56(a)(1) Statement ("Defs.' Stmt."), AP-ECF No. 83. The Trustees did not seriously object to any of these facts. *See* Pls.' Local Rule 56(a)(2) Statement ("Pls.' Stmt."), AP-ECF No. 106-59. The undisputed material facts, as set forth by the parties' submissions, are as follows:

1.    On June 23, 2005, this Court entered its Sale Order. Defs.' Stmt. ¶ 7; Pls.' Stmt. ¶ 7.

2.    The FAAPA and its exhibits were attached to the Sale Order. Exhibits A and A-1 to the FAAPA set forth Acquired Assets to be included in the Sale, all of which James Licata claimed to own. Defs.' Stmt. ¶ 8; Pls.' Stmt. ¶ 8.

3.    Exhibit A contains a document labeled as "Schedule A (James J. Licata ownership interests in various entities)," which sets forth the Holding Group LLCs that James Licata claimed to own. Each listed entity had a footnote providing further information on the nature of the ownership interests in that entity. FCHG IV was related to footnote 2, which

30

contains the following statement: "Cynthia Licata claims 100% ownership pursuant to a 1998

transaction with James Licata, but see Separation Agreement dated June 4, 2002." *Id.*

    4.    The TSRA between Cynthia Licata and SWJ Holdings was attached to the Sale

Order as Exhibit H. The TSRA includes an attachment labeled as "Exhibit A The LLCs," which

contained a table listing James and Cynthia Licata's ownership percentages in fifteen of the

Holding Group LLCs. The table states that Cynthia Licata owned 100% of FCHG IV. *Id.* The

table included in "Exhibit A The LLCs" is as follows:

| | **Membership Interest Percentage Claimed by the Licatas** | |
|---|---|---|
| **Limited Liability Company** | James J. Licata | Cynthia Licata |
| First Connecticut Holding Group L.L.C. I | 50% | 50% |
| First Connecticut Holding Group L.L.C. II | 50% | 50% |
| First Connecticut Holding Group L.L.C. III | 50% | 50% |
| **First Connecticut Holding Group L.L.C. IV** | **0%** | **100%** |
| First Connecticut Holding Group L.L.C. V | 50% | 50% |
| First Connecticut Holding Group L.L.C. VI | 50% | 50% |
| First Connecticut Holding Group L.L.C. VII | 50% | 50% |
| First Connecticut Holding Group L.L.C. VIII | 50% | 50% |
| First Connecticut Holding Group L.L.C. IX | 50% | 50% |
| First Connecticut Holding Group L.L.C. X | 50% | 50% |
| First Connecticut Holding Group L.L.C. XI | 50% | 50% |
| First Connecticut Holding Group L.L.C. XII | 50% | 50% |
| First Connecticut Holding Group L.L.C. XIII | 50% | 50% |
| First Connecticut Holding Group L.L.C. XXII | 50% | 50% |
| First Connecticut Holding Group L.L.C. XXIV | 50% | 50% |

AP-ECF No. 671 (emphasis added).

5.      Copies of the FAAPA and the TSRA were made available to all parties in interest, not only as exhibits to the Sale Order but also as filings on the docket in the FCCG bankruptcy case made available before entry of the Sale Order. Defs.' Stmt. ¶ 8; Pls.' Stmt. ¶ 8.

6.      The Sale Order contains the following language:

> M.      This Court and all parties-in-interest in these cases have been given the opportunity to examine [SWJ Holdings] with respect to its relationship with Licata. In addition, the Asset Purchase Agreement includes as Exhibit H thereto the [TSRA] dated as of April 25, 2005 between Cynthia Licata and [SWJ Holdings]. Moreover, [SWJ Holdings] has previously advised the Seller, the Creditors' Committee, this Court and all parties-in-interest that it is negotiating an agreement with EMP Whole Loan 1, L.L.C. ("EMP"), pursuant to which, and among other things [SWJ Holdings] is acquiring certain claims of EMP and its affiliates against the Estate.

> N.      The Court having considered the disclosures that have been made to this Court, this Court makes the finding and determines that [SWJ Holdings] is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. [SWJ Holdings] will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code, *In re Gucci*, 126 F.3d 280 (2d Cir. 1997) and *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983) in closing the Transactions.

> O.      The Asset Purchase Agreement must be approved and consummated promptly in order to preserve the viability of the Debtors' estates.

7.      No party ever appealed the Sale Order.

The Licatas produced copies of the FAAPA, TSRA, and Sale Order. The Trustees note that the TSRA was amended after the Sale, and have produced a copy of the Amended TSRA.

**B.  Disputed Material Facts**

In response to the Licata's Local Rule 56(a)(1) Statement, the Trustees set forth genuine disputes of material fact concerning the Licatas' fraudulent concealment of information from Judge Shiff, as follows:

    a)  Whether James Licata owned 100% of FCHG IV at the time the Court approved the Sale;

    b)  Whether James Licata fraudulently concealed his ownership interest in FCHG IV by making misrepresentations and withholding relevant documents from production in his bankruptcy case;

    c)  Whether James Licata's fraudulent concealment prevented the Trustees from discovering the existence of the claims asserted in this adversary proceeding within the applicable statute of limitations; and

    d)  Whether the Trustee's lack of knowledge of James Licata's fraudulent concealment was the result of any lack of diligence on the part of the Trustees.

Related to these disputes, the Trustees include a Statement of Additional Material Facts (the "SAMF") supported by the Gilmore Affidavit and over 1,000 pages of attached evidence (the Trustee's SAMF is found in subsection B of Part Two in their Local Rule 56(a)(2) Statement). In their SAMF, the Trustees set forth the following facts:

    1)    After the Debtors' jointly administered bankruptcy cases were converted from Chapter 11 to Chapter 7 and the Committee was formed, the Committee retained Buchanan, Ingersoll & Rooney, P.C. ("Committee Counsel") as legal counsel to represent its interests. (BR-ECF No. 30, FCCG No. 02-50852).

    2)    Committee Counsel made extensive use of the subpoena power to compel the production of documents and examine witnesses in its investigation of the financial affairs of the Debtors. Gilmore Aff. ¶ 7. Committee Counsel took depositions of, and served requests for production on the Licatas, *see* Exs. A, B, and I to Gilmore Aff., as well as subpoenaed the Licatas' accountants, *see* Exs. C-1, C-2, D-1, and D-2 to Gilmore Aff. The Licatas were deposed multiple times, and Committee Counsel was either involved in or obtained a transcript of the depositions. Committee Counsel amassed over a dozen "banker's boxes" of data on the Debtors'

financial affairs and the extent of their respective assets (the "Committee Counsel Discovery"). Gilmore Aff. ¶ 7.

3)       Committee Counsel produced a closing binder for the Sale, which showed that the FAAPA purportedly closed on March 13, 2006. Gilmore Aff. ¶ 9. Pursuant to the FAAPA, James Licata purportedly transferred to SWJ Holdings any and all interests that he then had in any of the fifteen Holding Group LLCs listed on the document known as "Exhibit A The LLCs." *Id.*; *see also* Exs. F-1 through F-6 to Gilmore Aff. consisting of Omnibus Assignments of Claim by the Debtors and certain Holding Group LLCs to SWJ Holdings.

4)       The TSRA was also executed on March 13, 2006. Ex. E-1 to Gilmore Aff., the TSRA; Ex. E-2 to Gilmore Aff., the Amended TSRA. By means of the TSRA, SWJ Holdings purportedly transferred to Cynthia Licata all the interests in the Holding Group LLCs attributable to her as described in the table shown in "Exhibit A The LLCs." Gilmore Aff. ¶ 9.

5)       With respect to FCHG IV, SWJ Holdings executed a stock power of its stated managing member, *see* Ex. E-3 to Gilmore Aff., Stock Power for FCHG IV, and a transfer of all its membership interests in FCHG IV, *see* Ex. E-4 to Gilmore Aff., Membership Interest Power for FCHG IV. James Licata also purportedly executed an Affidavit of Lost Membership Certificate and Undertaking stating that he was the owner of FCHG IV but could not find the Certificate showing his ownership of that entity. Ex. E-5 to Gilmore Aff.

6)       In March 2009, James Licata's criminal defense counsel provided the Trustees with a document production disc containing documents that were not included in the Committee Counsel Discovery (the "Criminal Counsel Discovery"). Gilmore Aff. ¶ 11. Four documents produced by James Licata's criminal defense counsel gave the Trustees reasonable cause to believe that James Licata was the owner of FCHG IV. Those four documents were:

a)  The purported Operating Agreement of FCHG IV, whose parties are identified therein as First Connecticut Holding Corporation IV ("FCH Corp. IV") and Alan C. Webber ("Webber") as trustee of a Trust Agreement dated May 1, 1997, and which states that Webber, as trustee, holds a 99% interest in FCHG IV with FCH Corp. IV holding the remaining 1% interest, *see* Ex. J to Gilmore Aff.;

b)  The purported Operating Agreement of FCHG I, whose parties are identified therein as First Connecticut Holding Corporation I ("FCH Corp. I") and Webber as trustee, and which states that Webber, as trustee, holds a 99% interest in FCHG I with FCH Corp. I holding the remaining 1% interest, *see* Ex. K to Gilmore Aff.;

c)  The index for a closing binder for a $3.4 million loan by Transatlantic Capital Company, LLC to FCHG I, with a purported closing date of April 18, 1997 (the "April 1997 FCHG I Closing Binder"), *see* Ex. L to Gilmore Aff., Index to April 1997 TCC Closing Binder; and

d)  Within the April 1997 FCHG I Closing Binder, a December 20, 1996 Revocable Trust Agreement between James Licata, as grantor/settlor, and Webber, whereby James Licata purported to transfer his 99% interest in FCHG I to Webber, as trustee, *see* Ex. M to Gilmore Aff.

Gilmore Aff. ¶ 11.

7)     The Trustees believed that the May 1, 1997 Trust Agreement referenced in the Operating Agreement of FCHG IV was a revocable trust that gave James Licata, as the grantor/settlor, plenary powers over the 99% interest in FCHG IV that was placed into that trust, similar to the arrangement that James Licata had made over the like interest in FCHG I.

8)     The Trustees commenced this adversary proceeding within two weeks of receiving the Criminal Counsel Discovery. Gilmore Aff. ¶ 11.

9)     In April 2009, shortly after the Trustees commenced suit against the Licatas, they received additional document discovery in response to a subpoena against Deutsche Bank Mortgage Capital, LLC that confirmed that James Licata was the owner of FCHG IV (the "Deutsche Bank Discovery"). Gilmore Aff. ¶ 10. The Deutsche Bank Discovery contained a closing binder for a $6.42 million loan from Transatlantic Capital Company LLC to FCHG IV

with a closing date of June 5, 1997 (the "June 1997 FCHG IV Closing Binder"). Ex. H to Gilmore Aff. The June 1997 FCHG IV Closing Binder contained a copy of the May 1, 1997 Trust Agreement referenced in FCHG IV's Operating Agreement. Ex. G to Gilmore Aff. This May 1, 1997 Trust Agreement was not contained in the Committee Counsel Discovery, nor was it provided in response to the Trustees' subpoenas for information from James and Cynthia Licata, despite this document being within the scope of the Trustees' document production requests. Gilmore Aff. ¶ 10. Furthermore, James Licata testified in 2003 that he never entered into such a trust agreement with Webber. *See id.*; James Licata Dep. at 36, Ex. I to Gilmore Aff.

The Licatas never responded to these factual statements. In the District of Connecticut, courts will deem facts admitted for purposes of summary judgment where a party "has objected to [the other party's] facts but has failed to support the objection with any admissible evidence in the record, where the record itself does not support a party's denials, or where a party has neither admitted nor denied a fact and where the record supports such fact." *Chiaravallo v. Middletown Transit Dist.*, 561 F. Supp. 3d 257, 269 (D. Conn. 2021) (internal quotation marks omitted). Not only have the Trustees provided ample citation to admissible evidence to support their factual contentions, but the record of this case also supports the facts advanced by the Trustees.

Accordingly, all facts set forth in the Trustees' SAMF will be deemed admitted for purposes of summary judgment. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."); *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 726–29 (N.D.N.Y. 2020) (plaintiff's failure to sufficiently respond to defendants' Rule 56 Statement warranted deeming certain facts admitted for purposes of summary judgment). Normally, the Court would be frustrated by the Licatas' failure to comply with the Local Rules. In this instance,

however, the Trustees have made it easy for the Court to determine that this is the appropriate consequence for the Licatas. The Trustees' evidence speaks for itself.

### C. Discussion

#### 1. Rule 56 Standard of Review

Federal Rule of Civil Procedure 56, made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056, directs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988)). Additionally, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby, Inc.*, 477 U.S. at 249.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson*, 477 U.S. at 256). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby, Inc.*, 477 U.S. at 247–48 (emphasis in original).

While the evidence relied upon at the summary judgment stage need not be presented in admissible form, it must, however, be capable of being presented at trial in admissible form. *In re Soundview Elite Ltd.,* 543 B.R. 78, 100–01 (Bankr. S.D.N.Y. 2016) ("[Rule 56(c)(2)] provides for the exclusion of matter that cannot be presented in a form that would be admissible in evidence—not that is *not* so presented." (emphasis in original)).

### 2. Whether Plaintiffs' Claims are Time-Barred Under 11 U.S.C. §§ 544, 549, or 550

The Licatas argue that 11 U.S.C. § 549(d) governs whether the Trustee's claims are time-barred because their claims arise from the Sale, which occurred postpetition. They argue that they are entitled to summary judgment because the Trustees commenced this action one year after the statute of limitations expired. The Licatas acknowledge that the Complaint asserts causes of action under 11 U.S.C. §§ 544 and 550 but, regardless of which section governs, they contend that the result is the same: this action is time-barred under §§ 544, 549, and 550 of the Code. (Defs.' Mem. at 7–8, ECF No. 82). The Licatas further contend that defeating those claims somehow results in the defeat of all other Counts in the Complaint, but provide no legal authority or analysis to support that position.[13]

Counts Two, Three, Four, Nine, Ten, and Eleven assert fraudulent transfer claims against James Licata under § 544 of the Code and CUFTA, as well as § 549 of the Code. Those same Counts seek recovery from Cynthia Licata as a subsequent transferee under § 550 of the Code.

---

[13] The Licatas argue that "all of plaintiffs' purported causes of action – regardless of what self-serving label may be affixed to them in the Complaint – are governed by 11 U.S.C. §549 which provides the statutory authority for a trustee's attempt to avoid post-petition transfers." Defs.' Mem. at 7.

The Trustees do not directly address the Licatas' argument concerning the time-barred nature of the case under §§ 544, 549, and 550 but instead contend that the statute of limitations is equitably tolled by the Licatas' fraudulent concealment of James Licata's ownership stake in FCHG IV at the time this Court approved the Sale and argue that genuine disputes of material fact preclude summary judgment on this issue. (Pls.' Mem. at 9–12, ECF No. 106).

The Court will address the time-barred nature of any claims under §§ 544, 549 and 550 of the Code before turning to the issue of fraudulent concealment and equitable tolling.

### i.  11 U.S.C. § 544

Section 544 of the Bankruptcy Code provides the trustee with the authority to avoid a prepetition transfer of property of the estate that is not authorized by the Bankruptcy Court or the Code. Subsections (a) and (b) of § 544 grant certain "strong arm avoidance powers" to a bankruptcy trustee with the goal of maximizing the estate for the benefit of creditors. Subsection (a) empowers the trustee to avoid certain prebankruptcy transfers as a lien creditor of the debtor and as a successor to certain creditors and purchasers, including bona fide purchasers of real property, whether or not such creditors or bona fide purchasers actually exist. *See* 11 U.S.C. § 550; 5 Collier on Bankruptcy ¶ 544.01 (16th ed. 2021); *Katz v. Anderson (In re Anderson)*, 623 B.R. 199, 212 (Bankr. D. Conn. 2020); *Coan v. Xin Chen (In re LXEng LLC)*, 607 B.R. 67, 88 (Bankr. D. Conn. 2019). In contrast, Subsection (b)(1) "arms the trustee with the powers of an actual creditor with an allowable unsecured claim that could have avoided a transfer of the debtor's property or any obligation of the debtor" under applicable state law. 5 Collier on Bankruptcy ¶ 544.01 (16th ed. 2021); *see also Katz*, 623 B.R. at 212.

The Licatas do not explain their rationale supporting the conclusion that the Trustee's claims under § 544 of the Code are time-barred, but the Court will nonetheless address the issue.

As previously stated, although 11 U.S.C. § 544(b)(1) allows the Trustees to bring claims under CUFTA, it is not clear whether the Trustees also intend to assert a cause of action under § 544(a) as a hypothetical lien creditor. Regardless, as explained below, the same statute of limitations applies to both types of claims, even though a claim under § 544(b)(1) involves applicable state law but a claim under § 544(a) does not.

Fraudulent transfer claims brought under CUFTA outside of bankruptcy are generally extinguished unless brought within four years after the transfer was made or the obligation was incurred, with one exception. Conn. Gen. Stat. § 52-552j. If the action is brought under Conn. Gen. Stat. § 52-552f(b) because the transfer was made to an insider for an antecedent debt and the debtor was insolvent at the time and the insider has reasonable cause to believe the debtor was insolvent, then the action is extinguished unless brought within one year after the transfer was made or the obligation was incurred. Conn. Gen. Stat. § 52-552j(3). This time limitation under CUFTA functions as a repose period that cuts off a right of action after a specified period of time.

The statute of limitations for fraudulent transfer claims brought by a bankruptcy trustee under § 544(b)(1) of the Code and CUFTA works differently. There is consensus amongst bankruptcy courts that "upon the filing of a bankruptcy case, state law statutes of limitations [for fraudulent transfer claims] cease to have any continued effect, and, instead, the provisions of section 546(a) of the Code govern." *In re Bernard L. Madoff Inv. Sec. LLC*, 445 B.R. 206, 231 (Bankr. S.D.N.Y. 2011). Although CUFTA's provisions generally allow a creditor to recover transfers made within four years before the filing of the *complaint*, "it is well established that once a bankruptcy petition is filed, section 546(a) of the Code is triggered, allowing a trustee to recover transfers made [four] years before the *petition date*." *Id.* In other words, once § 546(a) is

triggered, the four-year look-back period under CUFTA still applies, but § 546(a) provides a new statute of limitations under the Bankruptcy Code that looks forward in time.[14]

Section 546(a) of the Bankruptcy Code imposes the following time limitations on the trustee's exercise of his avoidance powers under Section 544 of the Code:

> An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—
>
> (1) the later of—
>
> > (A) 2 years after the entry of the order for relief; or
> >
> > (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
>
> (2) the time the case is closed or dismissed.

11 U.S.C. § 546(a).

Thus, the time limitation in § 546(a) of the Code applies to all claims brought under § 544 of the Code, whether those claims be for avoidance of a lien under § 544(a) or for avoidance of a fraudulent transfer under § 544(b)(1) and CUFTA.

Applying the time limitation in § 546(a) of the Code to this case leads to the conclusion that all of the Trustees' claims under § 544 of the Code would be time-barred. The Debtors' bankruptcy cases are not closed or dismissed and therefore the relevant limitation provision is § 546(a)(1) of the Code. When a case is originally filed under Chapter 11 without appointment of a trustee and is subsequently converted to Chapter 7, upon which a Chapter 7 trustee is appointed,

---

[14] The term "statute of limitations" can often be confused with a repose period. The difference is meaningful because statutes of limitation and repose periods serve different purposes and the expiration of one versus the other can trigger different consequences. For an in-depth discussion of the difference between a statute of limitations and a repose period for fraudulent transfer actions in bankruptcy, see *In re EPD Inv. Co., LLC*, 523 B.R. 680, 687 (B.A.P. 9th Cir. 2015).

§ 546(a)(1) allows the Chapter 7 trustee, as the first and only statutorily appointed trustee, two years to commence an avoidance action. *In re C & R Beer & Soda, Inc.*, 186 B.R. 173, 175–76 (Bankr. E.D.N.Y. 1995) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240–42 (1989); *see also In re Colonial Realty Co.*, 168 B.R. 512, 515–19 (Bankr. D. Conn. 1994) (statute of limitations began to run on date trustees were appointed after case was converted from Chapter 11 to Chapter 7). The underlying bankruptcy cases were originally filed under Chapter 11 without appointment of a trustee and were subsequently converted to Chapter 7 on June 28, 2006. (First Conn. BR-ECF No. 1073; Licata BR-ECF No. 224). Both Chapter 7 Trustees were appointed under Section 702 that same day. Thus, the statute of limitations began to run on the day following appointment of the Chapter 7 Trustees and expired two years later, on June 29, 2008.[15] The Trustees, however, did not commence this action until March 13, 2009, over eight months after the statute of limitations had expired. Accordingly, unless tolled, the Trustees' claims under § 544 would be time-barred by the time limitations imposed by § 546(a) of the Code.

### ii. 11 U.S.C. § 549

Section 549(d) of the Code imposes time limitations on the trustee's exercise of his avoidance powers and states:

An action or proceeding under this section may not be commenced after the earlier of—

(1) two years after the date of the transfer sought to be avoided; or

(2) the time the case is closed or dismissed.

11 U.S.C. § 549(d).

---

[15] In calculating the statute of limitations, the Court notes that Fed. R. Bankr. P. 9006(a)(1)(A) dictates that, when the relevant period is stated in days or a longer unit of time, the day of the event that triggers the period is excluded.

The Licatas argue that the applicable earlier date in this case is March 13, 2008. (Defs.'
Mem. at 7, ECF No. 82). The Court generally agrees, but the Licatas do not explain the rationale
behind their conclusion. The underlying bankruptcy cases have not been closed or dismissed and
therefore the relevant limitation provision is § 549(d)(1). Thus, the statute of limitations expired
two years after the date of the Sale, which closed on March 13, 2006, making the statute of
limitations March 14, 2008.[16] The Trustees commenced this action exactly one year later, on
March 13, 2009. Accordingly, unless tolled, the Trustees' claims under 11 U.S.C. § 549(d)
would be time-barred. *See Nisselson v. Carroll (In re Altman)*, 302 B.R. 424, 429 (Bankr. D.
Conn. 2003) (case filed well past statute of limitations under § 549(d) was vulnerable to
dismissal and thus was appropriately compromised under Fed. R. Bankr. P. 9019).

### iii. 11 U.S.C. § 550

Once the trustee has successfully avoided a transfer, Section 550 of the Bankruptcy Code
permits the trustee to recover the property transferred or the value of the property transferred. 11
U.S.C. § 550(a); 5 Collier on Bankruptcy ¶ 550.01 (16th ed. 2022). "Section 550 thus enunciates
the separation between the concepts of avoiding a transfer and recovering from the transferee." 5
Collier on Bankruptcy ¶ 550.01 (16th ed. 2022) (internal quotation marks omitted). It also
distinguishes between initial and subsequent transferees. "Section 550(a) provides that the trustee
may recover the property transferred or its value from the "initial transferee" or the entity for
whose benefit the transfer was made or any "immediate" or "mediate" transferee of the initial

---

[16] The date of the Sale Order does not govern here because the transfer was not consummated until the Sale closed
on March 13, 2006. *See In re Carmel*, 92 B.R. 778, 779 (Bankr. N.D. Ill. 1988) (The date of transfer for purposes of
§ 549(d)(1) is determined under Bankruptcy Code § 101(5) and encompasses "any surrender of an interest in
property, whether the transfer is of legal title or of possession, custody or control.").

transferee." *Id.* Section 550(f) provides the relevant statute of limitations for the trustee's recovery action and states:

> An action or proceeding under this section may not be commenced after the earlier of—
>
> > (1) one year after the avoidance of the transfer on account of which recovery under this section is sought; or
> >
> > (2) the time the case is closed or dismissed.

11 U.S.C. § 550(f).

Here, the statute of limitations in § 550(f) has not yet been triggered for any initial or subsequent transferees. This case remains ongoing, and the Trustees have not yet avoided any transfers under §§ 549 or 544 of the Code. For this reason, the Licatas' are mistaken that the Trustee's claims under this section are time-barred. *Cf. Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. 26, 36 (S.D.N.Y. 2013) (trustee brought recovery action against subsequent transferees of Fairfield within one year of settlement of that action but statute had not begun to run for subsequent transferees of Kingate because that recovery action remained ongoing). Because the statute of limitations has not begun to run on any of the Trustee's § 550 claims yet, all the Trustee's § 550 claims in this action are necessarily timely. *See id.*

### iv.  Equitable Tolling

Notwithstanding the ostensible time-barred nature of the Trustees' avoidance claims under 11 U.S.C. §§ 544 and 549, the Trustees seek to avoid the limitations bar by invoking the doctrine of equitable tolling.

"First conceived by the Supreme Court in 1874, this equitable shield provides two defenses against a statute of limitations attack. First, if a plaintiff can show that the alleged fraud was concealed by affirmative acts of the defendant, and that a suit was commenced within a

44

reasonable time after plaintiff's discovery of the fraud, the statute of limitations will not bar relief." *Matter of Mediators, Inc.*, 190 B.R. 515, 524 (S.D.N.Y. 1995), *aff'd sub nom. In re Mediators, Inc.*, 105 F.3d 822 (2d Cir. 1997) (citing *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 347–48, 22 L.Ed. 636 (1874)); *see also Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir. 1985) (discussing development of the *Bailey* doctrine). "Even in the absence of 'fraudulent concealment' by the defendant, if 'the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part,' the limitations period is tolled until the fraud is discovered." *Id*. "Both prongs of the equitable tolling doctrine are 'read into every federal statute of limitation.'" *Id.* (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946)); *see also Atl. City Elec. Co. v. Gen. Elec. Co.*, 312 F.2d 236, 239 (2d Cir. 1962) (quoting *Holmberg*, 327 U.S. at 397); *In re Milby*, 875 F.3d 1229, 1232 (9th Cir. 2017) (quoting *Holmberg*, 327 U.S. at 397).

"The Second Circuit Court of Appeals has interpreted *Bailey* to make equitable tolling available to a plaintiff who establishes that: (1) the defendant concealed from plaintiff the existence of plaintiff's cause of action; (2) upon discovering the cause of action, plaintiff commenced an action within the time period prescribed by the applicable statute of limitations; and (3) plaintiff's ignorance of the cause of action was not the result of a lack of due diligence on his part." *Id.* (citing *State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988), *cert. denied* 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988)). "A plaintiff 'may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Id.* at 525.

The statute of limitations in 11 U.S.C. § 546(a), which governs avoidance proceedings under 11 U.S.C. §§ 544, 545, 547, 548, and 553, is subject to equitable tolling. *In re Draiman*, 714 F.3d 462, 466 (7th Cir. 2013). "Equitable considerations may warrant a tolling of the statute of limitations set forth in 11 U.S.C. § 546(a) where fraudulent concealment of assets and questionable transactions are evident throughout the record, and the transferee's conduct during the case has been designed to mislead the trustee into believing that the various transactions at issue are legitimate." Tolling of limitations period as to action or proceeding under 11 U.S.C.A. §§ 544, 545, 547, 548, or 553, 5A Fed. Proc., L. Ed. § 9:1212; *see also In re Candor Diamond Corp.*, 76 B.R. 342, 350 (Bankr. S.D.N.Y. 1987) (characterizing defendants' arguments as "disingenuous" where facts clearly demonstrated fraudulent concealment sufficient to equitably toll statute of limitations).

Here, the Trustees invoke the fraudulent concealment prong. The Trustees contend that James Licata affirmatively concealed his ownership of FCHG IV throughout his bankruptcy case by withholding material documents in discovery that would have proved his ownership of FCHG IV, failing to comply with subpoenas for document production, as well as committing perjury under oath during his deposition. The Trustees further argue that Licata made affirmative misrepresentations at the time of the Sale that his wife Cynthia owned FCHG IV. Pls.' Opp'n at 6–7.

In the nearly twelve years that have passed since the Trustees filed their Opposition setting forth these arguments, the Licatas have failed to provide a response or otherwise present evidence to controvert the Trustees' claims. The Trustees have presented material evidence to support their contentions of James Licata's fraudulent concealment of his interest in FCHG IV. The Trustees do not argue that the May 1, 1997 Trust Agreement was buried in voluminous

discovery in their possession and they simply needed more time to find it. *See Matter of Mediators,* 190 B.R. at 526 (due diligence not found where plaintiffs took nine months to discover "smoking gun" documents hidden in voluminous response to subpoena). They contend that the May 1, 1997 Trust Agreement was nowhere to be found until they received the Criminal Counsel Discovery and, upon receipt, filed suit eleven days later. This would appear to indicate sufficient due diligence, but it is not clear what led the Trustees to serve a subpoena on Licata's criminal defense counsel or when the subpoena was issued. Thus, although the Court has deemed all facts in the Trustees' SAMF as admitted for purposes of this Motion, the issue of fraudulent concealment must still be addressed at trial. Accordingly, the Licatas' Motion for Summary Judgment as to Counts Two, Three, Four, Nine, Ten, and Eleven is denied on the issue of equitable tolling, which will be determined at trial.

### 3.   Impermissible Collateral Attack and Similar Doctrines

The Licatas argue that the Trustees' Complaint constitutes an impermissible collateral attack on the Sale Order, which they argue is a final, non-appealable order. Defs.' Mem. at 11. The Licatas refer to, and ask the Court to take judicial notice of, an adversary proceeding brought by the Trustees in 2010 against the law firms that served as former counsel to Licata and FCCG, as well as the Committee, during the Debtors' jointly administered bankruptcy cases. *See Coan v. Arent Fox, PLLC,* No. 10-05010 (the "Malpractice Action"). The Licatas contend that the Trustees' Complaint in the Malpractice Action is identical to the Complaint in this action and that the similarities between the claims in each case show that this action is an impermissible collateral attack on the Court's prior Sale Order. Defs' Mem. at 11. The Trustees do not address the Licatas' argument related to the Malpractice Action in their responsive papers.

A bankruptcy court's order approving a sale under Section 363(b) free and clear of all liens and encumbrances is generally afforded finality and protected from collateral attacks. Section 363(m) of the Bankruptcy Code provides that reversal or modification of a sale order on direct appeal does not "affect the validity of a sale . . . to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal" unless the sale order was stayed pending appeal. 11 U.S.C. § 363(m). Consistent with this rule, circuit courts often bar subsequent actions attacking a sale order, not under normal principals of *res judicata*, but because "[a] proceeding under section 363 is an *in rem* proceeding" that "transfers property rights, and property rights are good against the world, not just against parties to a judgment or persons with notice of the proceeding." *Regions Bank v. J.R. Oil Co., LLC,* 387 F.3d 721, 732 (8th Cir. 2004) (quoting *Gekas v. Pipin (In the Matter of Met-L-Wood Corp.)*, 861 F.2d 1012, 1017 (7th Cir. 1988)).

Although the Court generally agrees with the Licatas that bankruptcy sale orders under 11 U.S.C. § 363(b) are final, non-appealable orders, the Trustees have made a substantial showing that newly discovered evidence supports the conclusion that James Licata fraudulently concealed material information from the Court at the time of the Sale that may allow this Court to unwind the Sale Order, if necessary.

The Court will first address the significance, if any, of the Malpractice Action before turning to the remaining arguments concerning the Sale Order.

### i.  The Malpractice Action

The Licatas do not fully articulate the relevance of the Malpractice Action to their Motion other than to casually infer that the Trustees only brought that action as a back-door attempt to attack the Sale Order after failing to appeal or otherwise challenge that order. Defs.' Mem. at 12.

48

The Trustees brought the Malpractice Action in 2010 in this Court against two law firms retained in the Debtors' bankruptcy cases at the time of the Sale: Arent Fox PLLC, counsel for Licata and FCCG; and Buchanan Ingersoll & Rooney PC, counsel for the Committee. The essence of the Trustees' malpractice allegations in that case are that both law firms breached their fiduciary duties to the bankruptcy estates by negligently failing to render competent legal advice and perform due diligence leading up to the Sale, failing to advise this Court that Licata was using the Sale as a pass-through artifice to transfer significant assets (namely, FCHG IV) to Cynthia Licata, and withholding material information from this Court or otherwise obstructing the proper and efficient administration of the estates. (AP-ECF No. 1, Malpractice Action No. 10-05010). On May 5, 2015, after both law firms had moved to dismiss and responsive briefing occurred, the Trustees filed a voluntarily dismissal against all defendants with prejudice. (AP-ECF No. 85, Malpractice Action No. 10-05010). Thus, because the case never survived the pleadings phase, the Court never addressed the merits of the Trustees' claims, there was no actual litigation, and the Court never entered a final judgment on the merits that could operate to preclude this action. The Licatas fail to articulate any additional reason as to why this Malpractice Action should have any significant force or effect on the ability of the Trustee's to bring this Complaint. Accordingly, the Licatas have failed to show that they are entitled to judgment as a matter of law based upon this issue.

### ii.  The Sale Order and the Trustees' Fraudulent Concealment Exceptions

Before turning to the Sale Order, it is important to address recent precedent that frames the gravity of the issues presented by this case. In January 2022, the Second Circuit emphasized that Article III courts have a responsibility "to ensure the integrity of the Bankruptcy Court and its processes" when faced with alleged misconduct implicating the federal judiciary. *Alix v.*

*McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir.), *cert. denied*, 214 L. Ed. 2d 132, 143 S. Ct. 302 (2022). In *Alix*, AlixPartners, a bankruptcy consulting firm, filed suit against competing firm McKinsey & Co. alleging a "pay-to-play" scheme under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and state law. *Id.* at 199. Under the alleged scheme, "McKinsey secured lucrative consulting assignments . . . by knowingly and repeatedly filing disclosure statements in the Bankruptcy Court containing incomplete, misleading, or false representations concerning conflicts of interest." *Id.* at 199–200. AlixPartners alleged "that this pattern of misrepresentations to the Bankruptcy Court resulted in injury to AlixPartners through the loss of engagements it otherwise would have secured and of substantial revenues those assignments would have generated, as well as through the loss of the opportunity to compete for them in an unrigged market." *Id.* at 200. The district court dismissed the complaint for failure to allege proximate cause, but the Second Circuit held that the complaint comfortably met the Rule 9(b) heightened pleading standards for fraud and that the district court had conflated proximate cause with proof of damages. *Id.* at 209. Most importantly, the Second Circuit held that the district court "gave insufficient consideration to the fact that McKinsey's alleged misconduct targeted the federal judiciary" and further explained that "[l]itigants in all of our courts are entitled to expect that the rules will be followed, the required disclosures will be made, and that the court's decisions will be based on a record that contains all the information applicable law and regulations require." *Id.* at 204.

     With this backdrop in mind, the Court will address the parties' arguments concerning the law of the case doctrine, res judicata, and fraud on the court or relief from a final judgment under Fed. R. Civ. P. 60.

### *The Law of the Case Doctrine*

The Licatas invoke the doctrine of law of the case as a general basis for why this Court should not unwind the Sale Order. The Trustees argue that (1) cogent and compelling reasons exist for this Court to decline applying the law of the case doctrine to the Sale Order, and (2) that a fraudulent concealment exception to res judicata allows the Trustees to attack the finality of the Sale Order.

The Licatas argue that the law of the case doctrine "is especially compelling when raised in a continuing proceeding . . . as is the case here since this adversary proceeding relates to the cases that have been pending for so long." Def.'s Mem. at 13. It is not clear which "cases" the Licatas refer to. They raise these arguments in a section of their brief related to the Malpractice Action, a case which has no bearing on this adversary proceeding for the reasons discussed above. To the extent the Licatas argue that this adversary proceeding constitutes a continuation of Licata's bankruptcy case, and the Licatas are viewing those cases as essentially one and the same, they likewise do not make that clear. The sparse and abstruse briefing by the Licatas on this issue makes it difficult to ascertain the substance and boundaries of their arguments. Nonetheless, the Licatas' main objection appears to be that the Court should not depart from the law of the case doctrine because the Trustees "have made no showing of any cogent or compelling reasons for this Court to unwind its 2005 Sales Order" and, more specifically, that the Trustees "have never even sought any relief under Rule 60." Defs.' Mem. at 13.

The Court declines to apply the law of the case doctrine to the Sale Order. "Unlike the more precise requirements of res judicata, law of the case is an amorphous concept." *Arizona v. California*, 460 U.S. 605, 618 (1983), *decision supplemented*, 466 U.S. 144, (1984). "As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision

should continue to govern the same issues in subsequent stages in the same case." *Id.* "Law of the case directs a court's discretion, it does not limit the tribunal's power." *Id.* The doctrine "expresses a general reluctance, absent good cause, to reopen rulings that the parties have relied upon." *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 564 (2d Cir. 1998).

The law of the case doctrine consists of two directives. The first, referred to as the so-called "mandate rule," "requires a trial court to follow an appellate court's previous ruling on an issue in the same case." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002). "The second and more flexible branch is implicated when a court reconsiders its own ruling on an issue in the absence of an intervening ruling on the issue by a higher court." *Id.* The doctrine provides "that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless cogent and compelling reasons militate otherwise." *Id.* (citations and internal quotation marks omitted). "Cogent" and "compelling reasons" include "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Id.* at 1230.

The Licatas point to the Sale Order and the Podell Affidavit as proof that they did not fraudulently conceal any ownership claim regarding FCHG IV. According to their version of events, the Court heard the merits of any dispute over the ownership of FCHG IV during the Sale Hearing, decided the issue in their favor, and reflected that decision in the Sale Order. In other words, the Licatas argue that this Court fully determined that Cynthia Licata owned FCHG IV based on James Licata's disclosure of her ownership interest in the FAAPA and TSRA.

This simply did not happen. The Licatas' arguments can best be construed as an attempt to rewrite the history of this case.

As a threshold matter, a bankruptcy court has the power to interpret its own orders, particularly an order approving a sale under 11 U.S.C. § 363(b). "A bankruptcy court's decision to interpret and enforce a prior sale order falls under [the] formulation of "arising in" jurisdiction." *Motors Liquidation Company v. General Motors, LLC (In Matter of Motors Liquidation Co.)*, 829 F.3d 135, 153 (2d Cir. 2016). "An order consummating a debtor's sale of property would not exist but for [Section 363(b) of] the Code, and [Section 105(a) of] the Code charges the bankruptcy court with carrying out its orders." *Id.* (citations omitted); *see also* 11 U.S.C. § 363(b); 11 U.S.C. § 105(a); *Travelers Indemn. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (bankruptcy court has jurisdiction to interpret and enforce its own prior orders).

The Court's review of the Moccos' Objections to the Sale, the Podell Affidavit, the audio recording of the Sale Hearing, and the language of the Sale Order lead to one conclusion only: the Sale Order does not contain a determination on the merits of the ownership, or any claim to ownership, of FCHG IV. [17] The record in the Debtors' bankruptcy case reveals that neither the parties nor the Court were focused on the question of ownership of FCHG IV at the time the Sale was approved. It is barely mentioned by the Moccos' in their Objections to the Sale and was not the focus of the hearings leading up to the issuance of the Sale Order. Nonetheless, in response to the Moccos' concerns on that issue, Judge Shiff agreed during the Sale Hearing that the Sale would only transfer a quitclaim of the interest in FCHG IV, if any, and the Sale Order would contain no determination of the ownership of FCHG IV.

---

[17] In the NJ Ownership Dispute, Judge Rothschild conducted an extensive analysis of the Sale Order, as well as reviewed the transcripts from all hearings occurring directly before and after the Sale. Excerpts from those transcripts are included in his trial opinion. The Court will not repeat that entire analysis here, but refers to those relevant portions of Judge Rothschild's decision. *Mocco v. Licata*, No. L-7709-13 at 29–44. Judge Rothschild reached the same conclusion as this Court as to the scope and effect of the Sale Order regarding FCHG IV.

Moreover, the Sale Order entirely lacks language that could be interpreted as a determination of the ownership of FCHG IV. The Licatas point to following language in the Sale Order as proof that the parties had a full opportunity to examine the issues and make full disclosures:

> This Court and all parties-in-interest in these cases have been given the opportunity to examine the Purchaser with respect to its relationship with Licata. In addition, the Asset Purchase Agreement includes as Exhibit H thereto the Transfer, Settlement and Release Agreement (the "TSRA") dated as of April 25, 2005 between Cynthia Licata and the Purchaser. Moreover, the Purchaser has previously advised the Seller, the Creditors' Committee, this Court and all parties-in-interest that it is negotiating an agreement with EMP Whole Loan 1, L.L.C. ("EMP"), pursuant to which, and among other things, the Purchaser is acquiring certain claims of EMP and its affiliates against the Estate.

Sale Order, BR-ECF No. 716, at 7. Neither this language, nor any other language in the Sale Order, represents a determination on the ownership of FCHG IV. Thus, the Licatas' contention that Judge Shiff somehow determined that the Licatas did not fraudulently conceal their ownership of FCHG IV is not supported by the summary judgment record or the language of the Sale Order. *See Mocco v. Licata*, No. L-7709-13 at 29–44 (extensively discussing the Sale Order).

Furthermore, the Trustees' factual statements in its SAMF—that James Licata fraudulently concealed his ownership of FCHG IV—fall squarely within the exception to the law of the case doctrine for newly discovered evidence and, if true, would suggest that James Licatas' concealment of his ownership of FCHG IV prevented Judge Shiff from considering the appropriateness or good faith of the Sale. Although the Trustees bear the burden of proof at trial on their claims, the Licatas, as the moving party on summary judgment, bear the initial burden of establishing the absence of a genuine dispute of material fact. *See Weinstock*, 224 F.3d at 41. By

failing to respond to the Trustees' factual statements in their SAMF concerning James Licatas'

concealment of the May 1, 1997 Trust Agreement and the other documents uncovered in the

Criminal Counsel Discovery and the Deutsche Bank Discovery, the Licatas have failed to show

that no exceptions to the law of the case doctrine exist. Accordingly, summary judgment is

denied based upon this issue.

### *Res Judicata*

The Trustees argue that this Court's 2006 Sale Order does not operate as res judicata to

preclude any subsequent claims arising in connection with the Sale because the Sale Order was

obtained by fraud.

Res judicata, which evokes the common law principles of judicial economy and comity,

provides that a final judgment on the merits bars a subsequent action between the same parties

over the same cause of action. *Channer v. Dep't of Homeland Sec.*, 527 F.3d 275 (2d Cir. 2008).

The Trustees note that the question of whether a bankruptcy sale order under 11 U.S.C. §

363 operates as res judicata to preclude any subsequent claim arising with that sale was

considered, but not expressly determined by the Second Circuit in *Lawrence v. Wink (In re

Lawrence),* 293 F.3d 615 (2d Cir. 2002). They contend that this leaves open the issue of whether

newly discovered evidence indicating fraudulent concealment makes res judicata inapplicable

and thereby permits the prosecution of an independent action arising out of the sale. Since

*Lawrence*, the Second Circuit has addressed this issue in similar bankruptcy-related contexts. In

*In re Layo*, 460 F.3d 289 (2d Cir. 2006), the Second Circuit held that a Chapter 13 confirmation

order is a final judgment on the merits and determined that it precluded a post-confirmation

attempt to avoid a confirmed, recorded lien. In *EDP Med. Computer Sys., Inc. v. United States*,

480 F.3d 621 (2d Cir. 2007), the Second Circuit held that a bankruptcy court order allowing an

uncontested proof of claim constitutes a final judgment on the merits that can serve as a predicate for res judicata. Other circuit courts tend to agree that a bankruptcy sale order, even though it is an *in rem* order, is a final judgment on the merits. *See, e.g., Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 279 (4th Cir. 2016) (bankruptcy sale order under § 363 designed to satisfy debtor's debts owed to the bank was a final judgment on the merits for purposes of res judicata). However, these cases are fact-specific and focus on the precise issues that were or were not decided by the bankruptcy court at the time of the sale. Thus, it cannot be said that a sale order *always* has preclusive effect on subsequent litigation; that would be too broad of a statement. *See In re Just. Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990) (bankruptcy court's order authorizing settlement did not constitute final decision on the merits because court only determined the parties' probability of success on those claims, not the actual merits of those claims).

Here, we have a situation where Judge Shiff expressly told the parties that he *was not* making a determination on the merits of any claim to ownership of the Acquired Assets, specifically with regard to FCHG IV. This can only lead to the logical conclusion that the Sale Order is not a final judgment on the merits of any claim to ownership of FCHG IV. Accordingly, the Court finds that the Sale Order cannot be given preclusive effect as a final judgment on the merits of that issue.

Judge Shiff did determine, however, that SWJ Holdings was a good faith purchaser under 11 U.S.C. § 363(m), *In re Gucci*, 126 F.3d 280 (2d Cir. 1997), and *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983). The parties have provided no briefing on the preclusive effect of a sale order regarding the determination that the buyer is a good faith purchaser when newly discovered evidence indicates that the debtor and/or

the purported good faith purchaser may have colluded to divert estate assets away from creditors

or otherwise lied to the bankruptcy court. For this reason, the Court will refrain from a wholesale

analysis on this issue. A fraudulent concealment exception on this issue, to the extent one exists,

may provide the Trustees with another theory upon which they can claim entitlement to relief

from the Sale Order, but this issue has not been fully developed in the briefing.

### *Fraud on the Court and Relief from a Final Judgment Under Rule 60(b) and (d)*

The Trustees contend that the "savings clause" under Rule 60 provides exceptions to the

preclusive effect of a final judgment when the judgment is obtained by fraud on the court. The

Trustees assert that the Complaint meets the requirements for maintaining an independent action

under the "savings clause" in Rule 60 under *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*,

117 F.3d 655, 658 (2d Cir. 1997). The Trustees also contend that the Licatas' conduct satisfies

the elements for fraud on the court under *In re Clinton St. Food Corp. v. DelPrete (In re Clinton

Street Food Corp.)*, 254 B.R. 523, 527 (Bankr. S.D.N.Y. 2000), which, they argue, provides

additional support for allowing this case to continue as an independent action under Rule 60.

Aside from citing to these cases with a conclusory statement, however, the Trustees provide no

further analysis.

Res judicata "does not preclude a litigant from making a direct attack . . . upon the

judgment before the court which rendered it." *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*,

117 F.3d 655, 661 (2d Cir. 1997); *Weldon v. U.S.*, 70 F.3d 1, 5 (2d Cir. 1995). Rule 60(b) and (d)

of the Federal Rules of Civil Procedure provide the vehicle for making such a direct attack.

Under Rule 60(b)(3), the court may relieve a party from a final judgment, order, or proceeding

for fraud, misrepresentation, or misconduct by an opposing party so long as the claim of fraud is

brought "no more than a year after the entry of the judgment or order or the date of the

proceeding" under Rule 60(c). Fed. R. Civ. P. 60. Rule 60(d) further states that the rule does not limit a court's power to "(1) entertain an independent action to relieve a party from a judgment, order, or proceeding" or "(3) to set a side a judgment for fraud on the court."[18] Fed. R. Civ. P. 60(d)(1), (3). "Although the granting of such relief is within the discretion of the trial court, the rule 'is remedial and should be liberally construed.'" *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1346 (5th Cir. 1978) (citations omitted) (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Barrett*, 246 F.2d 846, 849 (9th Cir. 1957)); *Petition of Devlas*, 31 F.R.D. 130, 132 (S.D.N.Y. 1962).

"Generally, claimants seeking equitable relief through independent actions must meet three requirements. Claimants must (1) show that they have no other available or adequate remedy; (2) demonstrate that movants' own fault, neglect, or carelessness did not create the situation for which they seek equitable relief; and (3) establish a recognized ground—such as fraud, accident, or mistake—for the equitable relief." *Campaniello*, 117 F.3d at 662. There is no time limit on when an independent action may be brought, but laches applies such that a party may be barred from relief if they unreasonably delayed in bringing the action. *See, e.g., Simons v. U.S.*, 452 F.2d 1110 (2d Cir. 1971) (independent action to set aside naturalization decree, if available, would be barred by laches when party bringing action waited 22 years for no good reason and key witness died in interim); *LinkCo, Inc. v. Akikusa*, 615 F. Supp. 2d 130 (S.D.N.Y. 2009), *judgment aff'd*, 367 Fed. App'x 180 (2d Cir. 2010) (software developer five years after competitor allegedly engaged in fraudulent scheme to induce settlement in developer's previous unfair-competition action, via obstruction of discovery and witness perjury, fell short of

---

[18] The language contained in Rule 60(d) used to be included in subsection (b) and was previously referred to as the "savings clause."

establishing that it lacked an adequate remedy at law and had not created the situation itself, precluding relief).

Relief from a judgment based on fraud on the court is a far more expansive concept that has very few procedural boundaries. In *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 248 (1944), the Supreme Court held that a federal court has inherent equitable power to vacate a judgment that is obtained by fraud on the court. Most of the requirements for vacating a judgment based on fraud on the court can be found in *Hazel-Atlas*. Wright and Miller, however, provides the most complete review of this type of relief. To briefly summarize, relief for fraud on the court: (1) is not subject to any time limitation, (2) consideration of the matter cannot be barred by laches, (3) it is irrelevant that the party bringing the matter to the court's attention has unclean hands, and (4) the court may avail itself of amici curiae to represent the public interest and may invite the United States to weigh in on the matter. Wright and Miller, 11 Fed. Prac. & Proc. Civ. § 2870 (3d ed.). To successfully vacate a judgment on this ground, however, the fraud must be shown by clear and convincing evidence. *Id.*

More difficult questions exist regarding the type of conduct encompassed by fraud on the court. Some circuit courts have held that a finding of fraud on the court "is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel." *See, e.g., In re Veg Liquidation, Inc.*, 931 F.3d 730, 739 (8th Cir. 2019) (quoting *Landscape Props., Inc. v. Vogel*, 46 F.3d 1416, 1422 (8th Cir. 1995)). This "category is narrowly defined, and does not include 'fraud between the parties or fraudulent documents, false statements or perjury.'" *Id.* (quoting *United States v. Smiley*, 553 F.3d 1137, 1144 (8th Cir. 2009)). The actions of a litigant, however, may qualify as well. *See Gazes v.*

*DelPrete (In re Clinton St. Food Corp.)*, 254 B.R. 523, 532 (Bankr. S.D.N.Y. 2000) (collecting cases).

The relationship between Rule 60(b)(3) and Rule 60(d) is far from clear. In dicta, the Second Circuit has noted that the power of the court to bring an independent action or set aside a judgment for fraud on the court under Rule 60(d) "may provide a basis for invocation of the fraudulent concealment exception within the framework of Rule 60(b)" but that Rule 60(d) "generally cannot be used to preserve an ordinary Rule 60(b)(3) fraud claim which could have been asserted in a timely manner." *Lawrence,* 293 F.3d at 622 n.9. Relief sought under Rule 60(d), however, is not subject to any time limitations, other than laches in the case of an independent action. The Court has yet to find authority explaining this seeming anomaly—that Rule 60(d) could render the one-year time limitation in Rule 60(b)(3) meaningless.

The Second Circuit has had at least two occasions to address relief under Rule 60(b)(3) in the bankruptcy context. In *Campaniello*, an American furniture distributor brought suit against an Italian designer and manufacturer for concealing material information in a scheme to induce the distributor to dismiss its fraud and breach of contract claims against the designer. *Campaniello*, 117 F.3d at 662. The Italian designer had availed itself of protections in Italy that function like the Chapter 11 bankruptcy process in the United States. The Second Circuit determined that the plaintiffs could have raised claims for fraud and breach of contract in Italy through the arbitration clause contained in a settlement agreement between the parties. *Id.* Further, the Second Circuit determined that the plaintiffs had failed to show that their own carelessness did not create the situation for which they sought equitable relief under Rule 60. *Id.*

In *Lawrence*, the Second Circuit considered a case similar to the one at hand. *Lawrence* involved the debtor-plaintiffs' appeal of the district court's dismissal of seven of their adversary

proceedings premised on allegations that the debtor-plaintiffs' had unwittingly sold over 800,000 shares of stock in Mechanical Technology, Inc. ("MTI") to insiders of MTI after "the defendants had concealed information in their possession at the time of the sale about the more rapid than expected development of MTI's fuel-cell technology product." The purchasing group comprised of MTI insiders remained anonymous until the sale closed. *Lawrence*, 293 F.3d at 622. After the sale closed, the price of MTI's stock more than quadrupled after public disclosure of the fuel-cell technology product. *Id.* Upon the defendants' motion to dismiss, the district court concluded that the plaintiffs' claims constituted impermissible collateral attacks on the sale order and dismissed the claims after declining to recharacterize them as motions for relief from a judgment obtained by fraud under Rule 60(b)(3). *Id.* at 619–20. The district court included a decision in the alternative that, even if it did recharacterize the claims as seeking relief under Rule 60(b)(3), the plaintiffs waited too long to bring their actions. *Id.*

The Second Circuit determined that the district court had abused its discretion in not recharacterizing the plaintiffs actions as Rule 60(b)(3) motions for the following reasons: (1) the bankruptcy court had clearly stated that the plaintiffs deserved their day in court on the basis that their claims did not constitute a collateral attack on its sale order; (2) the facts alleged in the plaintiffs' complaint were the precise type of facts that would warrant Rule 60(b)(3) relief; and (3) "[t]he alleged fraud was not, and could not with due diligence have been, discovered during the original Sale Order proceedings." *Id*. at 624–25. Further, the Second Circuit determined that the record of the bankruptcy case contained "circumstantial indications that the alleged fraud of the defendants prevented the issue of fairness from being fully explored during the Sale Order Proceedings." *Id.* at 626.

In *Gazes*, a case that involved allegations of collusion during the sale bidding process, the court determined that the trustee's fraudulent concealment claims under Rule 60(b)(3) were time barred for failure to bring the case within the one-year limitations period. *Gazes*, 254 B.R. at 532–33. The court's decision in *Gazes* was released after *Campaniello* but before *Lawrence*. Even if ignorance of the concealment tolled the one-year period, the court further held that the trustee's claims were still time-barred because he knew about the cause of action within the one-year period. *Id.* Notwithstanding the time-barred nature of the trustee's Rule 60(b)(3) claim, the court held that the trustee had stated a legally cognizable claim for fraud on the court because the complaint alleged that the defendants lied to the bankruptcy court when asked about any bidding agreements and the lie contributed to the approval of the sale order. *Id.* at 534.

Neither party has provided briefing on the issue of whether the Trustees have sufficiently stated a claim under Rule 60(b)(3) or whether that claim is time-barred. *Gazes* supports the conclusion that the Trustees in this case have stated a legally cognizable claim for fraud on the court even if they are time-barred from bringing an action under Rule 60(b)(3), which allows the Trustees to treat this case as an independent action under Rule 60(d). The Complaint sufficiently alleges that James Licata lied to Judge Shiff about the ownership of FCHG IV, and likely lied to Judge Shiff about his connection to SWJ Holdings. The Malpractice Action was designed to address the issue of the lawyers' involvement in that scheme, but it never produced a determination on that issue and thus any lawyers' involvement remains an open question in this case. Thus, the Court finds that the Complaint states a legally cognizable claim for fraud on the court under Rule 60(d), but stops short of determining the time-barred nature of any relief under Rule 60(b)(3) and whether the determination of that issue has any bearing on the Trustees' ability to bring a claim for fraud on the court or maintain an independent action.

In this context, the Licatas have failed to show the absence of a genuine dispute of material fact on the application of the law of the case doctrine, res judicata, or relief from a judgment under Rule 60 such that summary judgment is denied on these issues. Although the Court has deemed admitted the Trustees' factual statements concerning Licata's fraudulent concealment for purposes of this Motion, that evidence must be further developed at trial.

## VI.    CONCLUSION

For the reasons stated above, the Court finds the following:

1)      Counts Two, Three, Four, Nine, Ten, and Eleven of the Trustees' Complaint sufficiently state a claim for avoidance of postpetition transfers under 11 U.S.C. § 549;

2)      Count Six sufficiently states a claim for fraud on the court; and

3)       On all other issues, the Licatas' Motion for Summary Judgment is denied.

**IT IS SO ADJUDGED, ORDERED AND DECREED** at Hartford, Connecticut this 31st day of March 2023.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut