**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | |
|---|---|
| In re:<br><br>FIRST CONNECTICUT CONSULTING GROUP, INC., et al.,<br><br>Debtors. | Chapter 7<br><br>Case No. 02-50852 (JJT)<br>(Jointly Administered) |
| RICHARD M. COAN, TRUSTEE, and RONALD I. CHORCHES, TRUSTEE,<br><br>Plaintiffs,<br><br>v.<br><br>CYNTHIA LICATA, et al.,<br><br>Defendants. | Adv. Pro. Case No. 09-05010 (JJT) |

**MEMORANDUM OF DECISION AND THE TRIAL**
**COURT'S FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

Appearances

Paul N. Gilmore, Esq.
Updike, Kelly & Spellacy, P.C.
225 Asylum Street
Hartford, CT 06103
*Counsel for Plaintiffs, Trustee Richard M. Coan and Trustee Ronald I. Chorches*

James Licata (pro se)
*Defendant*

Cynthia Licata (pro se)
*Defendant*

Tucker Licata (pro se)
*Defendant*

Douglas S. Skalka, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
*Counsel for Defendant Jessica Licata*

Meryl Anne Spat, Esq.
Law Office of Meryl Anne Spat
41 Burr Mountain Rd.
Torrington, CT 06790
*Counsel for Defendant Natasha Yeoh*

Jon Newton, Esq.
Reid & Riege, P.C.
One Financial Plaza, 21st Floor
Hartford, CT 06103
*Counsel for Defendants Charter Holdings*, *Santa Fe Holdings Group, LLC, and Michael Lander*

**1. Introduction**

On March 13, 2009, Richard M. Coan, Trustee of the Estate of First Connecticut Consulting Group, Inc., and Ronald I. Chorches, Trustee of the Estate of James J. Licata (referred to collectively hereinafter as the "Trustees" or the "Plaintiffs"), commenced this Adversary Proceeding against Cynthia Licata; James Licata; East Coast Investments, LLC; and First Connecticut Holding Group LLC, IV. (ECF No. 1) Its history is protracted, convoluted, and unruly. This action spans seventeen years and includes 1,300 filings on the docket of this Adversary Proceeding alone. This Adversary Proceeding was filed within the bankruptcy cases of Mr. Licata and First Connecticut Consulting Group, Inc. ("FCCG"). These cases were originally filed as Chapter 11 cases but were later converted to Chapter 7 cases, at which time Mr. Coan and Mr. Chorches were installed as Chapter 7 Trustees of the respective estates. (Case No. 02-50852 – ECF No. 1073; Case No. 02-51167 – ECF No. 224)

Throughout the course of this Adversary Proceeding, the Plaintiffs amended their Complaint four times to include additional claims and parties. Over time, the claims and parties were winnowed back down.[1] The remaining Counts for trial are now those against James and Cynthia, and their son, Tucker Licata. After the withdrawal of their long-time legal counsel, the Licatas proceeded through trial without legal representation. During this case, and particularly the trial, the Licatas emphatically expressed their frustration with the long history of this case, the offensive tenor of its allegations, and the claimed injustices it has wrought. This Court attempted to treat these parties solicitously, while appropriately directing them to follow the attendant Federal Rules of Evidence and Civil Procedure, the applicable provisions of the Bankruptcy Code, and the customary procedures for an orderly trial and courtroom civility.

The central issue in this case is whether the Licatas improperly hid a particularly valuable asset – namely, Mr. Licata's *claim to an ownership interest*[2] in First Connecticut Holding Group, LLC IV ("FCHG 4") – from Mr. Licata's bankruptcy estate and the bankruptcy estate of FCCG, Mr. Licata's company. The Plaintiffs contend that the Licatas hid Mr. Licata's claim to an interest in FCHG 4

[1] Several parties had default judgments entered against them, and several parties settled with the Plaintiffs. *See* Parts 2.12 and 2.13 of this Memorandum of Decision.

[2] As explained in Part 2 of this Memorandum of Decision, the asset at stake here is not actual ownership of FCHG 4, as it was later found by a New Jersey Court that Mr. Licata did not have an ownership interest in FCHG 4 on the date he filed his bankruptcy petition. What he did possess at that time of his bankruptcy filing, and what is at issue here, was a *disputed claim* to an ownership interest in FCHG 4. Nevertheless, that disputed claim possessed value because of a title insurance policy.

when seeking this Court's approval of an Asset Sale in 2006[3] by falsely asserting that Mrs. Licata owned the claim, rather than Mr. Licata. When the Asset Sale closed in 2006, it is alleged that Mrs. Licata appeared to have "retained" her claim to an interest in FCHG 4, when Mr. Licata really effectuated the transfer of the claim to her through material misrepresentations that led this Court to approve the Asset Sale.[4] (ECF No. 594, p. 10)

In sum, the Plaintiffs' basic contention is that the claim to an interest in FCHG 4 – which Mrs. Licata received through the closing of the Asset Sale and which the Licatas then later monetized for approximately $9,000,000 – was really always Mr. Licata's property pre-petition, and that the bankruptcy estates were deprived of its value through the Licatas' calculated obfuscation. In so arguing, the Plaintiffs illustrate how the claim was monetized and where the money derived therefrom has since traveled.

In response, the Defendants argue that the Plaintiffs have needlessly mired them in protracted and unjustified litigation, as this Court, in my predecessor (the Honorable Alan H. W. Shiff), entered a final order approving the disposition of the disputed assets in 2006 – including the allegedly hidden asset – with full cognizance of all material facts. They further assert that other malevolent actors are likely responsible for any alleged misdealing in these bankruptcies.

---

[3] The Asset Sale refers to the sale of the assets of FCCG, First Connecticut Holding Group, LLC XXIII, First Connecticut Holding Group LLC, XXIV, and Mr. Licata, which closed on March 13, 2006. The Asset Sale is discussed in greater detail in Part 2.4 of this Memorandum of Decision.

[4] The Plaintiffs assert that the transfer of the claim from Mr. Licata to Mrs. Licata was effectuated contemporaneously with the closing of the Asset Sale, because that is when, they contend, Mr. Licata's assets were sold without accounting for the claim. (ECF No. 594, p. 5, 10, 12)

The Court is mindful that the Plaintiffs' core assertions, by the nature, process, and roles in the previous Chapter 11 proceedings of these Debtors, implicate Debtors' counsel, the Creditors' Committees and their counsel, and my predecessor Judge Shiff, for allegedly "overlooking" Mr. Licata's facilitation of an alleged fraud. To the contrary, a fulsome examination of the record of the 363 Asset Sale demonstrates their probing and recognition of potential prepetition frauds, and diligent efforts to effectuate a practical resolution over competing claims to a disputed asset in the Asset Sale.

In part due to the complexity of the claims asserted in the Fourth Amended Complaint and the lengthy, contentious history of this case within which they were made, this Court took significant time during the trial to focus the gravamen of the Plaintiffs' allegations – that the Licatas misrepresented material facts to hide Mr. Licata's claim to an interest in FCHG 4 from the bankruptcy estates.[5] This trial was regrettably contorted due to Mr. Licata's emotional outbursts during proceedings, the defendants' repeated contentions of alleged facts and conspiracies without evidence, and a convoluted version of their defense that shielded the Licatas' deeds from plain view.

Ultimately, this Court concludes from the evidence at trial that the Trustees are unable to prove that the Licatas fraudulently concealed an allegedly valuable asset from the bankruptcy estates and the Court, and that the transfer of that asset

---

[5] The Court finds paragraph 47 of the Fourth Amended Complaint to be the clearest statement of the gravamen of the Plaintiffs' allegations that appears in the Complaint. (ECF No. 594, p. 10)

The Plaintiffs also nakedly allege that SWJ was an insider. (*Id.*, 5) The Plaintiffs provided no proof at all as to this allegation.

through the Asset Sale is avoidable, or that the funds derived therefrom are recoverable by the Trustees. Accordingly, all eleven Counts of the Fourth Amended Complaint must fail. This conclusion lies on a factual foundation largely discernable through the Court's "deep dive" into the chronology of the Chapter 11 cases, the record of briefs, recorded transcripts of hearings, and rulings, which, when analyzed, reveal that the Debtor's counsel, the Creditors' Committees, and the Court were fully cognizant of the Licata's prepetition machinations, manipulations, and obfuscations through a fulsome discovery and sale hearing process. Notwithstanding, the Court advanced a controversial asset sale to SWJ Holdings, LLC ("SWJ") to its conclusion, finding benefit to the related bankruptcy estates.

In this Chapter 7, the Licatas bear culpability for the twisted and confusing nature of their prepetition business affairs. Mr. Licata's general culpability for harms to his creditors stands out in this Court's entry of judgment denying Mr. Licata his discharge (Licata Bankr. – ECF No. 1134); and Mrs. Licata's culpability is evidenced, in part, in the Trustee's separate judgment for $1,625,000.00 against Mrs. Licata. (AP – ECF No. 466) In contrast, after a review of all of the facts and circumstances germane to this trial, this Court cannot find the appropriate quantum of evidence supporting the allegation that the disputed Ownership Claim permitted the Licatas to hide an interest in FCHG 4 from the bankruptcy estates and that an order approving the Asset Sale should be undone some twenty years later. Further, this Court cannot find credible evidence supporting the related inferences put forth by the Plaintiffs, whether intended or unintended, that the

parties to the Asset Sale, including their legal counsel, were somehow complicit, duped, negligent, or deceived. This Court concludes that the consummation of the Asset Sale set forth a sound and balanced judicial resolution of a case otherwise defined by interminable litigation, and disputed facts borne of innumerable prepetition deceits, manipulations, and evasions. The fully examined record of the Asset Sale, however, clearly defeats the Plaintiffs' causes of action.

## 2. Findings of Fact[6]

### 2.1 The Licatas' Pre-Bankruptcy Business Dealings and the Formation of FCHG 4

In the 1990s and 2000s, James Licata ("Mr. Licata" or "James") was a businessman primarily residing in Greenwich, Connecticut, and conducting his business dealings in Connecticut, New Jersey, and Florida. (Licata Bankr. – ECF No. 31, p. 2; Licata Bankr. – ECF No. 9) James's wife, Cynthia Licata ("Mrs. Licata"

---

[6] The Court declines to adopt the facts contained in the Plaintiffs' Proposed Findings of Fact and Conclusions of Law (ECF No. 1321) in their entirety. Instead, the Court only adopts those facts where specifically referenced herein.

To the extent that any Findings of Fact stated herein are considered Conclusions of Law, they are adopted as such. To the extent any Conclusions of Law stated herein are considered Findings of Fact, they are adopted as such.

During trial, this Court took judicial notice of the docket of this Adversary Proceeding (Bankruptcy Case No. 09-05010), the bankruptcy filing of FCCG, within which this Adversary Proceeding was filed (Bankruptcy Case No. 02-50852), James Licata's bankruptcy filing (Bankruptcy Case No. 02-51167), and a related Adversary Proceeding (Bankruptcy Case No. 03-05045). All of these bankruptcy cases were filled in the United States Bankruptcy Court for the District of Connecticut, although Bankruptcy Case No. 02-51167 was initially filed in Florida as *In re James J. Licata*, Case No. 8:02-bk-12696-CTC (Bankr. M.D. Fla. 2002). *See* Part 2.1 of this Memorandum of Decision.

A few notes regarding citation to specific records:

- Entries on the docket of this Adversary Proceeding, Bankruptcy Case No. 09-05010, shall be referenced simply as "(ECF No. X)."
- The bankruptcy filing of FCCG, Bankruptcy Case No. 02-50852, will be referred to as the "Main Case" or the "FCCG Bankruptcy" and where entries on its docket are cited, they shall be referenced as "(MC – ECF No. X)."
- James Licata's bankruptcy filing, Bankruptcy Case No. 02-51167, will be referred to as the "Licata Bankruptcy" and where entries on its docket are cited, they shall be referenced as "(Licata Bankr. – ECF No. X)."
- The 2003 Adversary Proceeding, Bankruptcy Case No. 03-05045, will be referred to as the "2003 Adversary Proceeding" and where entries on its docket are cited, they shall be referenced as "(AP – ECF No. X)."

This Court also took judicial notice during trial of the docket of related litigation that took place in the U.S. Bankruptcy Court for the District of Vermont (*In re First Conn. Consulting Grp., Inc., et al.*, No. 2:04-CV-230, 340 B.R. 210 (D. Vt. 2006)), and the docket of related litigation that took place in New Jersey (*Titan Mgmt., L.P., et al. v. James J. Licata, et al.*, No. L-7709-13 (N.J. Super. Ct. June 2, 2015)), as well as the appeal of the judgment that resulted therefrom (*Peter Mocco, et al. v. James J. Licata, et al.*, No. A-5041-14T2, 2018 WL 2923483 (N.J. Super. Ct. App. Div. June 5, 2018)). Where the memoranda of decision from the U.S. Bankruptcy Court for the District of Vermont, the Superior Court of New Jersey, or the Appellate Division of the Superior Court of New Jersey are cited, they shall be cited in full.

or "Cynthia") also resided in Greenwich. (Licata Bankr. – ECF No. 31, p. 3) The couple had two children together: Whitney Licata, born in 1990, and Tucker Licata, born in 1995. (Exh. P56) James also had a daughter, Jessica Licata, who became Cynthia's stepdaughter. (7/21/25 Transcript, p. 131, lines 4–8[7])

Prior to his bankruptcy filing in 2002, James was "in the business of owning and managing real estate investments, mostly located in northern New Jersey" (MC – ECF No. 66); and also worked as a consultant. *In re First Conn. Consulting Grp., Inc., et al.*, No. 2:04-CV-230, 340 B.R. 210, 214 (D. Vt. 2006). In 1996, James became a consultant for Peter Mocco, who was also a player in the New Jersey real estate business. *Id.*, 213. Mr. Mocco and his wife, Lorraine, had been enmeshed in a Chapter 11 bankruptcy in New Jersey since 1994. *Id.*; *Titan Mgmt., L.P., et al. v. James J. Licata, et al.*, No. L-7709-13, at 2 (N.J. Super. Ct. June 2, 2015). James and his company, FCCG, were hired as consultants to help secure a bridge loan that would hopefully allow the Moccos to confirm a plan of reorganization and emerge from bankruptcy. *In re First Conn. Consulting Grp., Inc., et al.*, 340 B.R. at 213–14.

Throughout their business relationship, and certainly by the time that Mr. Licata filed for bankruptcy in 2002, the Moccos' and the Licatas' finances became increasingly entangled. A key event that led to this entanglement occurred from 1996 to 1997, when Mr. Mocco transferred ownership of certain of his valuable

---

[7] Henceforth, references to one page of a written transcript will be cited as: "[Date] Tr. [Page Number]:[Line Number]–[Line Number]." Where multiple pages of written transcripts are referenced, they may be cited thus: "[Date] Tr. [Page Number]:[Line Number]–[Page Number]:[Line Number]." References to multiple pages may also be cited thus: "[Date] Tr. [Page Number]–[Page Number]." Conversely, references to audio recordings will be cited as: "[Date] Tr. [Hour]:[Minute]:[Second]–[Hour]:[Minute]:[Second]."

properties into LLCs created and controlled by the Licatas. *Id.*, 214; MC – ECF No. 66. The Licatas created at least twenty-one LLCs, all called "First Connecticut Holding Group, LLC" followed by a roman numeral that distinguished one LLC from another.[8] Some of these entities, if not all, ultimately held some of the properties owned by the Moccos. (Exh. P59)

One such LLC was FCHG 4, a New Jersey entity formed by the Licatas on September 12, 1996. (Exh. D8, p. 1–2) Over time, this LLC came to hold many of the Mocco properties. (Exh. P59) For example, on June 4, 1997, the deeds to seven New Jersey properties were transferred out of other FCHG LLCs and into FCHG 4. (*Id.*) By 2002, FCHG 4 held the deeds to twenty-two multi-unit apartment buildings in New Jersey. *Peter Mocco, et al. v. James J. Licata, et al.*, No. A-5041-14T2, 2018 WL 2923483, at *1 (N.J. Super. Ct. App. Div. June 5, 2018). Because of this deep entanglement, by the time Mr. Licata filed for bankruptcy in June 2002, the Licatas and the Moccos both asserted competing claims of 100% ownership of FCHG 4.

Mr. Licata and Mrs. Licata also disputed who held a claim to ownership of FCHG 4 as between the two of them. When they formed FCHG 4 in 1996, James and Cynthia each received a 50% ownership interest. (Exh. D8, p. 1–2) Purportedly, Cynthia received James's 50% ownership interest in 1998, becoming the 100% owner of FCHG 4. (7/21/25 Tr. 29:9–12; 7/24/25 Tr. 9:11–18) Cynthia supposedly obtained James's ownership rights at that time in connection with, and in

[8] Henceforth, each of the First Connecticut Holding Group LLCs will be referenced as "FCHG #," with the number representing the corresponding roman numeral. For example, First Connecticut Holding Group, LLC IV will be referred to as "FCHG 4." Collectively, these LLCs will be referred to as the "FCHG LLCs."

consideration for, her agreement to undertake indemnity liability for a $24,000,000 bond in connection with a real estate project that James was developing with Mr. Mocco.[9] (7/21/25 Tr. 29:9–12; 7/24/25 Tr. 9:11–18) No documentary evidence was adduced at trial demonstrating that this 1998 transaction actually took place . . . nor was evidence adduced to rebut such testimony by the Licatas.[10]

By 2002, Cynthia and James decided to divorce. Accordingly, on June 13, 2002, Cynthia and James both signed a Separation Agreement. (Exh. P56) The Separation Agreement stated that a marriage dissolution action was then pending in the Superior Court for the Judicial District of Stamford/Norwalk at Stamford as Docket No. FA-02-0189385S. (Exh. P56, p. 2)

The Separation Agreement allocated the Licatas' assets in contemplation of their pending dissolution judgment and Mr. Licata's imminent bankruptcy filing,[11] with James receiving thereunder 100% ownership interest in FCHG 4. (*Id.*, 11–13) Accordingly, Section 8.2 of the Agreement states:

> The Husband is not presently, but shall be, the owner of the following assets, to the complete exclusion, and free of and from all claims, of the Wife, absolutely and forever . . . :
>
> . . .
>
> (e) *All interests, presently in the Wife's name, in and to First Connecticut;*
> (f) All claims, presently in the Wife's name, relative to Mocco . . . .

---

[9] The Hope VI Project was a real estate project that Mr. Licata and Mr. Mocco were involved in. (Exh. P12; 7/24/25 Tr. 130:24–131:1; 8/19/25 Tr. 95:7–96:6) The Project entailed the construction of apartment buildings in New Jersey.

[10] Mr. Licata also purportedly entered a Trust Agreement on May 1, 1997, conveying 99% of his member ownership shares in FCHG 4 to Alan C. Webber as Trustee. While this was referenced at trial, the Trustees did not explain whether such a Trust was ever created, nor of what import this Trust Agreement is to the issues now before the Court. (ECF No. 106-21, Exh. G)

[11] The Separation Agreement expressly contemplated a bankruptcy filing by James and/or FCCG. (Exh. P56, p. 13)

(*Id.*, 10) (emphasis added) The term "First Connecticut" as defined in the Agreement refers to FCCG and entities related or affiliated thereto, and thus includes FCHG 4.[12] (*Id.*, 8) Accordingly, through the execution of the Separation Agreement, Mr. Licata purportedly held any claim Mrs. Licata may have had in and to the ownership of FCHG 4 – which at that time was somewhere between 50% (per the FCHG 4 formation documents) and 100% (per the undocumented 1998 deal). The Licatas never actually divorced, however, leading to unresolved speculation about whether the Separation Agreement was indeed valid and enforceable. If it was, James owned 100% of FCHG 4 upon its execution. *Titan Mgmt., L.P., et al. v. James J. Licata, et al.*, No. L-7709-13, at 136 (N.J. Super. Ct. June 2, 2015). If it was not, Cynthia held perhaps her original 50% claim to ownership, or even a 100% claim pursuant to the alleged 1998 deal. No court adjudicated the validity and enforceability of the Separation Agreement or allowed for its termination.

Thus, by the time of Mr. Licata's bankruptcy filing in late June of 2002, competing claims existed regarding who truly owned interests in FCHG 4, both as between the Moccos and the Licatas, and as between James and Cynthia.

---

[12] The term "First Connecticut" is defined in the Agreement to collectively refer to "First Connecticut Consulting Group, Inc. and/or entities related to and/or affiliated with First Connecticut Consulting Group, Inc.," which includes FCHG 4.

Although the record is replete with evidence illustrating that FCHG 4 is an entity related to and or affiliated with FCCG, further evidence is found in the Separation Agreement itself, wherein litigation concerning not only FCCG is referenced, but also litigation concerning the FCHG LLCs and even naming FCHG 4 as a defendant. (Exh. P56, p. 12–13) Within the case *S.A.S. Cap. Mgmt., Inc., et al. v. Hunneman Mortg. Corp., et al.*, Case No. 0177CV01570, filed in the Superior Court, Department of the Trial Court in Massachusetts, Essex County, both FCCG and FCHG 4 were named defendants.

**2.2 Bankruptcy Cases Commence (2002)**

On June 27, 2002, Mr. Licata filed a Chapter 11 petition in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, commencing *In re James J. Licata*, Case No. 8:02-bk-12696-CTC (Bankr. M.D. Fla. 2002). Mr. Licata's Chapter 11 bankruptcy petition was quickly transferred to the District of Connecticut, where it became Bankruptcy Case No. 02-51167 in this Court.[13]

Mr. Licata's bankruptcy filing revealed – albeit obscurely – his marriage to Cynthia, their pending divorce, and their financial entanglements. For example, he listed his marital status as "Divorced (pending)"; (Licata Bankr. – ECF No. 9, p. 52); and checked the box on Schedule E indicating that he had creditors holding unsecured priority claims for "Alimony, Maintenance, or Support," thereafter listing Cynthia as such a creditor with "possible child support" owed to her."[14] (*Id.*, 31–32) He did not, however, cite any ongoing divorce action in the list of lawsuits then-pending in which he was involved, or state a sum certain that he owed to her. (Exh. P56, p. 2)

Mr. Licata's bankruptcy schedules also revealed that he was deeply insolvent. The Summary of Schedules estimated his total assets at $216,000.00, while total liabilities were estimated at $64,893,198.18. (Licata Bankr. – ECF No. 9, p. 16)

---

[13] On August 1, 2002, the United States Trustee filed a Motion to Change Venue and Transfer Case, requesting that Mr. Licata's bankruptcy case be transferred to the United States Bankruptcy Court for the District of Connecticut. (MC – ECF No. 31) On August 30, 2002, the Motion was granted. (MC – ECF No. 57)

[14] On January 21, 2003, Cynthia filed Claim No. 46 within James's bankruptcy as a creditor, seeking $0.00. Presumably, she intended to update this claim as her indebtedness became known.

Mr. Licata's bankruptcy schedules also revealed that FCHG 4 was *potentially* one of his assets. On Schedule A, which summarized Mr. Licata's Real Property, including entities he owned, he listed the names of seventy-eight entities, their addresses, aliases, employer identification number, formation date (where known), and, presumably, whether they were owned by James in 1996, 1997, and 1998.[15] (*Id.*, 19) One of the entities listed thereon was FCHG 4. (*Id.*) FCHG 4 was listed as having been owned by James in 1996, but not in 1997 and 1998. (*Id.*) The apparent incongruence in that FCHG 4 appeared on a list of assets that James purportedly owned, but that the same list simultaneously indicated that he had not actually owned the LLC since 1996, was not addressed or explained on Schedule A, nor elsewhere in the bankruptcy filings.

Mr. Licata's bankruptcy filing was not a model of clarity, in part because of the way that he conducted his prepetition businesses. His financial affairs were simply not a model of clarity. With approximately $65 million in liabilities, over seventy-two affiliated corporate entities, and patent inconsistencies evident from even the most cursory review of his schedules (such as the listing of certain assets, while simultaneously indicating he no longer owned them, and the confusing, and at times inconsistent, information provided about whether Cynthia Licata remained his spouse), this Court was on early notice that Mr. Licata's pending divorce and potential obligations to Cynthia Licata were unresolved issues, that he may have

---

[15] The column "Ownership" is largely blank but followed by three additional columns entitled "96", "97", and "98." Under each of those three additional columns for certain entities are Ys and Ns, indicating that yes, James owned it that year, or that no, James did not own it that year.

some interest in FCHG 4, and that corralling the disputed bankruptcy estates and assets would be a gargantuan task.

On July 12, 2002, FCCG filed its own Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Connecticut, commencing Case No. 02-50852. (MC – ECF No. 1) Collectively, the Licata Bankruptcy and the FCCG Bankruptcy will be referred to as the "Bankruptcy Cases," while the bankruptcy estate of Mr. Licata and FCCG will be referred to as the "Bankruptcy Estates."

From September 23 to October 1 of 2002, an additional twenty-one LLCs related to Mr. Licata filed bankruptcy petitions in the Bankruptcy Court for the District of Connecticut. The petitions were as follows:

1. Debtor: FCHG; Case Number: 02-51228; Petition Date: 10/1/2002;
2. Debtor: FCHG 2; Case Number: 02-51177; Petition Date: 9/23/2002;
3. Debtor: FCHG 3; Case Number: 02-51197; Petition Date: 9/25/2002;
4. Debtor: FCHG 5; Case Number: 02-51178; Petition Date: 9/23/2002;
5. Debtor: FCHG 6; Case Number: 02-51200; Petition Date: 9/25/2002;
6. Debtor: FCHG 7; Case Number: 02-51179; Petition Date: 9/23/2002;
7. Debtor: FCHG 8; Case Number: 02-51199; Petition Date: 9/25/2002;
8. Debtor: FCHG 9; Case Number: 02-51202; Petition Date: 9/26/2002;
9. Debtor: FCHG 10; Case Number: 02-51180; Petition Date: 9/23/2002;
10. Debtor: FCHG 11; Case Number: 02-51198; Petition Date: 9/25/2002;
11. Debtor: FCHG 12; Case Number: 02-51201; Petition Date: 9/25/2002;
12. Debtor: FCHG 13; Case Number: 02-51181; Petition Date: 9/23/2002;
13. Debtor: FCHG 14; Case Number: 02-51175; Petition Date: 9/23/2002;
14. Debtor: FCHG 15; Case Number: 02-51170; Petition Date: 9/23/2002;
15. Debtor: FCHG 16; Case Number: 02-51174; Petition Date: 9/23/2002.
16. Debtor: FCHG 17; Case Number: 02-51173; Petition Date: 9/23/2002;
17. Debtor: FCHG 18; Case Number: 02-51172; Petition Date: 9/23/2002;
18. Debtor: FCHG 19; Case Number: 02-51171; Petition Date: 9/23/2002;
19. Debtor: FCHG 21; Case Number: 02-51205; Petition Date: 9/25/2002;
20. Debtor: FCHG 22; Case Number: 02-51203; Petition Date: 9/25/2002; and
21. Debtor: FCHG 24; Case Number: 02-51176; Petition Date: 9/23/2002.

(MC – ECF No. 66, p. 5) Collectively, these cases will be referred to as the "FCHG Bankruptcies." Although other FCHG entities existed at this time, including FCHG 4, they did not all file for bankruptcy. In fact, FCHG 4 *never* filed for bankruptcy.

On December 9, 2002, many of the twenty-one Licata-related entities listed above, as well as Mr. Licata and FCCG, jointly filed a Motion to have the FCCG Bankruptcy, the Licata Bankruptcy, and the FCHG Bankruptcies jointly administered by this Court. (*Id.*) On December 30, 2002, this Court granted the Motion and the cases were jointly administered thereafter within the FCCG Bankruptcy, Case No. 02-50852. (MC – ECF No. 86) Hereinafter, FCCG, FCHG 13, and Mr. Licata will be referred to collectively as "the Debtors."

### 2.3 The Pendency of the Bankruptcy Cases (2003 to 2005)

As more and more information eventually came to light throughout the pendency of the Bankruptcy Cases and the FCHG Bankruptcies, this Court naturally became increasingly aware of the interwoven complexities of the Licatas' finances and the competing claims to FCHG 4. This Court will now survey some of the critical events that revealed these circumstances to then-presiding Bankruptcy Judge Shiff and the constituent parties to the Asset Sale.

#### 2.3.1 The Moccos' Motion to Dismiss Certain Related FCHG Bankruptcy Cases and the Vermont Litigation

On March 19, 2003, the Moccos moved to dismiss the Chapter 11 cases of FCHG 2, FCHG 3, FCHG 10, FCHG 12, and FCHG 13. (MC – ECF No. 154, p. 7) The Moccos therein asserted that they – not James – owned those LLCs on the petition date, as well as FCHG 4 (even though FCHG 4 was not in bankruptcy). (*Id.*)

The Moccos further asserted that FCHG 4 was "owned 100% by Lorraine Mocco" and that "[o]n or about May 1997, properties owned by" FCHG 5, 6, 7, 8, 9, and 12 "were conveyed to FCHG [4] as part of a refinancing." (*Id.*)

On August 6, 2003, Cynthia filed a Motion to Intervene in the Moccos' Motion to Dismiss. (MC – ECF No. 378) There, Cynthia asserted her own claim to an ownership interest in certain FCHG entities. Specifically, Cynthia argued that her intervention was necessary to protect her own "assert[ed] ownership interests for the FCHG Entities," some of which she claimed "the Debtors ha[d] disclosed . . . in their schedules . . . ."[16] (*Id.*, 2) On August 12, 2003, this Court granted Cynthia's Motion to Intervene, granting her permission "to intervene in the Motion to Dismiss" as well as "any other related contested matter where the ownership interests of any Debtor or Debtor related entity is in issue and she asserts an ownership issue therein." (MC – ECF No. 391)

On December 24, 2003, upon the parties' consent, an order transferring venue of the Moccos' Motion to Dismiss to the District of Vermont entered. (MC – ECF No. 478) On July 27, 2004, the United States Bankruptcy Court for the District of Vermont (Hon. Colleen A. Brown) entered a Memorandum of Decision granting the Moccos' Motion to Dismiss. *In re First Conn. Consulting Grp., Inc., et al.,* No. 04-101 (Bankr. D. Vt. July 27, 2004). That court concluded that Mr. Mocco and Mr. Licata had woven a tangled web "through a complex series of transactions" and that, having "untangle[d] the various strands of the web," Mr. Licata ultimately

---

[16] Recall that Mr. Licata, one of the Debtors, disclosed a potential claim to ownership of FCHG 4 in his schedules.

"had no ownership interest in the [FCHG] LLCs as of the date he filed the LLC bankruptcy petitions." *Id.*, 19. Thus, the bankruptcy cases of FCHG 2, FCHG 3, FCHG 10, FCHG 12, and FCHG 13 were dismissed, while the Licata-related bankruptcies continued on in Connecticut. *Id.*, 20.

Although the Vermont decision did not affect FCHG 4 directly, the Moccos' Motion to Dismiss and Cynthia's Motion to Intervene, which were both filed before this Court, alerted this Court, and the parties to the remaining and ongoing bankruptcy proceedings, that any claims that the Licatas' made to ownership of certain of the FCHG entities, including FCHG 4, were seriously uncertain.

**2.3.2 Adversary Proceeding No. 03-05045 (2003)**

On May 6, 2003, this Court was further apprised of the complicated intertwining of James's and Cynthia's financial affairs when the Committee of Unsecured Creditors commenced an Adversary Proceeding against FCCG, James, Cynthia, and other defendants, accusing James and FCCG of fraudulently transferring property to Cynthia pre-petition. (AP – ECF No. 1) The original Complaint alleged that James transferred a valuable property located in Greenwich to Cynthia in 2001, for $10.00, while FCCG transferred another valuable Greenwich property to her in 1997, for $1.00.[17] (*Id.*, 6–7)

On November 7, 2003, the Complaint was amended to include additional fraudulent transfer claims. (AP – ECF No. 55) The Committee further alleged that

---

[17] The Committee further alleged that Cynthia encumbered the property she received from FCCG with two mortgages as a security for two Notes she executed. (AP – ECF No. 1, p. 8) Thereby, Cynthia allegedly received $5,100,00.00 in proceeds, which she transferred to James after his bankruptcy filing. (*Id.*, 9)

James fraudulently transferred certain of his assets to Cynthia through the property transfers effectuated by the Separation Agreement, which was attached to the Amended Complaint as Exhibit J. (*Id.*, 12) In the Amended Complaint, seemingly to explain the belated additional claims, the Committee noted that, "[n]otwithstanding [its] request at the onset of the Debtors' bankruptcy cases, the Committee did not receive [a copy of] the Separation Agreement until on or about September 18, 2003." (*Id.*) Accordingly, by at least September 18, 2003, the Committee of Unsecured Creditors received a copy of the Separation Agreement and was thereby on notice that James had a potential claim to FCHG 4, and all the FCHG LLCs, per Section 8.2 of the Separation Agreement. (*Id.*) By at least November 7, 2003, when the Amended Complaint was filed, with the Separation Agreement attached, this Court effectively had before it the contention that James held a claim to ownership of FCHG 4. (*Id.*)

#### 2.3.3 The Motion for Substantive Consolidation (2005)

As time passed and more information came to light regarding the interconnectedness of the Licatas' finances, the Official Committee of Unsecured Creditors filed a Motion for Substantive Consolidation of the Non-Debtor Cynthia Licata with the Estates of [FCCG] and James J. Licata on February 16, 2005. (MC – ECF No. 560) The Committee also filed a support brief which summarized for this Court the interconnectedness of the Licatas' finances. (MC – ECF No. 564)

The Brief opens thus:

> Mr. Licata and Mrs. Licata were and are the sole shareholders of FCCG. Since even before their marriage in 1988, Mr. Licata, Mrs. Licata, and

> FCCG have continuously expended funds, transferred property, and incurred obligations to or for the benefit of each other, all at the behest of Mr. Licata and without regard to the separate rights and expectations of their creditors. In short, Mr. Licata used both FCCG and Mrs. Licata as instrumentalities in furtherance of his schemes to defraud creditors.

(*Id.*, 2) The brief describes the various transfers of property between the Licatas and reviews the Separation Agreement before contending that, based on the relevant facts, "the labyrinth of financial transactions implemented by the Debtors and Mrs. Licata cannot be disentangled" and that, consequently, the Court should substantively consolidate "Mrs. Licata with the Debtors' estates, thus allowing this Court to properly administer her assets and liabilities along with those of the Debtors." (*Id.*, 5) The brief also notes that, "[a]lthough Mrs. Licata filed for divorce in either 2001 or 2002, the Licatas still reside [together at 23 Meeting House Road in Greenwich] as husband and wife while allegedly attempting to reconcile their marriage." (*Id.*, 7)

This brief is but one stark example of the statements and filings that informed this Court that Mrs. Licata's finances were inextricably intertwined with the Debtors' (and had been since long before the filing of the bankruptcy petitions), and that this had serious implications for the disposition of the Debtors' rights and assets in the pending Chapter 11 cases.

In sum, the events from 2003 to 2005 sufficiently detailed for this Court, and the parties, that the Licatas' finances were commingled, that Mr. Licata potentially had a valid claim to FCHG 4, and that Mrs. Licata also claimed to possess ownership interests in the FCHG LLCs, including FCHG 4.

**2.4 The Asset Sale (2005 to 2006)**

By March of 2005, having presided over the Licata Bankruptcy, the FCCG Bankruptcy, and the 2003 Adversary Proceeding, and having reviewed the Vermont decision[18] granting the Moccos' motion to dismiss five related FCHG bankruptcies, this Court was again on notice that these competing claims to ownership of FCHG 4 had not yet been resolved. Nevertheless, on March 11, 2005, Mr. Licata (as a Debtor), FCCG, FCHG 23, and FCHG 24 (collectively "the Sellers") filed a Motion to Sell,[19] seeking approval from this Court to sell substantially all of the Debtors' assets under 11 U.S.C. § 363.

The Motion to Sell squarely put the concerns described herein on the Court's radar. That Motion outlined the history between the various parties, including the Separation Agreement that the Licatas executed in 2002, the "labyrinth of financial transactions between Cynthia Licata and the Debtors that resulted in the financial entanglement of those entities," and the disputes between Mr. Licata and Mr. Mocco resulting from their own financial entanglement. (MC – ECF No. 595, p. 5–9) It also provided the Court with a Term Sheet and a "general summary" of some of its "salient provisions," which explicitly stated that the assets would be conveyed "where-as, as-is," and that the Debtors and Creditors' Committee were providing "no warranties or representations as to the quality or enforceability of any of the

---

[18] *In re First Conn. Consulting Grp., Inc., et al.*, No. 2:04-CV-230, 340 B.R. 210, 214 (D. Vt. 2006).
[19] The motion filed was titled in full, "Motion Filed by Beth Green Kibel on behalf of [FCCG], Debtor for an Order (A) Approving Sale of Assets; (B) Approving Break-up Fee and Overbid Protections; (C) Approving Bidding Procedures; (D) Setting a Hearing Date for the Auction and Hearing to Approve the Sale; and (E) Approving the Form and Manner of Notice Filed." (MC – ECF No. 595)

Assets." (*Id.*, 12) The Debtors specifically sought the Court's approval for their property to be sold free and clear of liens, claims, and encumbrances, pursuant to 11 U.S.C. § 363(f), and that the Court find that the purchaser – whether SWJ or another successful bidder – has purchased the assets in good faith within the meaning of 11 U.S.C. § 363(m).

### 2.4.1 The Asset Purchase Agreement

FCCG's Counsel filed the Asset Purchase Agreement ("APA") on April 28, 2005, which the Debtors *and* the Official Committee of Unsecured Creditors had entered into with SWJ, "to sell . . . all of Seller's right, title and interest in all of its assets subject to the terms and conditions of" the APA for $5.5 million, subject to higher and better offers. (MC – ECF No. 638, p. 2)

The Acquired Assets that SWJ was to receive were defined in Section 1.1 of the APA as:

> all of the Seller's, the Estate's, and the Creditors' Committee's right, title and interest in and to all of the assets, properties and rights of Seller and the Creditors' Committee, other than the **Excluded Assets**, including
>
> (i) those listed on
>
> (A) **Exhibit A**, attached hereto and made part hereof,
>
> (B) **Exhibit A-1**, attached hereto and made part hereof,
>
> (C) the Acquired Claims and
>
> (D) the Assumed Contracts, free and clear of all Encumbrances . . . and
>
> (ii) all other assets, properties and rights of Seller and the Creditors' Committee (such assets, properties and rights are hereinafter, collectively referred to as the "**Unlisted Acquired Assets**," and collectively with the Listed Acquired Assets, each referred to as an "**Acquired Asset**," and collectively the "**Acquired Assets**.').

(*Id.*) (emphasis in original, footnotes omitted, reformatted)

FCHG 4 was listed on Exhibit A to the APA. (*Id.*, 48) Facially, then, according to Section 1.1(i)(A) of the APA, James Licata, as one of the defined Sellers, was selling his interest – whatever that interest was – in FCHG 4.[20] (*Id.*) Footnote 2 on Exhibit A, however, added, "Cynthia Licata claims 100% ownership [of FCHG 4] pursuant to a 1998 transaction with James Licata, but see Separation Agreement dated June 4, 2002." (*Id.*) No explanation appeared on the APA or any of its Exhibits regarding what effect this footnote was intended to have on James Licata's purported sale of his interest in FCHG 4 to SWJ, if any.

Also listed on Exhibit A to the APA as an Acquired Asset was "All [of James Licata's] claims under the Separation Agreement dated June 4, 2002 between James Licata and Cynthia Licata relating to ownership of various [FCCG] denominated LLCs and other related business entities identified in attached Schedule A and any claims relating to any of them." (*Id.*, 39) Under Section 8.2 of the Separation Agreement, James received a claim to FCHG 4 as an entity related to FCCG. (Exh. P56, p. 10) Accordingly, this provision again underscored that James's interest in FCHG 4 was to be sold to SWJ.

Reading these provisions in concert, then, the APA unequivocally proposed to sell James's interests in FCHG 4, both as an asset listed on Exhibit A, and as one of his claims under the Separation Agreement, while Cynthia's competing claim to

---

[20] Of note, there is no tenable claim that FCHG 4 was somehow included in the Excluded Assets. Those excluded assets were "rights arising under the Tax Indemnification Claims," as defined in the APA; $760,000 in cash to be "held in escrow by Debtors' counsel for the benefit of FCCG and FCHG [23]," and "[t]he claims of FCCG [1] arising out of the transfer by FCCG [1] of [a] certain property located at 555 Elizabeth Avenue, Newark, New Jersey to Bel Air Holdings, LLC." (MC – ECF No. 638, p. 4–5)

ownership of FCHG 4 appears to have been merely acknowledged in Footnote 2 to Exhibit A.

In conjunction with the filing of the APA, the Official Committee of Unsecured Creditors filed a Motion to Approve Settlement Agreement with Cynthia Licata in Adversary Proceeding No. 03-05045 (AP – ECF No. 115) as well as a support brief. (AP – ECF No. 116) There, the Committee directly addressed the pending Asset Sale to SWJ, writing:

> Cynthia Licata *claims an interest in some of the Sale assets, including the various LLC membership interests and mortgages which [SWJ] requires* in order to close on the Sale. [SWJ] has advised the Committees [of Unsecured Creditors for both FCCG and Mr. Licata's estates] that, absent Mrs. Licata's agreement to transfer and/or waive her interest in the various assets, it *cannot close* on the Sale of the Debtors' assets for the $5.5 million purchase price . . . .

(*Id.*, 10) (emphasis added) Accordingly, the Committee suggested that the estates settle with Mrs. Licata "*as an integral part of*, and subject to the consummation of, the Sale." (*Id.*) (emphasis added) The Committee further asserted that:

> The settlement is a necessary and requisite component to the [Asset] Sale and the estates' ability to maximize the value of the assets. Among other things, the Debtors are selling [their] interests in various entities, joint ventures and real estate 'projects' in which they claim to hold interests. The Debtors, however, *are unable to verify or confirm the actual interests they hold in such assets*. Therefore, the Sale is on a *'as is, where is' basis*. . . . Cynthia Licata claims an interest in some of the Sale assets, *including the various LLC membership interests and mortgages which [SWJ] requires in order to close on the Sale.*

(*Id.*, 9–10) (emphasis added) Thus, this Motion reiterated to the Court that the assets to be sold were subject to disputed claims – a fact which this Court undoubtedly already knew, as explained earlier – and that the Sale accordingly was

to take place on an "as is, where is" basis, mitigating the need to definitively determine which interests the Debtors held without dispute prior to closing.

A provision at Section 5.2.1 of the APA, entitled "Release of Insider Claims and Cynthia Licata," incorporated this release. (MC – ECF No. 638, p. 12–13) That provision stated that "the Insider Claims against Cynthia Licata shall be deemed settled, compromised, released and resolved and the Seller and the Creditor's Committee, on behalf of themselves and the Debtors' Estates shall release and discharge Cynthia Licata from such claims and causes of actions (collectively, the 'Cynthia Licata Release and Transactions') . . . ." (*Id.*) In return, Cynthia agreed to "support the transactions contemplated by" the APA, to "waive[] and relinquish[] all of her asserted rights, claims or interests, including membership interest with respect to [FCHG 13]," and to:

> [W]aive[] and relinquish[] all of her asserted rights, claims or interests with respect to the Acquired Assets listed or identified on **Exhibit A-1** attached hereto, and **Exhibit A** attached hereto (but only to the extent such assets are also listed or identified on **Exhibit A-1** hereof) . . . .

(*Id.*, 12) (emphasis in original) FCHG 4 was listed on Exhibit A to the APA, but not on Exhibit A-1. Importantly, the APA and the corresponding settlement with Cynthia therefore *did not contemplate that Cynthia would waive or relinquish any of her asserted rights, claims, or interests with regard to FCHG 4.*

On May 11, 2005, a hearing was held on the APA and the Motion to Sell. There, during a conversation with Attorney Robert E. Grossman of Arent Fox Kintner Plotkin & Kahn, PLLC, counsel for FCCG, regarding whether the Bankruptcy Cases should be resolved through a confirmed Chapter 11 plan, or

instead through conversion to Chapter 7, which would involve the appointment of Chapter 7 Trustees to oversee the remaining assets of the estates, Judge Shiff acknowledged the difficulty faced in these interrelated Bankruptcy Cases in determining which assets the APA proposed to sell. (5/11/05 Tr. 12:07:48–12:08:01) Judge Shiff stated: "The only problem is whether or not there is a clear understanding of what there is in these estates. The people sitting over there say there is no reason for us to have comfort that we know what there is in the [bankruptcy] estates." (*Id.*) It was abundantly clear to Judge Shiff that exactly what was in the bankruptcy estates and what was to be sold was a source of endless contention and potential confusion.

Later that afternoon, Judge Shiff surveyed the Acquired Assets listed in the APA, page by page, on the record. He stated, "I would like to look at that piece of paper" and examined the exhibits and schedules one by one. (*Id.*, 3:34:10–3:34:29) Judge Shiff pointedly noted on the record that Mr. Licata was to sell sixteen Acquired Assets, *including his claims under the Separation Agreement which included a claim to an ownership interest in FCHG 4*. (*Id.*, 3:37:16–3:37:30) No discussion ensued, nor were any objections raised regarding the inclusion of FCHG 4 as one of Mr. Licata's claims under the Separation Agreement.

Judge Shiff next reviewed the fifteen Acquired Assets to be sold by FCCG and those to be sold by FCHG 1, 23, and 24. (*Id.*, 3:37:30–3:39:47)

Judge Shiff then *specifically surveyed Schedule A*, which *listed FCHG 4 as an entity in which Mr. Licata had ownership interests*. (*Id.*, 3:42:33–3:42:40) No

discussion ensued, nor were any objections raised regarding the even more explicit inclusion of FCHG 4 on Schedule A, nor were any concerns raised regarding what effect Footnote 2 had on the inclusion of FCHG 4 as an Acquired Asset.

Judge Shiff was then advised on the record that the Exhibits and Schedules listing the Acquired Assets would be revised to more clearly reflect precisely what would be sold and what would not be sold. (*Id.*, 3:42:04–3:43:29) Judge Shiff commented to the parties that, in doing so, the amended agreement must “define with specificity exactly what it is [that is] for sale and describe what that asset is, and not include such word[s] as ‘including or not limited to’ so that anyone who wants to bid [on the Acquired Assets] knows it is X and it is only X.” (*Id.*, 3:43:33–3:44:30)

Shortly thereafter, during the hearing, Attorney Louis T. DeLucia of Buchanan Ingersoll Professional Corporation, counsel to the Official Committee of Unsecured Creditors of FCCG, again revisited with Judge Shiff the proposed sale under 11 U.S.C. § 363 and what exactly would be sold – the assets as defined in the sale documents, and nothing more. Attorney DeLucia stated: “ . . . [W]hat we’re trying to do, your Honor, is – since *we’re identifying a discrete set of assets, not all the assets of the estate*, much like a Chapter 11 Trustee would sell a discrete asset, a Chapter 11 Debtor could sell a discrete asset, we were attempting to sell these discrete assets pursuant to this bidding procedure and sale motion.” (*Id.*, 4:07:00–4:07:20) Judge Shiff later reiterated: “[Y]ou’re saying that the defined assets are going to be sold under the 363 [sale] and [that] the remainder will be disposed of

through a plan." (*Id.*, 4:12:42–4:13:00) Attorney DeLucia replied: "Correct, your Honor." (*Id.*, 4:13:00–4:13:01)

These statements evidence that the Court carefully surveyed the APA and its exhibits and schedules (which listed FCHG 4 as an Acquired Asset and further listed it through its sale of James's claims under the Separation Agreement). The Court was concerned with identifying the assets to be sold and required the parties to limit the sale to those assets identified in the sale documents themselves, which the Court reviewed at length on the record. The Court clearly appreciated the need to closely scrutinize those documents and the referenced assets, and did so in painstaking detail on the record.

**2.4.2 The First Amended Asset Purchase Agreement**

Two days later, on May 19, 2005, the First Amended Asset Purchase Agreement ("FAAPA") was filed upon the docket for hearing, upon due notice. (MC – ECF No. 671) There, the Sellers agreed to transfer their *claims to ownership interests* in certain limited liability companies, mortgages, joint venture agreements, causes of action against third parties, and other enumerated assets to SWJ. As in the APA, the FAAPA defined the Acquired Assets as "all of those assets, properties, rights and ownership interest of Seller, other than the Excluded Assets, listed on" Exhibit A and Exhibit A-1, both of which were attached to the FAAPA, as well as the Acquired Claims and Assumed Contracts.[21] (*Id.*, 7) The Acquired Assets were to be sold "free and clear of Encumbrances," as is, where is. (*Id.*)

---

[21] As in the APA, there is no tenable claim that FCHG 4 was included in the Excluded Assets defined in the FAAPA. Those excluded assets were "rights arising under the Tax Indemnification Claims," as

FCHG 4 was listed on Exhibit A to the FAAPA. (*Id.*, 48) Facially, then, the FAAPA, like the APA, indicated that James, as one of the Sellers, was still selling whatever interest he had in FCHG 4. (*Id.*) Footnote 2 on Exhibit A again stated: "Cynthia Licata claims 100% ownership [of FCHG 4] pursuant to a 1998 transaction with James Licata, but see Separation Agreement dated June 4, 2002." (*Id.*) As in the APA, no explanation appeared on the FAAPA or any of its Exhibits regarding what effect this footnote had on James's sale of his interest in FCHG 4.

And again listed on Exhibit A to the FAAPA were "[a]ll [James's] claims under the Separation Agreement . . . relating to ownership of various [FCCG] denominated LLCs and other related business entities identified in attached Schedule A and any claims relating to any of them." (*Id.*, 39)

Accordingly, then, the FAAPA – like the APA – proposed to sell James's interests in FCHG 4, as well as his interests under the Separation Agreement, which included FCHG 4, while Cynthia's potential claim was merely acknowledged.

The FAAPA also included a few key changes, however. For one, the FAAPA included a Cure Schedule as an attachment. (*Id.*, 119) The Cure Schedule listed Assumed Contracts and listed FCHG 4 as one such Contract, with the cure amount listed as $0.00. (*Id.*) This change indicates yet again that FCHG 4 was an entity in

---

defined in the APA; $760,000 in cash to be "held in escrow by Debtors' counsel for the benefit of FCCG and FCHG [23]"; "[a]ll claims of any Debtor entity against or with respect to [the Quillens and related entities]"; "[a]ll assets of [FCHG 1], including but not limited to, all claims of, or assertable in the name of , FCHG [1], if any, to ownership of, and title to, 555 Elizabeth Street, Newark, New Jersey or arising out of the transfer of title to Bel Air Holdings, LLC"; "Equity interests in FCCG"; and "Membership interests in" FCHG 23, FCHG 24, First Inn I, LLC, First Inn II, LLC, First Inn Holdings Kansas, and First Inn Louisiana, LLC. (MC – ECF No. 671, p. 4–5)

which James was selling his interest, despite Footnote 2's acknowledgment of a competing claim.

Another key change from the APA to the FAAPA was that Section 5.2.1 of the APA, releasing Cynthia Licata from liability in exchange for her relinquishment of certain assets, was deleted in the FAAPA. Instead, seemingly in its place, the FAAPA contained a new exhibit, Exhibit H, entitled "Transfer Settlement and Release Agreement." (*Id.*, 126, the "TSRA") One of the TSRA's recitals stated that the Licatas "claim ownership of membership interests in the limited liability companies listed on **Exhibit A** attached hereto (collectively, the "**LLCs**"), and the respective claimed membership interests of the Licatas are set under their names on **Exhibit A** attached hereto . . . ." (*Id.*) (emphasis in original)

Exhibit A to the TSRA listed the "Membership Interest Percentage Claimed by the Licatas" as between James and Cynthia for the FCHG LLCs. (*Id.*, 133) There, FCHG 4 was listed with Cynthia claiming 100% interest and James claiming 0%. (*Id.*) Thus, the FAAPA emphasized Cynthia's claim to own 100% interest in FCHG 4 even more than the APA did previously. At first blush, this creates a confounding inconsistency between the FAAPA and the TSRA. However, this inconsistency was reconciled through the combined workings of the FAAPA and the TSRA.

Through the TSRA, Cynthia Licata agreed to give consideration mirroring that listed in Section 5.2.1 of the APA. She again covenanted and agreed, among other things, to "convey and grant to SWJ all of her rights, claims, title and

interests (including membership interest), of any kind or nature, whether in contract or law, or whether contingent or unliquidated," in the "assets, claims and rights" listed on Exhibit A-1 and Exhibit A, "but only to the extent such assets are also listed or identified on Exhibit A-1 . . . ." (*Id.*, 126) (emphasis in original) Cynthia also "covenant[ed] and agree[d] not to assert or seek to enforce her rights, claims, title or interests of any kind or nature . . . whether arising or emanating from or relating to th[e] Separation Agreement . . . between [James and Cynthia]" and further "release[d] and forever discharge[d] the Debtors, the [related] LLCs and each of their respective [related parties] from any and all [claims, remedies, etc.,] which [Cynthia] or any of her [affiliates, etc.,] shall or may have against [them,] for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the dates of this Agreement with respect to the Conveyed Interests." (*Id.*, 127)

In exchange, among other things, SWJ:

> Agree[d] not to contest or challenge [Cynthia's] asserted membership interests in the LLCs set forth on **Exhibit A** hereto [which listed Cynthia as holding a 100% membership interest in FCHG 4] and [to] assign, convey and transfer to [Cynthia] any interests that SWJ acquires upon the closing of the transactions contemplated by the Asset Purchase Agreement in the a percentage that would cause SWJ's acquisition interest in such LLCs pursuant to the Asset Purchase Agreement to be greater than the percentage interest claimed to be owned by JL in **Exhibit A** hereto.

(*Id.*) (emphasis in original) Through this critical clause, SWJ agreed not to contest or challenge Cynthia's asserted 100% membership interest in FCHG 4, which was listed on Exhibit A to the TSRA. SWJ therein further agreed that it would transfer

to Cynthia Licata whatever interest it received from the Sellers in an entity listed on Exhibit A, such as FCHG 4, that would cause SWJ's interest in the LLC to become greater than that claimed by James in Exhibit A.[22]

How would this clause function in practice? Exhibit A of the TSRA lists James's ownership interest in FCHG 4 as 0%. (*Id.*, 133) Accordingly, if SWJ received even a 1% interest in FCHG 4 from James through the closing of the FAAPA, "SWJ's acquisition interest in [FCHG 4 would] be greater than the [zero] percentage interest claimed to be owned by [James Licata] in **Exhibit A** [of the TSRA]." (*Id.*, 127) (emphasis in original) In such an event, SWJ was contractually required to convey that interest to Cynthia. (*Id.*) Essentially, then, through the combined working of the FAAPA and the TSRA, Cynthia would receive whatever interest in FCHG 4 that SWJ received from James, even if just a miniscule percentage, or all 100%, because any amount received would be greater than James's 0% share. Accordingly, the combined workings of the FAAPA and the TSRA explain, resolve, and reconcile the Licatas' competing claims to FCHG 4.

To reiterate, a thorough review of the FAAPA and the TSRA reveals that:

1.) The Court did not intend to resolve the competing claims to the LLCs before permitting the Asset Sale to take place. The Court knew that

---

[22] The APA settled, compromised, released and resolved any Insider Claims against Cynthia Licata. The FAAPA, however, did not provide her with such a release, nor did it define Insider Claims or include any reference to them at all. Attorney Beth Green Kibel, representing FCCG, explained to the Court that this was an intentional change when she appeared at the hearing held on May 25, 2005, on the FAAPA: "We've taken out the fraudulent conveyance claims against Cynthia Licata from the Asset Purchase Agreement, which heightened the . . . definitions of all the assets. We've taken out any unknown assets as being part of the sale." (5/25/2005 Tr. 10:49:33–10:49:48)

Accordingly, on May 17, 2005, in anticipation of the filing of the FAAPA, the Committee withdrew the Motion to Approve Settlement Agreement with Cynthia Licata "[i]n accordance with statements [made] . . . at the May 11, 2005 hearing . . . ." (AP – ECF No. 119)

Cynthia, James, and the Moccos each claimed ownership interests in FCHG 4, and other FCHG LLCs.

2.) James nevertheless intended to sell whatever interest he *did* have in FCHG 4 to SWJ.[23]

3.) Cynthia refused to disavow her claim to 100% interest in FCHG 4.[24]

4.) To *accommodate* the manifest uncertainty over the ownership of FCHG 4, and in exchange for consideration, James would transfer his ownership interest in FCHG 4 to SWJ, and SWJ would then transfer it to Cynthia. The Moccos' claims to FCHG 4 would survive to be determined at a later date as against Cynthia.[25]

5.) Through the TSRA, and in exchange for SWJ's concession to allow Cynthia to keep her claim to FCHG 4 and gain whatever percentage of a claim to FCHG 4 it received from James, Cynthia released whatever claims she may have had in the interests that the Sellers conveyed to SWJ.

Thus, through the express – confusing and convoluted – workings of the FAAPA and TSRA, Cynthia would retain any ownership interest she allegedly

---

[23] Again, FCHG 4 is explicitly listed as an Acquired Asset on Exhibit A to the FAAPA and Footnote 2 thereto does not unequivocally refute such ownership. (MC – ECF No. 671, p. 48) James Licata's rights under the Separation Agreement are also listed as an Acquired Asset, which includes his alleged right to 100% ownership of FCHG 4. (*Id.*, 39) Last, FCHG 4 is included on the Cure Schedule. (*Id.*, 119) Clearly, the documents manifest an awareness that James's claim was disputed and resolved that uncertainty by providing that if James had any interest in FCHG 4, it was to be delivered to SWJ through the FAAPA as an Acquired Asset.

[24] This is clear because her ownership interest in FCHG 4 is cited in Footnote 2 and on Exhibit A to the TSRA, but not on Exhibit A-1 to the TSRA. (MC – ECF No. 671, p. 50, 133)

[25] We know this is so because, pursuant to the TSRA, Cynthia was only transferring to SWJ the assets, claims, and rights that were listed both on Exhibit A-1 of the FAAPA and Exhibit A of the FAAPA. (MC – ECF No. 672, p. 126–27) FCHG 4 is listed on Exhibit A of the FAAPA (*Id.*, 39, 48); but is not on Exhibit A-1 of the FAAPA. (*Id.*, 50) Accordingly, she did not intend to transfer any rights to FCHG 4 to SWJ.

Furthermore, the express language of the TSRA required SWJ not to contest Cynthia's ownership of FCHG 4, as it was one of her "asserted membership interests in [a] LLC[] set forth on Exhibit A [of the TSRA]." (*Id.*, 127) Recall that Exhibit A to the TSRA lists Cynthia as holding a 100% membership interest in FCHG 4. (*Id.*, 133)

Finally, SWJ agreed that, upon the closing of the transactions, it would convey to Cynthia "any interests that SWJ acquires upon the closing of the transactions contemplated by the [FAAPA] in a percentage that would cause SWJ's acquisition interest in such LLCs . . . to be greater than the percentage interest claimed to be owned by [James Licata] in Exhibit A [of the TSRA]." (*Id.*, 127) (emphasis in original)

already had in FCHG 4, which she asserted to be 100%; and would receive any ownership interests James may have had in FCHG 4, if her assertion was wrong. The documents acknowledge that the ownership of FCHG 4 was disputed, but that, regardless of the truth, Cynthia was ultimately to retain her existing portion and gain any portion that James held. Importantly, the FAAPA *did not* resolve the Moccos' claims to ownership of the FCHG LLCs.[26] Instead, the SWJ purchase was "as is, where is." (*Id.*, 7, 19) The Moccos' unresolved claims to ownership of FCHG 4 survived the Asset Sale, to be later determined by the New Jersey courts.

**2.4.3 The Asset Sale Closes**

On May 25, 2005, this Court held a hearing on the FAAPA. There, the Court asked whether the sale documents "[h]ave defined whether the assets are assets of one or [an]other of the estates?" (5/25/2005 Tr. 10:57:10–10:57:14) Attorney Alan J. Brody of Buchanan Ingersoll, PC, appearing on behalf of the Official Committee of Unsecured Creditors, replied, "Yes, your Honor. Attached to the [FAAPA] is [Exhibit] A, a definitive list of assets that go estate by estate." (*Id.*, 10:57:14–10:57:23) Attorney Brody continued: "The [Exhibit] that is attached to the [FAAPA] as has been modified, revised, which is before your Honor, expressly sets out the Estate and the Acquired Assets in specific terms." (*Id.*, 10:58:00–10:58:16) This colloquy yet again illustrates that the Court had clear notice that Mr. Licata's claim to FCHG 4 was to be sold, as Exhibit A lists, as an Acquired Asset, Mr. Licata's

[26] This issue was ultimate litigated and decided in New Jersey. *See* Part 2.7 of this Memorandum of Decision.

claims under the Separation Agreement and to FCHG 4. (MC – ECF No. 671, p. 30, 48)

At that same hearing, Judge Shiff asked whether "this agreement has been exposed to the creditors here [in Court]?" (5/25/2005 Tr. 10:58:17–10:58:23) Attorney Brody replied, "Your Honor, it has not only been exposed to the creditors here, and others, but we have also, over the last two weeks, have worked with these creditors in drafts and taken in comments they've had to all the documents." (*Id.*, 10:58:23–10:58:38) No objections or concerns regarding the inclusion or definitive ownership of interests in FCHG 4 in the FAAPA were raised at that hearing, nor through any filings on the docket.

On May 26, 2005, this Court entered an order approving the sale. (MC – ECF No. 676 ("Sale Order"); Exh. P17) There, the Court granted "the relief requested in" the Debtor's March 11, 2005 Motion to Sell[27] "in all respects" and ordered prospective purchasers to submit their bids by June 14, 2005, at 4:00 p.m. (MC – ECF No. 676, p. 2–3) The Sale Order specifically noted that "the [FAAPA] includes as Exhibit H thereto the Transfer, Settlement and Release Agreement (the 'TSRA') dated as of April 25, 2005 between Cynthia Licata and [SWJ]." (*Id.*, 7)

Pursuant to the Sale Order, the Debtors auctioned the Assets. SWJ was the successful bidder at $8.95 million. (*Id.*, 20) On June 21, 2005, the Court approved the sale. (*Id.*)

---

[27] *See* MC – ECF No. 595.

On November 11, 2005, the Debtors and the Official Committee of Unsecured Creditors moved for entry of an order approving an alternative sale transaction after SWJ defaulted. (MC – ECF No. 857) On November 16, 2005, the Court granted the motion. (MC – ECF No. 866) Therein, Judge Shiff wrote:

> In the event the Purchaser acquires the Acquired Assets pursuant to the Amended FAAPA, notwithstanding anything to the contrary contained in this Order and the Sale Order:
>
> (i) this Order and the Sale Order are not intended to adjudicate or resolve any of the claims, defenses or issues that have been and continue to be disputed between the Moccos and their affiliated entities (the 'Mocco Parties'), and James and Cynthia Licata and their affiliated entities (the 'Licata Parties");
>
> (ii) the Purchaser is acquiring all claims, defenses, and interests of the Licata Parties subject to all existing claims, defenses and interests of the Mocco Parties; and
>
> (iii) to the extent that the Purchaser and the Mocco Parties continue to be in disagreement as to their respective claims, defenses and asserted interests in the various entities and properties set forth in the FAAPA at Exhibit A, those disputes shall either be resolved in the pending State Court proceedings or the proceedings now on appeal to the United States District Court for the District of Vermont, however this Order shall not prohibit any party from bringing any proceedings or motions before this Court which may be properly venued in this Court.

(*Id.*, 14) Again, this language illustrates that the Court was well aware that disputes remained regarding the ownership of the Acquired Assets, but that this Court expected the Asset Sale to accommodate the uncertainty, with James's alleged interest in FCHG 4 transferring to Cynthia and certain other issues surviving the Asset Sale to be resolved at a later date.[28]

---

[28] Furthermore, while the Court's order focuses on the dispute between the Licatas and the Moccos, this language does not foreclose a reading that the Court was also aware that disputes persisted as

Due to further complications and delays with the closing of the sale, a Motion to Amend Sale Order was filed on February 22, 2006, raising the purchase price to $11.25 million. (MC – ECF No. 904; *see also* MC – ECF No. 902) The Court granted the Motion on March 9, 2006. (MC – ECF No. 917)

The sale ultimately closed on March 13, 2006. (Exhs. P31–44; MC – ECF No. 927, p. 18) SWJ paid consideration for the Acquired Assets comprised of:

1) the sum of $400,000, which had previously been deposited with Debtors' counsel on July 5, 2005;

2) the sum of $5,000,000, which was deposited with Debtors' counsel on February 15, 2006, by Dare Investments, LLC, who provided financing for SWJ; and

3) a promissory note in the amount of $5.85 million with an interest rate of 9% per annum with all interest and principal payable on December 15, 2006.

(Exh. P28; Exh. P29; Exh. P30; 7/22/25 Tr. 118; 7/23/25 Tr. 17–18) The sale price was not comprised of allocated sums per asset. Instead, the sale price accounted for all of the Acquired Assets. Further additional consideration was implicit in the covenants, compromises, and releases exchanged by the parties to the Asset Sale, including Cynthia Licata.

Pursuant to the FAAPA and the TSRA, after this Court approved the proposed sale on June 21, 2005, and the sale ultimately closed on March 13, 2006, Mrs. Licata retained her ownership interests in FCHG 4 and received whatever ownership interests Mr. Licata previously possessed through SWJ.

---

between "James and Cynthia Licata and their affiliated entities" – as it indeed was, regardless of whether it is mentioned in this Order. (MC – ECF No. 866, p. 14)

### 2.5 Monetization of the Disputed FCHG 4 Ownership Claim (2006)

On May 26, 2006, after the closing of the Asset Sale, FCHG 4 sold its real estate to SWJ for $31.3 million by way of deed. (Exh. P52, p. 2) The deed was recorded on June 2, 2006. (*Id.*) Cynthia Licata signed the deed on behalf of FCHG 4 as a purported "Member Duly Authorized By Her Attorney In Fact Daniel Shepro, Esq." (*Id.*, 3) At the closing of the sale, FCHG 4 received a mortgage on the subject real estate in the original principal amount of $22,950,833.50. (Exh. P53; Exh. P55; Exh. P61) In connection with the closing of the sale of FCHG 4's real estate to SWJ and the issuance of the mortgage to Cynthia, Chicago Title Insurance Company issued Title Policy No. 72107-2834094 ("Title Policy") to Cynthia on June 2, 2006, insuring her against any loss or damage sustained or incurred due to title defects in SWJ's acquisition of the real estate from FCHG 4. (Exh. P62, p. 4)

### 2.6 The Conversion to Chapter 7 and Filing of this Adversary Proceeding (2006 to 2009)

On June 28, 2006, shortly after the Asset Sale to SWJ closed, this Court entered orders converting the Debtors' Chapter 11 cases to Chapter 7 cases.[29] (MC – ECF No. 1073; Licata Bankr. – ECF No. 224) Thereafter, Mr. Richard M. Coan was assigned to serve as the Chapter 7 Trustee of the FCCG and FCHG 13 estates. (MC – ECF No. 1073). Mr. Ronald I. Chorches was assigned to serve as the Chapter 7 Trustee of Mr. Licata's estate. (Licata Bankr. – ECF No. 224) On March 13, 2009, after an extended investigation of the Asset Sale (a sale in which the Trustees did

[29] On April 26, 2005, this Court entered an Order to Appear and Show Cause Why Their Cases Should Not Be Converted to Chapter 7 or Why a Chapter 11 Trustee Should Not Be Appointed. (ECF No. 635)

not participate), the Plaintiffs commenced this Adversary Proceeding against Mr. Licata, Mrs. Licata, East Coast Investments, LLC ("ECI"), and FCHG 4. (ECF No. 1)

**2.7 The New Jersey Litigation (2014 to 2018)**

The Moccos' claims to ownership of the Acquired Assets were unresolved and survived the Asset Sale. Thereafter, a trial commenced in the Superior Court of New Jersey on November 17, 2024, to determine who rightfully owned FCHG 4 and its properties. *Titan Mgmt., L.P., et al. v. James J. Licata, et al.*, No. L-7709-13, at 2 (N.J. Super. Ct. June 2, 2015). In that action, Mr. Licata asserted that Mr. Mocco transferred title and ownership of the properties to him, while Mr. Mocco asserted that Mr. Licata only held the properties as his agent and nominee. *Id.* In 2015, the Superior Court issued its decision, acknowledging that "[t]he corporate documents evidencing ownership of FCHG [4] are Byzantine, inconsistent, and difficult to understand." *Id.*, 19. Nevertheless, that court determined that the Moccos owned the properties. *Id.* That court further determined that when the Asset Sale[30] disposed of Mr. Licata's assets, the only thing that was transferred to SWJ (and then to Cynthia) was *a bare claim* to ownership of FCHG 4 – not an actual ownership interest. *Id.*, 58.

In its decision, the Superior Court reviewed the events that took place prior to the Asset Sale. In its review, that court determined that in the Asset Sale, "Mr. Licata undertook to sell whatever assets he thought he owned []including, but not

[30] *See* Part 2.4 of this Memorandum of Decision.

limited to, claims to" FCHG 4. *Id.*, 35. This Court does not rely on that determination, but agrees with it on its merits and notes that some of the evidence cited therein is particularly relevant and illuminating to the issues at hand here. For example, a dialog between Judge Shiff and Attorney Brody, counsel for the Official Committee of Unsecured Creditors, is transcribed, wherein Attorney Brody states, "Your Honor, the debtor is selling *whatever interest it has, if it has any interest* in the assets that are listed in the schedules. . . . To the extent that an asset is transferred to the purchaser, the only asset they can – only the debtor's interests in that asset are being transferred." *Id.*, 37. (emphasis added) This evidence bolsters this Court's factual determination that the Licatas never represented that solely Cynthia had a claim to FCHG 4. Rather, the more nuanced representation, supported by the sale documents, was that Cynthia, too, had a claim to FCHG 4, as did James, and that whatever portion James possessed would be transferred to SWJ and then to Cynthia in exchange for the promises she made under the TSRA.

Accordingly, the New Jersey courts concluded in 2015, and again on appeal in 2018, that at the time of Mr. Licata's bankruptcy and the Asset Sale, the only property held by either of the Licatas regarding FCHG 4 was *a mere claim to the ownership* of FCHG 4. That decision was challenged by Mr. Licata on appeal and upheld by the Superior Court of New Jersey, Appellate Division. *Peter Mocco, et al. v. James J. Licata, et al.*, No. A-5041-14T2, 2018 WL 2923483, at *1 (N.J. Super. Ct. App. Div. June 5, 2018). It is a final and critical decision implicating many of the factual issues before this Court.

**2.8 The Buyback Agreement and the JL Accounts (2016 to 2018)**

In 2016 – eight years after the Asset Sale closed – the Licatas remarkably monetized the Title Policy that Chicago Title Insurance Company issued to Cynthia in connection with the closing of the sale of FCHG 4's real estate to SWJ. The details regarding where the money derived from the Title Policy went were extensively set forth in the Plaintiffs' briefs before this Court and the evidence at trial. This Court will more generally describe the money's path herein because, although the monetization of the Title Policy is suspicious, it is ultimately less relevant to this Court's conclusions.

On February 17, 2016, Cynthia assigned the Title Policy to James. (Exh. P64) Just prior to receiving the Title Policy from Cynthia, Mr. Licata adeptly marketed and monetized the Title Policy to obtain significant funds for their mutual benefit. Specifically, on February 16, 2016, Mr. Licata entered into an Assignment and Buyback Agreement (the "Buyback Agreement") with Mr. Larry D. Kelley. (Exh. P66) After closing costs, the Licatas received a $3,835,000.00 loan from Kelley, thereunder, with $2,601,300.00 advanced to them in net proceeds. (*Id.*, 9) In exchange for the loan, Mr. Licata assigned "all rights and interest of the Chicago Title Policy of $22,950,833" to Kelley. (*Id.*, 3) From August 1, 2016, to December 1, 2017, Kelley and the Licatas entered into seven amendments[31] to the Buyback Agreement pursuant to which additional funds were incrementally advanced.

[31] Each amendment shall be referred to as "First Amendment," "Second Amendment," and so on.

Of the funds advanced pursuant to the Buyback Agreement and its first seven amendments, $215,000 was advanced to Joseph E. Torres, a neighbor and associate of the Licatas.[32] Most of the funds from the Buyback Agreement and its amendments, however, went into bank accounts maintained at JPMorgan Chase Bank, N.A. ("Chase") in Jessica Licata's name (the "JL Accounts").[33] (Exh. P67; Exh. P69; Exh. P71; Exh. P73; Exh. P75; Exh. P77; Exh. P79; Exh. P81) Although the JL Accounts were held by Jessica and in her name, Mr. and Mrs. Licata directed the use of the accounts to control the funds advanced by Kelley. (Exh. P141; Exh. P106,

---

[32] A small portion of the funds advanced pursuant to the Buyback Agreement and its first seven amendments was transferred to Joseph E. Torres. Scant evidence was presented at trial regarding who Mr. Torres is, but the Court concludes from statements made at trial that he was a neighbor and associate of the Licatas. (7/23/25 Tr. 83:24–25; 7/24/25 66:8–17, 95:9–17, 140:10–11)

Pursuant to the Fifth Amendment, Torres received $25,000.00. (Exh. P76; Exh. P77; Exh. P153, p. 69–74 (Deposition Transcript of Mr. Larry D. Kelley)) Pursuant to the Sixth Amendment, Torres received $50,000.00. (Exh. P78; Exh. P79; Kelley Dep. Tr. 74–78) Finally, pursuant to the Seventh Amendment, Torres received $140,000.00. (Exh. P80; Exh. P81; Kelley Dep. Tr. 78–82) No evidence was presented at trial regarding where these funds ultimately went or for what purpose the transfers were made.

[33] Jessica held four bank accounts with Chase, three of which were utilized by Mr. Licata and, at times, Mrs. Licata. (Exh. P73; 7/21/25 Tr. 117:14–118:25) Those three accounts, ending in 5710, 1528, and 3517, comprise the JL Accounts. (7/21/25 Tr. 117:14–118:25) Jessica understood that the funds held in the JL Accounts did not belong to her and were under the control, direction, and for the benefit of Mr. and Mrs. Licata, as well as their son, Tucker. (*Id.*, 119:21–120:25, 123:17–125:13, 147:6–22; 7/22/25 Tr. 73:19–23, 78:8–18, 87:19–23)

Indeed, the movement of moneys in and out of the JL Accounts was overseen and scrutinized by Mrs. Licata. (Exh. P141; Exh. P106, p. 13–33) Mr. Licata, Mrs. Licata, and Tucker held debit cards for the JL Accounts. (7/21/25 Tr. 119:21–120:25, 123:17–125:13, 147:6–22; 7/22/25 Tr. 73:19–23, 78:8–18, 87:19–23) Although the debit cards were issued to Jessica Licata and Natasha Yeoh, a neighbor and associate of the Licatas, the debit cards were actually held and used by Mr. and Mrs. Licata. (7/21/25 Tr. 123:20–25, 135:4–15; 7/22/25 Tr. 47:11–22) Mrs. Licata also periodically directed Jessica to deliver pre-signed checks to her from the JL Accounts, which Jessica did, and both Mr. and Mrs. Licata would direct Jessica to conduct electronic fund transfers from the JL Accounts. (7/21/25 Tr. 124:12–22; 7/22/25 Tr. 40:2–10, 41:2–7, 87:1–8)

The Court notes that Cynthia Licata testified at trial that Jessica used the money for her own purposes. (7/22/25 Tr. 87:19–23) The Court – finding Jessica to have testified credibly in denying that she used the money for her own purposes, and that Mrs. Licata did not testify credibly – concludes that Mrs. Licata's statements and the line of questioning in her rebuttal were unconvincing.

p. 13–33; 7/21/25 Tr. 119:21–120:25, 123:17–125:13, 135:4–15, 147:6–22; 7/22/25 Tr. 40:2–10, 41:2–7, 47:11–22, 71:12–72:21, 73:19–23, 78:8–18, 87:1–23)

From February 18, 2016, to December 1, 2017, the JL Accounts received $6,406,300.00 in transfers from Kelley.[34] The Court concludes that it is more likely

---

[34] Pursuant to the Buyback Agreement, dated February 16, 2016, Kelley loaned Mr. Licata $2,851,300.00. (Exh. P66) On February 18, 2016, the JL Accounts received a $250,000.00 wire transfer referencing Larry D. Kelley at his address in Oregon. (Exh. P67, p. 5) On February 25, 2016, the JL Accounts received a $2,601,300.00 wire transfer again referencing Larry D. Kelley. (*Id.*, 6)

Pursuant to the First Amendment, dated August 1, 2016, Kelley advanced the additional sum of $250,000.00 in net loan proceeds. (Exh. P68) In his deposition transcript, Kelley agreed that the First Amendment indeed states that he was "to deliver a quarter million dollars upon mutual execution of this agreement . . . ." (Kelley Dep. Tr. 59–62) However, the documentation provided from the JL Accounts in this period does not confirm receipt of a $250,000.00, and no evidence was otherwise presented at trial to confirm that such a transfer of $250,000.00 was made. (Exh. P69)

Pursuant to the Second Amendment, dated October 7, 2016, Kelley advanced the additional sum of $500,000.00 in net loan proceeds. (Exh. P70) On October 11, 2016, the JL Accounts received a $500,000.00 wire transfer referencing Larry D. Kelley. (Exh. P71, p. 5)

Pursuant to the Third Amendment, dated November 29, 2016, Kelley advanced the additional sum of $500,000.00 in net loan proceeds. (Kelley Dep. Tr. 63–64) On November 30, 2016, the JL Accounts received a $500,00.00 wire transfer referencing Larry D. Kelley. (Exh. P73, p. 8)

Pursuant to the Fourth Amendment, dated July 31, 2017, Kelley advanced the additional sum of $400,000.00 in net loan proceeds. (Exh. P74) On August 11, 2017, the JL Accounts received a $350,000.00 wire transfer referencing Larry D. Kelley. (Exh. P75, p. 4)

Pursuant to the Fifth Amendment, dated September 11, 2017, Kelley advanced the additional sum of $240,000.00 in net loan proceeds. (Exh. P76) On September 19, 2017, the JL Accounts received a $215,000.00 wire transfer referencing Larry D. Kelley. (Exh. P77, p. 7)

Pursuant to the Sixth Amendment, dated October 3, 2017, Kelley advanced the additional sum of $550,000.00 in net loan proceeds. (Exh. P78) On October 3, 2017, the JL Accounts received a $490,000.00 wire transfer referencing Ludon Investments Inc. (Exh. 79, p. 4)

Ludon Investments, Inc. ("Ludon") is a business registered with the Oregon Secretary of State since September 28, 1977. *Ludon Investments*, OREGON.GOV: BUS. NAME SEARCH, https://egov.sos.state.or.us/br/pkg_web_name_srch_inq.login (Search "Ludon Investments" and click on first entry, registry number 052675-88) (last visited May 6, 2026). Its place of business is listed as 4000 South Corbett Avenue in Portland, Oregon. (*Id.*) Kelley's place of business is also 4000 South Corbett Avenue in Portland, Oregon. (Kelley Dep. Tr. 162–63) Furthermore, Mr. Larry D. Kelley is listed with the Oregon Secretary of State as Ludon's registered agent. Similarly, Ludon's Amended Annual Report, filed on August 15, 2017, with the Oregon Secretary of State, lists its billing address as 4000 SW Corbett Ave., Portland, Oregon, and lists Mr. Larry D. Kelley of the same address as its registered agent. Accordingly, the Court infers this transfer from Ludon was in fact another transfer from Larry D. Kelley pursuant to the Sixth Amendment.

Pursuant to the Seventh Amendment, dated December 1, 2017, Kelley advanced the additional sum of $1,500,000.00 in net loan proceeds. (Exh. P80) On December 1, 2017, the JL Accounts received a $1,500,000.00 transfer, again from Ludon. (Exh. P81, p. 4) The Court again infers that this transfer from Ludon was in fact a transfer from Larry D. Kelley pursuant to the Seventh Amendment.

To summarize, the JL Accounts received from Kelley:

$250,000.00 via wire on February 18, 2016 (Exh. P67, p. 5);

than not that an additional transfer of $250,000.00 was sent to the Licatas by other means on or about August 1, 2016, when the First Amendment was entered into. (Exh. P68; Kelley Dep. Tr. 59–62) Accordingly, the Court concludes that the Licatas received in excess of $6,656,300.00[35] from Kelley in total under the Buyback Agreement and its first seven amendments.

While the JL Accounts were intact, Mr. and Mrs. Licata used the funds to conduct business, pay lawyers, and support their lifestyle. (7/22/25 Tr. 71:12–72:21) The funds were also used to make three larger purchases – a home at 120 Candyce Drive in Osprey, Florida, purchased for $657,000; (*Id.*, 13:7–19, 69:16–70:2; Exh. P105, p. 98; Exh. P97); a 58-foot used Monterey Sport Fisherman yacht from Galati Yacht Sales, purchased for $485,000.00; (Exh. P101, p. 2; Exh. P108; 7/22/25 Tr. 15:11–16:3); and property at Lot 9, Block 133, South Gate, Unit 30 in Sarasota, Florida, purchased for approximately $132,346.37. (Exh. P91 p. 1–2; Exh. P95)

**2.9 The Eighth Amendment and the Santa Fe Accounts**

By early 2018, Cynthia decided to stop using the JL Accounts. (7/21/25 Tr. 121–138; 7/22/25 Tr. 30–37, 76:17–20; Exh. P122; Exh. P185; Exh. P186; Exh. P187; Exh. P188) Accordingly, around this time, Jessica created two new entities, upon

---

$2,601,300.00 via wire on February 25, 2016 (Exh. P67, p. 6);
$500,000.00 via wire on October 11, 2016 (Exh. P71, p. 5);
$500,000.00 via wire on November 30, 2016 (Exh. P73, p. 8);
$350,000.00 via wire on August 11, 2017 (Exh. P75, p. 4);
$215,000.00 via wire on September 18, 2017 (Exh. P77, p. 7);
$490,000.00 via wire transfer on October 3, 2017 (Exh. P79, p. 4);
$1,500,000.00 via wire transfer on December 1, 2017 (Exh. P81, p. 4).

The sum of these totals is $6,406,300.00.

[35] This sum includes the $6,406,300.00 in documented transfers, and the $250,000.00 payment that was likely sent to the Licatas on or about August 1, 2016. It does not include the payments made to Joseph E. Torres, the final destination of which are unknown.

Cynthia's and James's request, to serve as alternate funding sources over which the Licatas would have greater control of the remaining moneys.

One of the new entities was Santa Fe Development, LLC ("SFD").[36] (Exh. P8) The second new entity was Santa Fe Holdings Group, LLC ("SFHG").[37] (Exh. P112) Jessica Licata also opened two new accounts at Chase – one for SFD, and one for SFHG. The Chase SFHG Account was seldom used, but the Licatas' made great use of the Chase SFD Account. These accounts will be referred to collectively as the "Santa Fe Accounts."

On or about April 12, 2018, when the Buyback Agreement was amended an eighth and final time and Kelley advanced an additional $3,046,835.00 in net loan proceeds, the funds did not go to the JL Accounts. (Exh. P82) Instead, the majority of the funds went to an account ("SM Account No. 1") held by Syprett Meshad, a law firm, for the benefit of SFHG.[38] (*Id.*; Exh. P83, p. 2; Kelley Dep. Tr. 82–83; Exh. P129, p. 75–78). Kelley funded SM Account No. 1 directly through a wire transfer to Syprett Meshad from Ludon of $2,600,000.00 on April 19, 2018. (Exh. P83, p. 2)

[36] On February 14, 2018, Jessica Licata opened a bank account at Chase for SFD ("Chase SFD Account") with an address of 351 Delavan Ave., Greenwich, CT. (Exh. P85; 7/22/25 Tr. 30–37) 351 Delavan Ave. was Jessica's residence. (Exh. P85; 7/22/25 Tr. 30; Exh. P184, p. 11) SFD was structured to have nominal individual members serve as the beneficial holders of a substantial majority of its membership interests. (Exh. P184; 7/22/25 Tr. 30–34) Those members included Jessica, Michael Lander, and Natasha Yeoh, as well as a trust. (Exh. P184; 7/22/25 Tr. 30–34) The trust had not yet been created, but was to be the beneficial holder of 95% of the membership interest. (Exh. P184, p. 14) It is unknown if such a trust was ever created, nor who the beneficiaries of the trust were to be.

[37] On September 24, 2018, Jessica opened a bank account at Chase for SFHG ("Chase SFHG Account"). (Exh. P87; 7/22/25 Tr. 17:1–11) The address listed on the account was 3400 S. Tamiami Trail, Suite 304B, Sarasota, FL. (Exh. P87) SFHG's principal office and mailing address was 3400 S. Tamiami Trail. (Exh. P10; Exh. P113) SFHG eventually received title to the Key Avenue property.

[38] This trust account was identified as the Santa Fe Holdings, LLC General Trust Ledger, account no. 31228.001. (Exh. P82; Exh. P83; Kelley Dep. Tr. 82–83; Exh. P129, p. 75–78) Exhibit P129 will hereinafter be cited as "Dumbaugh Dep. Tr. [Page Number]–[Page Number]."

Joseph Torres received $446,835.00 from Kelley via wire transfer pursuant to the Eighth Amendment. (Exh. P82, p. 4) Of that sum, Torres then transferred $306,435.00 to SM Account No. 1 on April 19, 2018.[39] (Exh. P83, p. 2; Exh. P86, p. 1)

Thus, with the transfers from Kelley and Torres, SM Account No. 1 received $2,906,435.00 in transfers from April 12 to 27, 2018. The funds in this account were then disbursed, in full, by attorneys at Syprett Meshad at James Licata's behest from April to July of 2018. (Dumbaugh Dep. Tr. 45:12–47:13)

Two of the disbursements were made to law firms.[40] Another was made to purchase a vehicle.[41] Additional substantial transfers were then made to the Chase SFD Account, with a total of $1,895,172.28 transferred from SM Account No. 1 to the Chase SFD Account from April 20 to July 3, 2018.[42] The remaining $250,000 in

[39] The $446,835.00 was sent via two transfers – one for $230,435.00 on April 19, and another for $76,000.00 on April 27. (Exh. P83, p. 2; Exh. P86, p. 1) No evidence was provided at trial regarding what Joseph E. Torres did with the remaining funds once the $306,435.00 transfer was made to SM Account No. 1.

[40] On June 4, 2018, the law firm of Cummings and Lockwood received $20,000.00 from SM Account No. 1. (Exh. P86, p. 2) On June 14, 2018, the law firm of Corrigan & Morris, LLP received $5,000.00 from SM Account No. 1. (*Id.*, 3) This retainer was paid pursuant to work that Corrigan & Morris performed for Cynthia's and James's other daughter, Whitney. (*Id.*; Exh. P56)

[41] On April 19, 2018 – the same day SM Account No. 1 was funded – $112,219.50 of its funds were transferred to Miller Motorcars, Inc. to purchase an Aston Martin for Mr. Licata's use. (Exh. P83, p. 2; Exh. P84; Dumbaugh Dep. Tr. 82–83)

[42] On April 20, 2018, Syprett Meshad issued a check in the amount of $100,000.00 payable to the order of SFD. (Exh. P85, p. 10, 15–16) On April 24, 2018, the check was deposited into the Chase SFD Account. (*Id.*)

On May 2, 2018, Syprett Meshad transferred another $100,000.00 from SM Account No. 1 to the Chase SFD Account. (Exh. P85, p. 18; Exh. P86, p. 1) This amount was credited to the SFD Account on May 3, 2018. (Exh. P85, p. 18; Exh. P86, p. 1)

On May 17, 2018, Syprett Meshad wired another $20,000.00 from the SM Account No. 1 to the Chase SFD Account. (Exh. P85, p. 18; Exh. P86, p. 2)

On May 23, 2018, Syprett Meshad wired another $55,000.00 of the funds from SM Account No. 1 to the Chase SFD Account, which was credited that day. (Exh. P85, p. 18; Exh. P86, p. 2)

On June 6, June 8, June 11, and June 13, Syprett Meshad completed four more wire transfers, sending $172,000.00 of funds from SM Account No. 1 to the Chase SFD Account. (Exh P85, p. 31; Exh. P86, p. 2–3)

the account was first transferred to another Syprett Meshad trust account for the benefit of SFHG ("SM Account No. 2").[43] (Exh. P86, p. 2) Then, on July 13, 2018, the sum of $241,594.50 was then transferred from SM Account No. 2 to the Chase SFD Account, as well, which effectively closed SM Account No. 2. (Exh. P85, p. 42; Exh. P88, p. 2) The remaining sum of $8,405.50 was used to pay Syprett Meshad's fees and expenses. (Exh. P85, p. 42; Exh. P88, p. 2)

Accordingly, the Chase SFD Account received the vast majority of the sums originating from SM Account No. 1 – a net total of $2,136,766.78, comprised of $1,895,172.28 transferred directly from SM Account No. 1, and another $241,594.50 transferred from SM Account No. 2, all of which originated from the Eighth Amendment advance. (Exh. P85, p. 42; Exh. P88, p. 2) As with the JL Accounts, Mr. and Mrs. Licata then obtained debit cards and checks for the Chase SFD Account and controlled those funds to engage in business transactions, make various purchases, and otherwise support their lifestyle. (Exh. P85; 7/21/25 Tr. 121–138; 7/22/25 Tr. 34–37; 7/23/25 Tr. 30–41, 44; Exh. P122; Exh. P185; Exh. P186; Exh. P187; Exh. P188) Money from the Chase SFD Account was also used to fund the purchase of a property at 3631 Meyer Ave., Sarasota, FL.[44] (Exh. P113)

---

On July 3, 2018, Syprett Meshad wired another $1,448,172.28 from SM Account No. 1 to the Chase SFD Account, which effectively closed SM Account No. 1. (Exh. P85, p. 42; Exh P83, p. 4; Dumbaugh Dep. Tr. 89)

[43] This new account was identified as the Santa Fe Holdings, LLC Real Estate Trust Ledger 31228.002. (Exh. P86, p. 2) SM Account No. 2 contained a notation that it was designated as additional earnest money deposit for a contract to purchase real estate. (*Id.*)

[44] On September 12, 2018, a $5,000.00 sum was transferred out of the Chase SFD Account to Pike Law, a law firm located in Bradenton, FL. (Exh. P114) On September 18, 2018, another $15,000.00 sum was transferred out of the Chase SFD Account to Pike Law. (Exh. P115, p. 4) These sums together constituted a $20,000.00 deposit for the property at 3631 Meyer.

The sum total of the advances Kelley made to the Licatas pursuant to the monetization of the Title Policy was $9,562,735.00.[45]

**2.10 History of the Adversary Proceeding (2009 to 2025)**

From 2009 to 2025, the contours of this Adversary Proceeding shifted and coalesced time and time again with the course of related litigation.

In part, this was due to the complex and tortured path of ongoing litigation. For example, on October 9, 2014, this Court, after due notice and hearing, approved a settlement between Mr. Mocco and the Trustees. (MC – ECF No. 2486) Mr. Licata unsuccessfully appealed the 9019 Order to the United States District Court for the District of Connecticut, as well as the Second Circuit. *See Licata v. Coan*, No. 3:14-CV-1754 (MPS), 2015 WL 9699304 (D. Conn. Sept. 22, 2015), *aff'd sub nom. In re Licata*, 659 F. App'x 704 (2d Cir. 2016). Those proceedings and appeals affected and delayed this Adversary Proceeding.

Similarly, as mentioned, the critical question of whether the asset related to FCHG 4 that was transferred to SWJ (and later to Cynthia) in the Asset Sale was a

---

To pay a portion of the purchase price of 3631 Meyer, $200,000.00 was then transferred through an electronic funds transfer from the Chase SFD Account to the Chase SFHG Account on September 24, 2018. (Exh. P87, p. 4–5; Exh. P85, p. 82) Of that $200,000.00, $100,220.04 was transferred on October 5, 2018, to Pike Law. (Exh. P87, p. 9) On January 12, 2018, $100,000.00 was transferred from the JL Accounts to a third account held by Syprett Meshad, identified as the Santa Fe Holdings, LLC Real Estate Trust Ledger No. 31228.001 ("SM RE Account"). (Exh. P89, p. 2; Exh. P92, p. 2) To pay the remaining portion of the purchase price of 3631 Meyer, that $100,000.00 was then transferred to Pike Law on August 29, 2018. (Exh. P89, p. 2)

3631 Meyer was bought for Whitney Licata, Cynthia's and James's daughter. (7/24/25 Tr. 69:18–22) The property was later mortgaged to 12 Broadway LLC. (Exh. P151; Exh. P161) According to James, the property was purchased with the proceeds from the sale of the Yacht. (7/24/25 Tr. 69:1–22)

[45] This sum includes the $6,656,300.00 received from Kelley pursuant to the Buyback Agreement and its first seven amendments, and the $2,906,435.00 received from Kelley pursuant to the Eighth Amendment.

*claim* to ownership of FCHG 4, rather than the *right, title, and interest to FCHG 4 or the real property it held*, was litigated in New Jersey.[46] *Peter Mocco, et al. v. James J. Licata, et al.*, No. A-5041-14T2, 2018 WL 2923483, at *7–*8 (N.J. Super. Ct. App. Div. June 5, 2018). The advancement of this Adversary Proceeding was stayed from February 2017 until September 2021, at the parties' behest, while the New Jersey litigation and Mr. Licata's appeal played out. (ECF No. 216)

In part, the tortured path of this Adversary Proceeding was also due to the filing of less than conclusive Motions for Summary Judgment and Motions to Dismiss in this Court. Those Motions were underdeveloped, underbriefed, often conclusory, and ultimately nonresponsive to key and material factors or contentions that might have definitively focused the Court's view of this case earlier.

On August 12, 2010, Defendants James Licata, Cynthia Licata, and ECI filed a Motion for Summary Judgment. (ECF No. 81) There, the Defendants argued that the Trustees' case constituted "an impermissible collateral attack on Judge Shiff's Sale Order." (*Id.*, 3) After extensive deliberation over the years' long record of these proceedings, the Court issued its Memorandum of Decision and Order Denying Defendants' Motion for Summary Judgment on March 31, 2023.[47] (ECF No. 478)

---

[46] The Superior Court of New Jersey determined that the asset related to FCHG 4 that was transferred to SWJ (and later back to Cynthia Licata) in the Asset Sale was solely a *claim* to FCHG 4. *Titan Mgmt., L.P., et al. v. James J. Licata, et al.*, No. L-7709-13, p. 2 (N.J. Super. Ct. June 2, 2015).

[47] James and Cynthia filed a Motion for Summary Judgment. (ECF Nos. 81, 282) There, the Licatas characterized the Trustees' case as an impermissible collateral attack on Judge Shiff's Sale Order. The Court construed the Motion as both bringing a Motion to Dismiss and a Motion for Summary Judgment. Regarding the Motion to Dismiss, the Court denied the Motion, concluding that the Trustees successfully stated a claim for avoidance of post-petition transfers under 11 U.S.C. § 549. (ECF No. 478, p. 25–29) Regarding the Motion to Dismiss, the Court denied the Motion, concluding that "the Licatas have failed to show the absence of a genuine dispute of material fact on the

The Court "generally agree[d] with the Licatas that bankruptcy sale orders under 11 U.S.C. § 363(b) are final, non-appealable orders," but found that "the Trustees ha[d] made a substantial showing that newly discovered evidence support[ed] the conclusion that James Licata may have fraudulently concealed material information from the Court at the time of the Sale that may allow this Court to unwind the Sale Order, if necessary." (*Id.*, 48) The Court concluded, "[i]n this context, the Licatas have failed to show the absence of a genuine dispute of material fact on the application of the law of the case doctrine, res judicata, or relief from a judgment under Rule 60 such that summary judgment is denied on these issues." (*Id.*, 63) The Court further noted the need at that time for the parties' further discovery and development of the factual record, which the July 2025 trial ultimately allowed: "Although the Court has deemed admitted the Trustees' factual statements concerning Licata's fraudulent concealment for purposes of this Motion, that evidence must be further developed at trial." (*Id.*)

Similarly, on November 22, 2021, Defendant Jessica Licata filed a Motion to Dismiss. (ECF No. 335). There, Jessica moved to dismiss Counts Nine, Ten, and Eleven of the Amended Complaint, arguing that the Trustees "failed to state a claim for actual or constructive fraudulent transfer [as against her] under the Bankruptcy Code." (*Id.*, 12) The Court entered its Memorandum of Decision and Order Denying Defendant's Motion to Dismiss on March 31, 2023.[48] (ECF No. 479) Therein, the

---

application of the law of the case doctrine, res judicata, or relief under Rule 60 such that summary judgment is denied on these issues." (*Id.*, 63)

[48] Jessica moved to dismiss Counts Nine, Ten, and Eleven of the Amended Complaint. (ECF No. 335) This Court concluded that the Amended Complaint (ECF No. 261) sufficiently stated a claim of

Court concluded that the Trustees had pled sufficient facts that, taken as true, would constitute a claim for actual or constructive fraudulent transfer and that, regardless, Jessica was a necessary party to this Adversary Proceeding. (*Id.*, 14, 16, 19–20)

In sum, the daunting path of the Adversary Proceeding was amplified due to the amount of time that passed as related issues were litigated in other courts, and as these non-dispositive motions were filed and ruled on and tangential discovery issues were resolved. Meanwhile, the lawyers in the Adversary Proceeding urged a patient and incremental approach by this Court, with assurances that the related cases or settlement discussions would likely benefit the administration of the Bankruptcy Estates or any ultimate trial of the Adversary Proceeding.

**2.11 The Fourth Amended Complaint (2023)**

As time went on, funds derived from the monetization of the Asset Sale were further dispersed and the Plaintiffs widely investigated the downstream disbursement of funds by the Licatas. The Plaintiffs accordingly joined additional defendants and added new claims, ultimately amending the Complaint four times.[49]

On August 25, 2023, the Plaintiffs filed the operative Complaint – the Fourth Amended Complaint. (ECF No. 594) There, the Plaintiffs brought sixteen claims against Cynthia, James, Tucker, Jessica, ECI, FCHG 4, Michael Lander, SFHG,

---

recovery from Jessica Licata as a subsequent transferee under 11 U.S.C. § 550(a)(2), as well as a claim of recovery against her under Conn. Gen. Stat. § 52-552i, and that she is a necessary party under Federal Rule of Civil Procedure 19(a). (ECF No. 479)

[49] *See* Amended Complaint (ECF No. 261, filed September 3, 2021); Second Amended Complaint (ECF No. 395, filed April 20, 2022); Third Amended Supplemental Complaint (ECF No. 494, filed April 24, 2023); Fourth Amended Complaint (ECF No. 594, filed August 25, 2023).

SFD, Natasha Yeoh, Charter Holdings ("Charter"), Knox Trucking, LLC f/k/a/ Jtw3 Development ("Knox"), and M7A. (*Id.*)

The sixteen counts advanced brought claims for breach of fiduciary duty, fraudulent transfer claims under Conn. Gen. Stat. 52-552a *et seq.* (hereafter, "CUFTA") and 11 U.S.C. §§ 544 and 550 pursuant to the Ownership Claim; unjust enrichment; fraud on the court; and aiding and abetting.[50]

James and Cynthia, through previous legal counsel, filed an Answer on September 15, 2023. (ECF No. 608) Tucker filed an Answer on September 15, 2023. (ECF No. 609) Michael Lander filed an Answer on September 16, 2023. (ECF No.

---

[50] A comprehensive survey of the first eleven Counts appears in this Court's Memorandum of Decision and Order Denying Defendants' Motion for Summary Judgment on March 31, 2023:

> The Trustees' Complaint consists of eleven counts, many of which constitute fraudulent transfer claims. The first seven counts of the Complaint pertain to James Licata's transfer of FCHG [4] to Cynthia Licata at the time of the Sale. Counts One through Seven assert the following claims:
>
> a) Count One asserts a claim against James Licata for breach of fiduciary duty.
> b) Counts Two through Four assert claims against James Licata for intentional and constructive fraudulent transfer of FCHG IV under Section 52-552e(a) of the Connecticut Uniform Fraudulent Transfer Act ( CUFTA ). Counts Two through Four also cite to 11 U.S.C. § 544, and seek recovery of the transferred property under 11 U.S.C. § 550 from Cynthia Licata and East Coast, as her assignee.
> c) Count Five asserts a claim against Cynthia Licata and East Coast for unjust enrichment.
> d) Count Six asserts a claim for fraud on the court and seeks relief from the Sale Order. Count Six does not reference any defendants by name, but incorporates all prior allegations against all defendants.
> e) Count Seven purportedly asserts a claim against Cynthia Licata for aiding and abetting James Licata in perpetrating the fraud upon the court and the bankruptcy estates.
>
> Counts Eight through Eleven were later added to the Complaint by the Trustees to address the Licatas' acquisition of [funds advanced by Mr. Kelley] and the involvement of Jessica and Tucker Licata, Natasha Yeoh, and the Company Defendants in that component of the scheme. The Trustees added substantial factual allegations describing the Licatas' acquisition of [funds advanced by Mr. Kelley] and the subsequent transfers that occurred as they moved those funds through different bank accounts belonging to Jessica Licata and certain other Defendants. The Trustees also include allegations that Tucker Licata purchased certain property, including a house and a yacht, with the [funds advanced by Mr. Kelley].

(ECF No. 478, p. 15–16)

610) Charter and SFHG filed Answers on August 21, 2024. (ECF Nos. 800, 801) Natasha Yeoh filed an Answer on October 10, 2024. (ECF No. 929) Jessica filed her Answer on May 1, 2025. (ECF No. 1025)

James, Cynthia, and Tucker's Answers raised identical affirmative defenses, including that the Trustees' claims are barred by the applicable statutes of limitations and that the claims constitute an impermissible collateral attack on final orders of this Court. (ECF Nos. 608, 609)

Mr. Licata also attempted to file an Amended Answer on July 28, 2025, after the commencement of trial. (ECF No. 1145) The Court entered its Order on August 13, 2025, deeming the original Answer, filed September 15, 2023, to be the operative Answer. (ECF No. 1175) However, the Court allowed Section A of Mr. Licata's Amended Answer, construing that section as Mr. Licata's briefing or filing of Proposed Findings of Fact, and the Court allowed Sections B and C of Mr. Licata's Amended Answer, construing those sections as raising additional affirmative defenses.

**2.12 Defaults Enter Against Certain Defendants (2023)**

SFD, ECI, FCHG 4, Knox, and M7A were named as defendants in prior versions of the Complaint, as well as in the Fourth Amended Complaint. (ECF Nos. 261, 395, 494, 594) On May 18, 2023, however, before the Fourth Amended Complaint was filed, the Plaintiffs filed a Request for Entry of Default against these four entities for failure to appear and defend. (ECF Nos. 517, 519, 523, 530) The Court entered default against these Defendants on May 22, 2023. (ECF Nos. 535,

536, 538, 542) Given that the effectiveness of these defaults has not been challenged, and given that the Fourth Amended Complaint does not substantively alter the claims made against these defendants prior, the Court concludes that these defaults are still in effect and that motions for default judgments or withdrawals may be filed.

The Plaintiffs also filed a Request for Entry of Default against Michael Lander for failure to appear and defend. (ECF No. 527) The Court entered default against this Defendant on May 22, 2023. (ECF No. 541) Thereafter, Defendant Michael Lander filed a letter on the docket (ECF No. 561), retained counsel (ECF No. 571), and filed an Answer. (ECF No. 576) Accordingly, the Court entered an Order setting aside that default on August 18, 2023. (ECF No. 590)

Similarly, the Plaintiffs also filed a Request for Entry of Default against SFHG and Charter for failure to appear and defend. (ECF Nos. 511, 521, 525) The Court entered default against these Defendants on May 22, 2023. (ECF Nos. 533, 537) Thereafter, SFHG retained counsel (ECF No. 775) as did Charter (ECF No. 774), and these parties jointly filed a Motion to Reopen Default (ECF No. 793). On August 22, 2024, a hearing was held on the Motion. The Court subsequently set aside those defaults on August 26, 2024. (ECF No. 805)

Accordingly, when the Fourth Amended Complaint (ECF No. 594) was filed, bringing claims against Cynthia, James, Tucker, Jessica, FCHG 4, Michael Lander, SFHG, Natasha Yeoh, Charter, SFD, ECI, Knox, and M7A, defaults had already entered against SFD, ECI, Knox, and M7A. Thus, the remaining claims at issue

after the entries of default were those against Cynthia, James, Tucker, Jessica, FCHG 4, Michael Lander, SFHG, Charter, and Natasha Yeoh.

### 2.13 Certain Defendants Dropped or Settled (2024 to 2025)

On February 8, 2024, prior to the start of trial, but after the filing of the Fourth Amended Complaint, the Plaintiffs filed a Motion to Drop FCHG 4 as a Party Defendant. (ECF No. 712) FCHG 4 filed a Memorandum of Law in Partial Opposition to the Motion to Drop, contending that, while it supported the Motion overall, the order dropping FCHG 4 as a defendant should be with prejudice. (ECF No. 722, p. 4, 9) On March 21, 2024, the Court granted the Motion, dropping FCHG 4 as a defendant with prejudice. (ECF No. 738)

Furthermore, when trial commenced in this case on July 21, 2025, it was announced that settlements had been reached between the Plaintiffs and Jessica Licata, Natasha Yeoh, Michael Lander, SFHG, and Charter, respectively.[51] Plaintiffs' Counsel had filed a Notice of Certain Settlements. (ECF No. 1126) The Court thereafter bifurcated the trial to continue with the claims against Cynthia, James, and Tucker, while awaiting hearings and dispositions on the related Rule 9019 Motions with the Settled Defendants. (7/21/25 Tr. 54:7–23)

On August 22, 2025, the Plaintiffs filed the Motions to Compromise the Controversies. (ECF Nos. 1200, 1201, 1202) The Plaintiffs filed executed settlement agreements on September 4, 2025. (ECF Nos. 1224, 1225, 1226) A hearing was held on the Motions to Compromise that same day. (ECF No. 1227) The Court entered

[51] Collectively, these defendants will be referred to as the "Settled Defendants."

Orders approving the compromises on September 5, 2025. (ECF Nos. 1231, 1232, 1233) In September and October of 2025, the Plaintiffs subsequently filed Motions to Drop the Settled Defendants. (ECF Nos. 1262, 1263, 1309) The Court granted these Motions. (ECF Nos. 1291, 1293, 1312) No motions, appeals, or requests for stays of the Orders Granting the Motions to Drop the Settled Defendants have been filed.

The remaining claims presented to this Court at trial were those against Cynthia Licata, James Licata, and Tucker Licata. Those claims are:

1. Count One asserting a claim against James for breach of fiduciary duty to the Bankruptcy Estates;

2. Count Two asserting a claim against James and Cynthia for intentional fraudulent transfer under CUFTA pursuant to the Ownership Claim;
3. Count Three asserting claims against James and Cynthia for constructive fraudulent transfer under CUFTA pursuant to the Ownership Claim;

4. Count Four asserting claims against James and Cynthia for constructive fraudulent transfer under CUFTA pursuant to the Ownership Claim;

5. Count Five asserting a claim against Cynthia for unjust enrichment;

6. Count Six asserting a claim for fraud on the Court and seeking relief from the Sale Order;

7. Count Seven asserting a claim against Cynthia for aiding and abetting James in perpetuating fraud upon the bankruptcy estates and the Court;

8. Count Eight asserting that James and Cynthia are the equitable owners of Charter, Knox, SFHG, SFD, and M7A (the "Company Defendants") and asserting a claim against Tucker and the Company Defendants for unjust enrichment;

9. Count Nine asserting a claim against James and Cynthia for intentional fraudulent transfer pursuant to CUFTA as well as 11 U.S.C. §§ 544 and 550, and a claim against Tucker as subsequent transferees, pertaining to

the transfer of moneys and properties with the JL Accounts or Santa Fe Accounts as their root source;

10. Count Ten asserting a claim for constructive fraudulent transfer against James and Cynthia, and again against Tucker as subsequent transferee, pertaining to the transfer of moneys and properties with the JL Accounts, or Santa Fe Accounts as their root source; and

11. Count Eleven asserting a claim for constructive fraudulent transfer against James and Cynthia, and again against Tucker as subsequent transferee, pertaining to the transfer of moneys and properties with the JL Accounts or Santa Fe Accounts as their root source.

As only claims against James, Cynthia, and Tucker proceeded to trial, only their identical affirmative defenses remain, including that the claims are barred by the applicable statutes of limitations and that the claims constitute an impermissible collateral attack on final orders of this Court. (ECF Nos. 608, 609)

### 2.14 Testimony and Exhibits

The trial in this Adversary Proceeding commenced on July 21, 2025. It continued on July 22, 23, and 24, as well as August 19 and 20, and finally concluded on August 26, 2025. (ECF No. 1212) During the trial, the parties' arguments and evidence were presented to this Court. The Court admitted into evidence 167 exhibits proposed by the Plaintiffs.[52] The Court admitted into evidence thirty-one

---

[52] The Plaintiffs submitted proposed exhibits (ECF Nos. 984, 986, 1045, 1056, 1057) and provided the Court with Plaintiffs' Final Exhibit List with ECF No. Reference (ECF No. 1113) summarizing the exhibits and their related ECF number. The Court admitted exhibits: P1, P3, P4, P5 (in part), P8, P9, P10, P11, P12, P13, P15, P16, P17, P19, P20, P21, P22, P27, P28, P29, P30, P31, P32, P33, P34, P35, P36, P37, P38, P39, P40, P41, P42, P43, P44, P45, P46, P48, P49, P51, P52, P53, P55, P56, P58, P59, P60, P61, P62, P64, P65, P66, P67, P68, P69, P70, P71, P73, P74, P75, P76, P77, P78, P79, P80, P81, P82, P83, P84, P85, P86, P87, P88, P89, P90, P91, P92, P93, P94, P95, P96, P97, P99, P101, P102, P103, P104, P105, P106, P107, P108, P109, P110, P111, P113, P114, P115, P117, P118, P119, P122, P123, P124, P126, P127, P129, P130, P131, P132, P133, P134, P137, P139, P140, P141, P142, P144, P145, P146, P148, P149, P150, P151, P152, P153, P154, P155, P156, P158, P159, P160, P161, P163, P164, P167, P168, P170, P172, P173, P174, P175, P176, P177, P178, P179, P180, P181, P182, P184, P185, P186, P187, P188, P189, P190, P191, P192, P193, P195, P196, P197, P198, P199, P200,

exhibits proposed by James Licata.[53] Cynthia and Tucker never submitted any exhibits into evidence and exclusively appeared remotely.

In its affirmative case, the Plaintiffs called as a witness:

1) Jessica Licata, who testified credibly about her relationship and involvement with James and Cynthia and explained how the Licatas used the JL Accounts as a conduit for the funds advanced pursuant to the Buyback Agreement and its first seven amendments, and as a means to fund their lifestyle;

2) Attorney Ronald I. Chorches, who testified credibly about his role as Trustee of the bankruptcy estate of James Licata and his experience investigating and pursuing the transactions at issue since the Asset Sale closed in 2006;

3) Attorney Richard M. Coan, who testified credibly about his role as Trustee of the bankruptcy estate of FCCG and his own experience investigating and pursuing the transactions at issue since the Asset Sale closed in 2006;

4) Natasha Yeoh, who testified credibly about her role as an associate of the Licatas, Mr. Licata's directions and threats, and the unknowing actions she undertook on their behalf to facilitate the transactions at issue;

5) Cynthia Licata, who testified indistinctly about the events taking place since the Asset Sale, including her critical role in facilitating the monetization of

P201 (in part), P202, P203, and P204 (ECF No. 1139). *See* ECF No. 1276 summarizing admitted exhibits.

[53] Defendant James Licata submitted three tranches of proposed exhibits. (ECF No. 1105 (containing four exhibits) and ECF No. 1124 (listing fifteen exhibits) and ECF No. 1186 (listing forty-two exhibits)) The Court admitted exhibits: D1, D2, D3, D4, D7, D8, D9, D10, D11, D12, D13 (for notice), D14, D15, D16, D17, D18, D19, D21, D22, D23 D24 (for notice), D25 (for a limited purpose), D26, D28(a), D29, D30, D31, D35, D37, D40, and D41(b). *See* ECF No. 1277 (summarizing admitted exhibits).

the Title Policy and in using and transferring funds to and from the various Licata-related entities and accounts; and

6) James Licata, who angrily testified about his role in monetizing the Title Policy, the history of his transactions and disputes with Mr. Mocco and others, and securing and using the funds obtained through the Buyback Agreement and its amendments.

Tucker and Cynthia did not call any witnesses.

In his defense, James Licata called as a witness:

1) Herbert Blake, who testified with precision about the events in connection with the closing of the Asset Sale, his friendship with James, the travails of the Licatas, and his real estate work as an attorney for the Licatas;

2) Attorney Ronald Chorches, who again testified credibly in his capacity as Trustee of the bankruptcy estate of James Licata regarding the closing of the Asset Sale and his pursuit and investigation into the transactions following the monetization of Cynthia Licata's purported interest in FCHG 4; and

3) Attorney John Carberry, who testified somewhat credibly about his experience serving as the Licatas' attorney in this Adversary Proceeding from March 10, 2016 (ECF No. 199) to March 1, 2024 (ECF No. 706) and his incomplete production of documentation associated therewith.[54]

[54] Attorney Carberry served as Mr. Licata's counsel for that duration. On July 23, 2021, he also appeared as Cynthia Licata's counsel. (ECF No. 225) On November 23, 2021, he also appeared as Tucker Licata's counsel. (ECF No. 336) His March 1, 2024, withdrawal as counsel served as his withdrawal from serving on behalf of Mr. Licata, Mrs. Licata, and Tucker Licata. (ECF No. 670; ECF No. 706)

During the trial, Mr. Licata hand delivered a Motion for Summary Judgment to the Court. The document was later scanned and filed on the docket on August 1, 2025. (ECF No. 1157) The Court construed the Motion as a Motion for Judgment on Partial Findings pursuant to Federal Rule of Civil Procedure 52(c) and denied the Motion. (ECF No. 1176) Mr. Licata also attempted to amend his Answer, as explained prior in Part 2.11 of this Memorandum of Decision.

After trial, the parties submitted Post-Trial Findings of Fact and Conclusions of Law.[55] The Plaintiffs submission summarized the evidence presented at trial in support of their claims and reasserted that "[t]he Ownership was not a valid claim," but instead "was an artifice devised as a means [to] conceal [James] Licata's disputed (by Peter Mocco) claim to an ownership interest[] in FCHG [4], in order to transfer to Cynthia Licata, this valuable property of the estate without just compensation or provision of reasonably equivalent value to the estate, using SWJ as a conduit to do so . . . ." (Plntff. Post-Trial Brief, p. 8–9)

Cynthia asserted in her submission that she "acted in good faith, with honesty, and without deception or improper motive" and with the guidance of legal counsel throughout the bankruptcy and Asset Sale. (CL Post-Trial Brief, p. 3–6)

Similarly, James asserted in his submission that Cynthia owned the claim to an interest in FCHG 4 pursuant to the 1998 deal, that "[t]he lawyers that did the

[55] The Plaintiffs' Post-Trial Brief (ECF No. 1321) will be cited as "Plntff. Post-Trial Brief."

The Defendants' Post-Trial Briefs were submitted as letters. Cynthia Licata's Post-Trial Brief (ECF No. 1341), will be cited as "CL Post-Trial Brief." Tucker Licata's Post-Trial Brief (ECF No. 1344) will be cited as "TL Post-Trial Brief." James Licata's Post-Trial Brief (ECF No. 1338) will be cited as "JL Post-Trial Brief."

sale papers told me and the [C]ourt that [FCHG 4] was what they called a pass through asset," and that "Judge Shiff knew and approved the agreement between [SWJ] and [Cynthia] . . . ." (JL Post-Trial Brief, p. 1) In sum, Mr. Licata wrote to "ask that the [C]ourt rule against the [T]rustees because of all the prior orders of your [C]ourt that approved the 363 sale done by two experienced bankruptcy law firms . . . ." (*Id.*, 3)

Last, Tucker asserted in his submission that "[a]t that time the funds in question were managed, [he] was a minor and had no authority or control over the account[s]" and that he "acted based on what was provided to [him], without knowledge, authority, or intent." (TL Post-Trial Brief, p. 1)

Thereafter, these matters were taken under advisement to allow the Court sufficient time to travel the dusty, old, discordant record of this dispute, surveying the relevant and lengthy chronology of events, decisions, pleadings, and contentions.

### 2.15 The Fundamental Credibility and Evidentiary Deficiencies of the Defense

In their Answers (ECF Nos. 608, 609), arguments at trial, the Amended Answer (ECF No. 1145), their post-trial submissions to this Court (ECF Nos. 1338, 1341, 1344), and in their defensive protests about the maintenance of this Adversary Proceeding, James, Cynthia, and Tucker Licata have asserted various arguments and "defenses," although not all are material or cognizable in this context.

The Licatas' central defensive tenet is essentially delineated as follows:

1. Cynthia, at and before all times relevant to the Asset Sale to SWJ, owned and possessed all legal and equitable right and title to, and dominion over FCHG 4, and rightfully held the Title Policy later assigned to James to be monetized on their behalf;

2. Cynthia initially obtained all such ownership rights by and through James in connection with, and in consideration for, her undertaking indemnity liability for a $24,000,000 bond in the late 90s for the Hope VI Project (which James and Cynthia both attested took place at trial and which Plaintiffs' Counsel could not rebut except through his reference to the absence of documentary evidence supporting that the transaction took place); (7/21/25 Tr. 29:9–12; 7/24/25 Tr. 9:11–18)

3. The pre-petition Separation Agreement, transferring the ownership of FCHG 4 to James Licata, is of no legal force and effect because they did not further prosecute divorce proceedings (Exh. P56; 7/24/25 Tr. 76:3–4); and because James and Cynthia simply did not intend it to still be effective;

4. Their post-petition monetization of proceeds from the Title Policy of FCHG 4 did not implicate property of the estate, and hence their familial and business uses, dissipation, concealment, and transfer of the funds is no business of the Trustees and is not actionable; and

5. This Court (Shiff, J.) previously decided or knew of Cynthia's and James's confused, disputed, or manipulated interests in FCHG 4 so that the Trustees' core premises about fraudulent concealment of property of the bankruptcy estates or fraud upon the Court in connection with the Section 363 Asset Sale are unsupported.

These defenses (inartfully asserted), if proven, fundamentally defeat the Trustees' claims.

A variety of other supposed "defenses" asserted by the Licatas, however, are either not cognizable, remain unproven, implicate matters previously decided by final decisions of Courts of competent jurisdiction, or stray far, far afield of the issues before the Court in this trial. Each of these alleged "defenses," as

characterized by the Court below, are rejected as matters of fact or law. They include, but are not limited to:

1. Mr. Mocco's "underworld" machinations, threats, and subterfuges caused the Licatas' financial and legal misfortunes, and corrupted court decisions wherein Mr. Mocco prevailed, but misled courts and lied in asserting that he was the undeserving beneficiary of James Licata's real estate successes.

2. The Adversary Proceeding has been wrongfully maintained by the Trustees to oppress, harass, and intimidate the Licatas for years with threats, duplicity, interminable litigation, and false or inconclusive claims of fraud.

3. Mr. Mocco's manipulations and the Trustees' maintenance of the Adversary Proceeding and related claims against Cynthia Licata are tantamount to a criminal enterprise calculated to ruin and oppress the Licata family and currently are the subject of scrutiny by the U.S. Justice Department.

As to these three "defenses" this Court finds that the Licatas have failed to advance any cognizable legal authority or offer credible evidence to support their tenability. As to any other "defenses" that the Court might glean or divine from their arguments, they, too, fail as matters of law or proof.

Further, this Court firmly rejects James Licata's contention that, on the basis of the trial record, various parties, including the Trustees, should be referred by this Court[56] to the Justice Department for criminal prosecutions.(7/21/25 Tr. 28:17–23, 64:2–11; 7/22/25 Tr. 166:1–7; 8/20/25 Tr. 117:18–118:4; 8/26/25 Tr. 17:4–12, 95:13–96:5) The claims of this case were born in the Licatas' web of deceit, evasions of

[56] As no threshold for this Court's referral has been met, the Licatas are left to their resources to initiate any bona fide inquiries into their ancient grievances.

accountability, and manipulations of facts, which seemingly were amplified by their course of resisting discovery, personal attacks, the passage of time, and half-truths.

Regarding the credibility of the Defendants, although the Licatas all appeared at trial (with Cynthia and Tucker only sometimes appearing, always remotely), and although James and Cynthia testified, scant definitive evidence was gained from their appearances, testimony, and exhibits. It has been judicial notice of the formal Court record of these proceedings that has been direct, partially exonerating, and irrefutable. Cynthia, Tucker, and James frequently spoke during trial in loud, unruly, and boisterous protest of the Trustees' investigations and alleged false claims and thereby disrupted the orderly progression of the trial to a significant degree.[57] Their conduct only reflected disrespect for the legal process of this Court that reflected poorly on their defensive postures and credibility.

Last, regarding other evidentiary proof, the Licatas frequently claimed, without substantiating those claims, that crucial documents were destroyed or inaccessible, or that other constituents refused to provide them with those documents. (7/24/25 Tr. 13:9–13, 16:10–18) While James Licata belatedly provided the Court with some documents that were admitted into evidence, those exhibits were ultimately largely irrelevant to the issues at hand. While this conduct, too, undermined credibility and seemingly suggested evasion, this Court is confident that the material documents and record relating to and dispositive of this dispute were available to the Plaintiffs and are now before the Court.

[57] The Court's admonitions to Mr. Licata, threats of a contempt citation, and instructions on trial protocols were frequent but often disregarded by Mr. Licata.

### 3. Jurisdiction

The United States District Court for the District of Connecticut has jurisdiction over the instant proceedings under 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court under 28 U.S.C. § 157(a) and (b)(1) and the General Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984. The fraudulent transfer claims brought are core claims under 28 U.S.C. § 157(b)(2)(H), but may be *Stern* claims.[58] The remaining claims are non-core claims, as they set forth claims for relief under common law and statutes of the State of Connecticut and are "related to" claims. The parties have expressly or impliedly consented to this Court's jurisdiction over all the claims brought herein. (ECF No. 1, p. 22; ECF No. 58)

### 4. Conclusions of Law

#### 4.1 The Ownership Claim

All of the Plaintiffs' claims rely on prevailing on what they have deemed the "Ownership Claim" and the Licatas' conduct before bankruptcy and alleged (mis)representations to this Court that underly it. (ECF No. 594, p. 10) The Ownership Claim refers to Mrs. Licata's pre-petition claim to an ownership interest in FCHG 4, purportedly granted to her through an unrefuted 1998 transaction.[59]

---

[58] *See Stern v. Marshall*, 564 U.S. 462 (2011).

[59] Both James and Cynthia attested at trial and in their Post-Trial Briefs that the 1998 deal took place and was effective. (7/24/25 Tr. 4:4–30:7; JL Post-Trial Brief, p. 1; CL Post-Trial Brief, p. 3) In response, Plaintiffs' Counsel only refuted this contention by pointing to the Licatas' failure to produce documents reflecting that the transaction actually took place. (7/24/25 Tr. 4:4–7:6)

During trial, Plaintiffs' Counsel sought to obtain an adverse inference pursuant to Fed. R. Civ. P. 37 regarding the lack of documents produced. Specifically, Plaintiffs' Counsel stated that no

(*Id.*) The Plaintiffs assert that Mr. Licata devised, or participated in devising, the Ownership Claim, which was fully contrived, and made subsequent material and false statements to this Court to support it. (*Id.*) In doing so, Mr. Licata was allegedly able to hide his true ownership of FCHG 4 and ultimately transfer his claim to ownership of FCHG 4 to Cynthia using SWJ as a conduit. (*Id.*) While the Moccos were later adjudged to be the true owners of FCHG 4, the Plaintiffs assert that James Licata's disputed claim to the ownership of FCHG 4 was, at the time of the Asset Sale, and in the years that followed, an incredibly valuable asset. (*Id.*) The Plaintiffs essentially conclude that, as the Ownership Claim was really always James's pre-petition property, it should have been an undisputed asset of his bankruptcy estate that was maximized and monetized for the benefit of creditors. (*Id.*)

A thorough review of the record in this case, however, reveals the evidentiary deficiencies of the Plaintiffs' bald assertions, which causes the central contention underlying all of the Plaintiffs' claims to fail.

---

"documents have been produced establishing a pre-petition ownership of Cynthia Licata . . . to FCHG 4 . . . ." (*Id.*, 6:23–25) Accordingly, "due to that lack of production," Plaintiffs' Counsel asked the Court to conclude that "no such documents exist, and" to preclude Cynthia "from seeking to testify orally as to . . . any transfer of membership interest in [FCHG 4] to her, pre-petition." (*Id.*, 6:25–7:6)

The Court took the matter under advisement. (*Id.*, 22:24–25, 25:16–18)

After much deliberation, the Court notes that Cynthia and James Licata *and* the Plaintiffs are ostensibly responsible for the lack of relevant documentation demonstrating whether or not this deal took place in 1998. It is hardly astounding that documents over two decades old might not be available. Furthermore, the Court finds that the Plaintiffs have failed to demonstrate that permitting evidence of this 1998 deal will result in actual prejudice or change the result herein. Accordingly, the Court declines the Plaintiffs' request for an adverse inference as a result of the lack of documents produced to demonstrate that the 1998 deal took place.

Contrary to the Plaintiffs' allegations, the factual record – which this Court has surveyed in detail in this Memorandum of Decision – is replete with definitive evidence that the Court knew (or should have known)[60] – and was repeatedly reminded – that Cynthia may not have owned FCHG 4 in its entirety and that various competing claims had also been asserted by both James and the Moccos. In effect, no one in the sale process was fooled – and no one wanted to further litigate over the issues posed (regardless of their potentially fraudulent characterizations) because an inconclusive disposition of those interests equally served the Bankruptcy Estates. The Court had full awareness of the Separation Agreement (which purportedly gave James 100% ownership of FCHG 4), the APA (in which James listed FCHG 4 as his asset and Cynthia noted her competing claim), the FAAPA (which largely mirrored the APA, but which also listed FCHG 4 on its Cure Schedule and through which the parties agreed to grant Cynthia 100% ownership as between James, SWJ, and Cynthia), and the TSRA (which effectuated the parties' intent to grant Cynthia full ownership of the claim to an interest in FCHG 4 as between them in exchange for her waiver and release of other claims and interests).

The Court conducted lengthy hearings on the many motions and material deal documents in these Bankruptcy Cases, including the APA and the FAAPA. The motions were litigated over a series of four years and each party – including the Licatas – was represented by competent bankruptcy counsel who conducted

[60] As did counsel for the Debtors, the Committee of Unsecured Creditors, and other proactive constituents to the Asset Sale process, of which there were many.

extensive discovery and addressed the ownership issues posed to the Court, as has been detailed at length in Part 2 of this Memorandum of Decision. Ultimately, the Court permitted an "as is, where is" sale, pursuant to the FAAPA, specifically with the intent to permit the Asset Sale to go forward *without* resolving the thorny issues of ownership that hung over the complicated, entangled finances of the Licatas and the many related entities they created, including FCHG 4.

The claim that the Licatas (and, by inference, their legal counsel) falsely represented to this Court that Mrs. Licata solely owned FCHG 4 in its entirety is undercut by abundant evidence, as surveyed above. Furthermore, the claim that this Court *relied* on any representation that Mrs. Licata solely owned FCHG 4 is undercut by abundant evidence in the record, including the FAAPA and the TSRA, which together effectuated the Asset Sale. The parties, their lawyers, and the Court sufficiently vetted, disclosed, and weighed the factual, legal, and practical realities relating to clouded interests in FCHG 4 in the Asset Sale. The trial before this Court failed to reveal, by either a preponderance of the evidence, or by clear and convincing evidence, a fraudulent scheme by the Licatas. For this reason alone, all of the Plaintiffs' claims fail as a matter of proof.

The Trustees have not proven that the Licatas acted "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor . . . ." Conn. Gen. Stat. § 52-552e(a). The Trustees' speculations and attacks on the Licatas' character, history, and confounding business methods will not suffice here. "If the actor *knows that the consequences are certain, or substantially certain*, to result from his act, and still

goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness . . . . As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence . . . ." *In re Fairfield Sentry Ltd.*, 147 F.4th 136, 162 (2d Cir. 2025) (citing Restatement (Second) of Torts §8A cmt. b (1965)) (emphasis in original). "It is true, as Judge Hand explained over a hundred years ago, that 'in general, civil responsibility is imputed to a man for the usual results of his conduct, regardless of whether in the instance under consideration he actually had those consequences in mind.' *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912) (L. Hand, J.). But 'in specific cases like this,' in order to establish an 'intent to hinder, delay, or defraud' creditors, 'the law requires proof of that added element, his mental apprehension of those consequences, before it attaches to his conduct the result in question.' *Id.* at 950–51." *Id.* The Plaintiffs have not proven that the Licatas apprehended any such consequences.

Although this Court concludes that all of the Plaintiffs' claims fail on the merits as a matter of fact, the Court will nevertheless address each of the Plaintiffs' legal claims in the Fourth Amended Complaint.

### 4.2 Fraudulent Transfer of the Ownership Claim under CUFTA

In Counts Two, Three, and Four, the Trustees allege claims of both intentional and constructive fraudulent transfer under CUFTA against James and

Cynthia Licata.[61] The CUFTA claims are made applicable in bankruptcy proceedings under Bankruptcy Code §§ 544(b)(1) and 502.

Section 52-552e(a) provides the elements of fraudulent transfer claims under CUFTA. Specifically, it provides that:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor
>
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or
>
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Conn. Gen. Stat. § 52-552e(a).

Under Connecticut law, a plaintiff must prove the elements of Conn. Gen. Stat. § 52-552e(a) by clear and convincing evidence. *In re Carrozzella & Richardson*, 302 B.R. 415, 419–20 (Bankr. D. Conn. 2003) (citing *Dietter v. Dietter*, 54 Conn. App. 481, 737 A.2d 926 (1999), *cert. denied*, 252 Conn. 906, 743 A.2d 617 (1999)).

The Court concludes that Counts Two, Three, and Four fail because the Trustees have not proven by clear and convincing evidence that the Bankruptcy

[61] The Connecticut Uniform Fraudulent Transfer Act is found at Conn. Gen. Stat. § 52-552, *et seq*.

Estates did not receive reasonably equivalent value in the Asset Sale in exchange for the transfer of James's contested claim to an ownership interest in FCHG 4. *Id.*; *In re LXEng LLC*, 607 B.R. 67, 88 (Bankr. D. Conn. 2019). A competitive sale bidding process yielded significant financial consideration, releases, covenants, and mutual promises in order to effectuate a disposition of estate assets.

The Trustees contend that, pursuant to the workings of the FAAPA and TSRA, through the Licatas' misrepresentations to this Court, it was on the day that the Asset Sale closed that Cynthia ultimately received the Ownership Claim from James, using SWJ as a conduit. (ECF No. 594, p. 10) As discussed earlier, Cynthia *did* indeed receive whatever portion of ownership in FCHG 4 that James possessed from SWJ through the workings of the FAAPA and the TSRA upon the closing of the Asset Sale. *See* Part 2.4 of this Memorandum of Decision. The Court does not conclude from the proof at trial, however, that Mr. Licata's bankruptcy estate did not receive the value of his alleged ownership interest to the detriment of creditors. The Asset Sale explicitly sold whatever James's ownership interest he had in FCHG 4 and thus that ownership interest was accounted for in the unallocated sale price and other consideration that SWJ was to pay and that Mrs. Licata exchanged. Debtors' counsel received $5,400,000 in cash and a promissory note in the amount of $5,850,000 in exchange for the Acquired Assets. (Exh. P28; Exh. P29; Exh. P30; 7/22 Tr. 118; 7/23/25 Tr. 17–18) Through the "as is, where is" sale, the Acquired Assets were "sold together and not individually," and any value attributable to James's

ownership interest in FCHG 4 was embedded in the sale price, to accommodate the manifest uncertainties that this sale entailed. (MC – ECF No. 671, p. 3)

Furthermore, with full disclosure, vetting, and awareness of the messy circumstances surrounding the Asset Sale, this Court entered a detailed Sale Order approving the sale. (MC – ECF No. 716) There, the Court explicitly adjudged that:

> The aggregate consideration provided by [SWJ] for the Acquired Assets pursuant to the [FAAPA[62]] and the assignment of Assumed Contracts thereunder (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets and Assumed Contracts, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical, available alternative, and (iv) constitutes *reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state,* territory, possession, or the District of Columbia. The terms and conditions of the Asset Purchase Agreement are also fair and reasonable.

(*Id.*, 10) (emphasis added)

The Court further concluded that:

> The [FAAPA] was negotiated, proposed, and entered into by the Debtors and [SWJ] *without collusion, in good faith, and from arm's-length bargaining positions*. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the [APA] or any part of the Transactions to be avoided under section 363(n) of the Bankruptcy Code. *Accordingly, the transactions contemplated by the [APA] cannot be avoided.*

(*Id.*, 26) (emphasis added)

---

[62] The text of the Sale Order refers to the Asset Purchase Agreement. However, within the Sale Order, the term "Asset Purchase Agreement" is defined to refer to the FAAPA. The Court therein wrote, "This matter having come before the Court on the Motion . . . for entry of an order authorizing and approving, among other things . . . (ii) the sale . . . of such Acquired Assets free and clear of liens, claims, and encumbrances to [SWJ], pursuant to that certain First Amended Asset Purchase Agreement, dated as of May 18, 2005 (including all exhibits, supplements and attachments thereto, the 'Asset Purchase Agreement') . . . ." (MC – ECF No. 716, p. 1–2) Accordingly, for clarity, the Court has altered those references to cite the FAAPA, since that is what the Court intended.

This Court has been provided with no compelling, credible, substantive evidence to rebut, void, or set aside these definitive findings. Accordingly, these findings warrant this Court's restraint from second-guessing, particularly where the Trustees have not sufficiently illustrated any misrepresentations or omissions by the Licatas that impacted the Court's decision. The Second Circuit has "long recognized the value of finality in judicial sales." *In re Gucci*, 126 F.3d 380, 387 (2d Cir. 1997); *In re General Insecticide Co.*, 403 F.2d 629, 631 (2d Cir. 1968)); *In re Boy Scouts of Am.*, 137 F.4th 126, 142 (3d Cir. 2025), *cert. denied sub nom. Lujan Claimants v. Boy Scouts of Am.*, 223 L. Ed. 2d 511 (Jan. 12, 2026) (discussing the constraints imposed by 11 U.S.C. § 363(m) in challenging sales and observing that "[i]n restricting appeals [of such sales], Congress chose to promote the policy of . . . finality" which "serves an important role in the bankruptcy process," because, "without assurance that a § 363(b) sale is final, potential purchasers of estate assets would be chilled from dealing with the debtor, causing assets to languish idly while the bankruptcy progresses, all the while hemorrhaging value and undermining the very purpose § 363(b) aims to serve.") (internal citations omitted).

Accordingly, Count Two must fail because, as found by Judge Shiff, the Trustees received reasonably equivalent value in exchange for the transfer of Mr. Licata's disputed claim to an ownership interest in FCHG 4 and other assets. Further, the trial record advances no convincing proof that the Licatas acted with actual intent to hinder, delay, or defraud any creditor, nor that there are compelling reasons (under Fed. R. Civ. P. 60 or otherwise) to disturb the deliberations and

judgments of the Court related to the Asset Sale on its findings of adequate consideration, good faith, insider status, or avoidability, two decades later.[63]

#### 4.2.1 Constructive Fraudulent Transfer (Counts Three and Four)

The Trustees further allege, concurrently or alternatively to Conn. Gen. Stat. § 52-552e(a)(2), that the transfers were constructively fraudulent under Conn. Gen. Stat. § 52-552f(a), which provides the following elements of constructive fraudulent transfer:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

The elements of Conn. Gen. Stat. § 52-552f must be proven by clear and convincing evidence. *In re Carrozzella & Richardson*, *supra*, 302 B.R. at 419–20.

As discussed in detail above, while Mr. Licata was insolvent at the time of the transfer of the Ownership Claim, the Bankruptcy Estates received reasonably equivalent value in exchange for the transfer of the ownership Claim. Accordingly, the Court concludes that the Plaintiffs have not proven, by clear and convincing evidence, that Mr. Licata's transfer of the Ownership Claim to Cynthia through the TSRA using SWJ as a conduit through the closing of the Asset Sale was a

---

[63] The Court concludes that the attendant statutes of limitations would constitute alternative grounds to deny the Plaintiffs' the relief sought, and further concludes that the claims brought indeed constitute an impermissible collateral attack on prior orders of this Court. *See* Memorandum of Decision and Order Denying Defendants' Motion for Summary Judgment (ECF No. 478, p. 47–48). While denial of summary judgment afforded the Trustees more time to develop supporting facts, insufficient evidence supporting a tolling of those times was advanced at trial.

constructively fraudulent transfer under CUFTA. As such, the Plaintiffs cannot prevail on Counts Three and Four.

#### 4.2.2 Fraudulent Transfer Pertaining to the JL Accounts and the Santa Fe Accounts (Counts Nine, Ten, and Eleven)

In Counts Nine, Ten, and Eleven, the Trustees renew their claims of intentional fraudulent transfers and a constructive fraudulent transfer rooted in the Asset Sale. However, the Trustees distinguish these claims by focusing not solely on the initial transfer of the Ownership Claim from James to Cynthia, but instead concentrate on the subsequent use of the Ownership Claim to fund the JL Accounts and the Santa Fe Accounts, and the property purchased therefrom. As stated, the Trustees must prove the elements of these fraudulent transfer claims by clear and convincing evidence. *Id.*; *In re LXEng LLC*, *supra*, 607 B.R. 67 at 88.

The Court agrees with the Plaintiffs, as a matter of fact, that the transfer of FCHG 4 to Cynthia Licata years later ultimately led to the funding of the JL Accounts and the Santa Fe Accounts in their entirety, as well as the often surreptitious disbursement of moneys from those Accounts to purchase properties, fund the Licatas' lifestyle and business dealings, and so on. This Court disagrees with the Plaintiffs, however, that the subsequent transfers made from the JL Accounts and the Santa Fe Accounts were fraudulent transfers because, as discussed at length herein, the Trustees' claims on the root of these transactions have failed. That the Licatas successfully and stealthily monetized the claim to an ownership interest in FCHG 4 in a title claim may have been a result of fraud perpetrated on other creditors of the Licatas, or on Kelley, Mocco, or even Chicago

Title,[64] but that monetization did not result from a fraudulent Ownership Claim as the Plaintiffs allege in the Fourth Amended Complaint. Accordingly, the Plaintiffs cannot prevail on Counts Nine, Ten, and Eleven, on account of an inability to present supporting clear and convincing evidence consistent with the allegations in their Complaint.

**4.3 Breach of Fiduciary Duty as to James Licata (Count One)**

In Count One, the Plaintiffs allege that James "Licata, as a debtor-in-possession of his bankruptcy estate, owed a duty to the creditors of his estate in accounting for, disclosing, and dealing with, the assets of the estate," and that Mr. Licata breached that duty by devising, or participating in the devising of, the artifice of the Ownership Claim and in structuring the FAAPA and the TSRA transactions so as to permit the transfer of the Ownership Claim to Cynthia using SWJ as a conduit.

Mr. Licata denies these allegations, but does not refute the existence of such a duty.

Under 11 U.S.C. § 1107, a debtor-in-possession has the powers of a bankruptcy trustee "and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a). *See also Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *Wolf v. Weinstein,* 372 U.S. 633, 649, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963); *In re Centennial Textiles, Inc.*, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998).

---

[64] Or perhaps even on other post-petition creditors from which they wanted to shield their moneys and assets.

"While the Bankruptcy Code permits a debtor to operate its business and exercise control over its estate, the debtor-in-possession acts as a fiduciary of the estate and its creditors. *In re Futterman*, 584 B.R. 609, 618–19 (Bankr. S.D.N.Y. 2018) ('The point of bankruptcy is to marshal assets in a way that maximizes their value for the benefit, primarily, of creditors, and then once creditors are paid, for owners. When a debtor remains in possession of his businesses and properties in a chapter 11 case, he does so as a fiduciary for those creditors.'). Among other responsibilities, a Debtor-in-possession has a fiduciary duty to: a) protect and conserve estate property for the benefit of creditors (including a duty to avoid self-dealing and to investigate and prosecute warranted avoidance actions); b) avoid damaging the estate; and c) refrain from acting in a manner that could hinder a successful reorganization. *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (Lifland, C.J.)." *In re Sillerman*, 605 B.R. 631, 648 (Bankr. S.D.N.Y. 2019). "Failure to protect and conserve estate property constitutes a breach of fiduciary duty." *Id.*

The Trustees must prove breach of fiduciary duty by a preponderance of the evidence. *See Culhane v. Culhane*, 969 F.Supp.2d 210, 224-25 (D. Conn. 2013); *Eastburn v. Imagineers, LLC*, No. CV-13-6039189-S, 2016 WL 3179488, at *5 (Conn. Super. Ct. May 13, 2016); *Stone v. Pattis*, No. CV-09-5011515-S, 2013 WL 2383595, at *6 (Conn. Super. Ct. May 9, 2013); *Stedman v. Stedman*, No. CV-10-6008073-S, 2012 WL 6122487, at *3 (Conn. Super. Ct. Nov. 14, 2012); *In re Neri Bros. Constr. Corp.*, 593 B.R. 100, 158 (Bankr. D. Conn. 2018).

As a debtor-in-possession, James Licata and Debtors' legal counsel indeed took on fiduciary duties. Regarding his duty to protect and conserve estate property for the benefit of creditors, and thereby to avoid self-dealing, the Court concludes that, based on the factual record examined by this Court, Mr. Licata and Debtors' counsel did not fail in this duty. They protected and conserved estate property for the benefit of his creditors, fully disclosed his assets – including those claims which were disputed – to all, and structured and noticed an arms-length bankruptcy sale. The Court cannot conclude that Mr. Licata engaged in deceptive post-petition self-dealing or that he otherwise failed in his duty to protect and conserve estate property. The fact that an "As Is" sale process subsequently unleashed value hardly distinguishes it from other bankruptcy asset sales.

As to Mr. Licata's duty to avoid damaging the estate, the Court concludes that Mr. Licata through his legal counsel discharged this duty. Mr. Licata, represented by respected, national bankruptcy counsel, made full disclosures to this Court, other prospective buyers, and creditors regarding his claim to the ownership of FCHG 4. In exchange for parting with his claim – which, according to the Separation Agreement, was arguably as much as a 100% claim – the bankruptcy estates received consideration not only from SWJ, but also from Cynthia Licata through her agreement to support the Asset Sale and part with assets of her own. The Trustees failed to controvert this proposition. Accordingly, the Plaintiffs have failed in their proof to show by a preponderance of the evidence that Mr. Licata damaged the estate as alleged in the Fourth Amended Complaint.

Finally, regarding his duty to refrain from acting in a manner that could hinder a successful reorganization, the Court again concludes, based on the facts at trial, that Mr. Licata did not act so as to hinder a successful reorganization by hiding, and secreting material assets which might have funded a plan of reorganization or liquidation. The record disclosures by the Debtors and legal counsel sufficiently addressed the disparate ownership claims. Whether those facts were based on confusion, manipulations, misunderstandings, or pre-petition fraud was insufficiently proven at trial. The Asset Sale was approved and consummated despite manifest uncertainties and reasonably equivalent value was exchanged, as found by this Court.

In sum, this Plaintiffs have failed to meet their burden to prove by a preponderance of the evidence that Mr. Licata violated any of his duties as a debtor-in-possession. Count One must therefore fail.

### 4.4 Fraud on the Court as to James Licata and Aiding and Abetting as to Cynthia Licata (Count Seven)

In Count Six, the Plaintiffs allege that James Licata perpetrated a "Fraud on The Court." (ECF No. 1, p. 16) The Plaintiffs base this allegation on Mr. Licata's conduct in shielding his right to the Ownership Claim from this Court through the statements made that affirmed that Cynthia Licata instead held the Ownership Claim in its entirety – particularly those in the FAAPA and TSRA.

In Count Seven, the Plaintiffs allege that Cynthia Licata "aided and abetted [James] Licata in perpetrating the fraud and wrong upon the estates and the Court" and that she "was aware of the wrongfulness of her conduct . . . ." (ECF No. 1, p. 16)

In response, the Defendants allege that they did not perpetrate fraud on this Court because Cynthia lawfully received the Ownership Claim from James in 1998 and, alternatively, because Judge Shiff, after ample discovery and plenary hearings, approved the Asset Sale . . . with full disclosure, in a non-collusive process, and found an exchange of reasonably equivalent value. Thus, those statements made in the FAAPA and TSRA were accurate reflections of rights and claims in bona fide dispute, rather than fraudulent.

"The power to vacate a judgment that has been obtained by [F]raud upon [T]he [C]ourt is inherent in courts." Wright and Miller, 11 Fed. Prac. & Proc. Civ. § 2870 (3d ed.). Fraud on the court must be proven by clear and convincing evidence. *Id.* In 1960, the Second Circuit adopted the following definition of Fraud on The Court:

> '[F]raud on the court' is limited to "that species of fraud which does or attempts to defile the court itself . . . so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Martina Theatre Corporation v. Schine Chain Theatres, Inc.*, 278 F.2d 798, 801 (2d Cir. 1960) (Friendly, *J.*) (quoting 7 Moore, Federal Practice ¶ 60.33, at 512). In several later cases, we have applied this formulation without modification. *See, e.g., Kupferman v. Consol. Rsch. & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972) (Friendly, *J.*); *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699, 702 (2d Cir. 1972) (per curiam); *Senate Realty Corp. v. Comm'r*, 511 F.2d 929, 931 (2d Cir. 1975); *King v. First Am. Investigations, Inc.*, 287 F.3d 91, 95 (2d Cir. 2002).) (per curiam).

*Mazzei v. The Money Store*, 62 F.4th 88, 93 (2d Cir. 2023).

"[T]o sustain an independent action for [F]raud on [T]he [C]ourt, a plaintiff must prove, by clear and convincing evidence, that the defendant interfered with the judicial system's ability to adjudicate impartially and that the acts of the

defendant must have been of such a nature as to have prevented the plaintiff from fully and fairly presenting a case or defense." *Id.*, 93–94. The plaintiff must "plausibly allege 'fraud which does or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases.'" *Moskovits v. Bank of Am., N.A.*, 2022 WL 1150626 at *2 (2d Cir. 2022) (citing *Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457, 460 (2d Cir. 1994)).

Regarding false statements presented to a Court specifically, the Seventh Circuit noted that "alleged fraud must go beyond mere discrepancies in the record evidence available at the time judgment was entered. The fraud must have been the kind of fraud that ordinarily could not be discovered, despite diligent inquiry, within one year or even many years. . . . We explained in Oxxford Clothes: 'A lie uttered in court is not a fraud on the liar's opponent if the opponent knows it's a lie yet fails to point this out to the court. If the court through irremediable obtuseness refuses to disregard the lie, the party has . . . a remedy by way of appeal." *Kennedy v. Schneider Elec.*, 893 F.3d 414, 420 (7th Cir. 2018).

This Court concludes that the Plaintiffs have not demonstrated that the Licatas perpetrated a Fraud on this Court (by either a preponderance of the evidence or clear and convincing evidence). As noted, the alleged fraud must "go beyond mere discrepancies in the record evidence available at the time judgment was entered." *Id.* As reviewed at length in this Memorandum of Decision, the competing ownership interests and claims to FCHG 4 were fully vetted and

weighed. Mr. Licata, through counsel, provided fulsome but troubling and insufficient disclosures. While those disclosures may have contained discrepancies or were fueled by confusion, this Court concludes this is due to the tangled and duplicitous nature of the underlying financial transactions between Mr. Licata, Mrs. Licata, and the Moccos, rather than any proven intentional misrepresentations or obfuscations of Mr. Licata, or Debtors' counsel to this Court. Accordingly, the Court concludes that the Plaintiffs certainly have not proven that Mr. Licata perpetrated a Fraud on this Court, nor that Mrs. Licata aided and abetted him in doing so, by clear and convincing evidence. Thus, Counts Six and Seven fail.

**4.5 Unjust Enrichment as to Tucker Licata and Cynthia Licata (Counts Five and Eight)**

In Count Five, the Plaintiffs allege that "it offends equity and good conscience for Cynthia Licata to enjoy and retain ownership of the" products and proceeds of the transfer of the Ownership Claim, "including, but not limited to, the Second Mortgage," the cash proceeds resulting from the transfer, the Title Policy and the related title claim pertaining to the policy, the funds derived from the Buyback Agreement and its Seven Amendments, and things acquired with the funds therefrom. (ECF No. 1, p. 15)

Similarly, in Count Eight, the Plaintiffs allege that "it offends equity and good conscience for . . . Tucker Licata to enjoy and retain ownership of any and all assets held in [his] name, and/or the products and proceeds thereof." (*Id.*, 23)

In both Counts, the Plaintiffs baldly assert that Cynthia and Tucker enjoy and retain ownership of assets and that a constructive trust should be imposed

upon these individuals, and that "a money judgment should enter against them for the value of the property so received by them, as otherwise they would be unjustly enriched by their actions and conduct." (*Id.*, 24)

The Defendants deny the allegations.

In Connecticut, "[a] right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another . . . Plaintiffs seeking recovery for [claims based upon] unjust enrichment must prove (1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 451–52, 970 A.2d 592 (2009). The Trustees "must demonstrate the elements [of unjust enrichment] by a preponderance of the evidence." *In re Neri Bros. Constr. Corp.*, *supra*, 593 B.R at 153–54 (citing *The Cadle Co. v. Jones*, Docket No. 3:00-CV-316-WWE, 2004 WL 2049321 (D. Conn. Aug. 20, 2004)).

Again, this Court concludes that as the root Ownership Claim was not hidden from this Court and that reasonably equivalent value was paid for James Licata's disclosed interest in FCHG 4. SWJ and Cynthia Licata indeed "paid" the Bankruptcy Estates for the benefits received through the Asset Sale, family members were not thereby unjustly enriched. The Plaintiffs have not met their burden to demonstrate, by a preponderance of the evidence, that moneys

downstreamed after the Asset Sale caused Cynthia or Tucker to be unjustly enriched as alleged in their Complaint.

Accordingly, the Plaintiffs cannot prevail on Counts Five and Eight.

**5. Conclusions**

For the foregoing reasons,[65] the Court enters Judgment against the Plaintiffs and in favor of the Defendants on all remaining Counts of the Fourth Amended Complaint.[66]

---

[65] While Defendants' summary judgment motion raising the attendant statutes of limitations as a defense was denied in favor of a trial on the issue of equitable tolling, nothing in Plaintiffs' proof would support the tolling of such a bar to recovery. Instead, this Court has concluded that the attendant statutes of limitations provide alternate grounds to defeat the Plaintiffs' Fourth Amended Complaint. *See* Memorandum of Decision and Order Denying Defendants' Motion for Summary Judgment (ECF No. 478, p. 47).

[66] The 17 years and rough course of this Adversary Proceeding have been profoundly disturbing. This litigation has proceeded slowly, haltingly, and oftentimes without due regard to its strategic goals, its efficacy, and its prospects for meaningful recoveries or resolution. Through the years of the Trustees' collateral litigation in Chapter 7 with the Licatas, disputes between the Licatas and the Moccos, and the absence of critical defense counsel for the Licatas in this complex case presaged the near-endless path of this case; it also signaled its growing lack of consequence to the creditors of the bankruptcy estates. The claims of these creditors are near-well forgotten, the "misdeeds" of James Licata are faded memories, and after more than a decade, the resources of the Licatas to respond to the Trustees' multimillion dollar claims herein are understandably doubtful. For the Licatas, their age misfortunes, the closure of business endeavors, looming divorce and family alienation, ostensible never-ending feuds with the Moccos, and, for James Licata, life unanchored in a home, business, or family, have provided this Court with convincing indicia that, even if the complex burden of proof in this case could be overcome by the Trustees at trial, feigned or real insolvency, tedious appeals, or other impediments to collection are its horizon.

During the course of this case and trial, James Licata proved to be rude, obstreperous, non-responsive, evasive, contradictory, and sometimes hardly credible—not a great tact for a defendant being pursued for fraud. The attributes of James Licata's history with this Court and his behaviors at trial might lead a reasonable person to infer that the subject transactions were equally tainted and actionable. His rantings in response to the Trustees' allegations, discovery, and disputed facts hardly evidence a lack of some culpability for his machinations. The material facts here were colorable to support this lawsuit, and the Court underscored the need for a plenary trial on disputed and other material facts in defeating the Licatas' previous efforts to obtain summary judgment. These facts (and more revealed at trial) were subject to disparate but bona fide interpretations, particularly as they affected the Trustees' ultimate burdens of proof at trial.

The saga of these Chapter 7 cases and this Adversary Proceeding should hopefully conclude with this decision, and the Trustees and their counsel are well advised, in light of all facts and circumstances here, to advance the closing of the underlying Chapter 7 proceedings as soon as is practical. In this context, the Trustees have each long and painfully performed their fiduciary

Motions for further default judgment as described in Part 2.12 of this Memorandum of Decision may be filed herein within twenty-one (21) days hereof or such defaults will be vacated for failure to prosecute.[67]

A separate judgment consistent with this Memorandum of Decision will enter upon the docket after any motions for default judgment are addressed.

IT IS SO ORDERED at Hartford, Connecticut this 28th day of August 2026.

James J. Tancredi
United States Bankruptcy Judge
District of Connecticut

responsibilities of inquiry, investigation, and prosecution of colorable claims and, thereby, have satisfied their duties under the Bankruptcy Code to creditors and to this Court.

[67] In light of the failure of the Plaintiffs' claims, as summarized herein, these motions may not be granted in the interests of justice.